Timothy J. Preso, MT Bar No. 5255
Earthjustice
1716 West Babcock Street
P.O. Box 4743
Bozeman, MT  59772-4743
Phone: (406) 586-9699
Fax: (406) 586-9695
tpreso@earthjustice.org

Michael S. Freeman (*pro hac vice pending*)
Ameya Gehi (*pro hac vice pending*)
Earthjustice
1125 17th Street, Suite 1010
Denver, CO  80202
Phone: (303) 623-9466
Fax: (303) 623-8083
mfreeman@earthjustice.org
agehi@earthjustice.org

*Counsel for Plaintiffs Montana Wildlife Federation, The Wilderness Society, and Defenders of Wildlife*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| MONTANA WILDLIFE FEDERATION; THE WILDERNESS SOCIETY; and DEFENDERS OF WILDLIFE <br><br> Plaintiffs, <br><br> v. <br><br> DOUGLAS BURGUM, in his official capacity as Secretary of the Interior; SONYA GERMANN, in her capacity as Montana Bureau of Land Management State Director; UNITED STATES BUREAU OF LAND MANAGEMENT; and UNITED STATES DEPARTMENT OF THE INTERIOR, <br><br> Defendants. | Case No. CV-26-133-GF-JTJ <br><br> **COMPLAINT** |

**INTRODUCTION**

1.      This case challenges the latest effort by the U.S. Bureau of Land Management (BLM) to walk away from the commitments it made in 2015 to protect the greater sage-grouse and avoid its listing under the Endangered Species Act (ESA).  BLM adopted land management plans in 2015 to establish range-wide protections for the sage-grouse on public lands across ten western states, where BLM administers much of the species' remaining habitat.  The agency's purpose for these plans was to prevent the sage-grouse, whose populations were in steep decline, from becoming so imperiled that it qualified for listing as an endangered or threatened species under the ESA. A "key component" of the plans' conservation strategy was a requirement for BLM to avoid harms to sage-grouse habitat from oil and gas development—a major threat to the species—by prioritizing oil and gas leasing outside of such habitat in order to "limit future surface disturbance" there and "guide development to lower conflict areas."[1]

2.      The 2015 Plans were successful in avoiding an ESA listing: shortly after their adoption, the U.S. Fish & Wildlife Service (FWS) determined that listing the sage-grouse as an endangered or threatened species was not warranted.

---

[1] BLM, RECORD OF DECISION AND APPROVED RESOURCE MANAGEMENT PLAN AMENDMENTS OF THE ROCKY MOUNTAIN REGION 1-25 (2015), https://eplanning.blm.gov/public_projects/%2Flup%2F103347%2F143765%2F177177%2F2015_Rocky_Mountain_Region_Record_GRSG_ROD_ARMPA_508.pdf (Rocky Mountain ROD).

In so doing, FWS specifically relied on the prioritization requirement and other avoidance measures in the plans to determine that sage-grouse habitat was adequately protected under BLM management.

3. However, following the change of presidential administration in 2017, BLM immediately attempted to circumvent the 2015 Plans, "reinterpreting" the leasing prioritization requirement as a meaningless procedural stepping-stone in the oil and gas leasing process and offering millions of acres of leases in sage-grouse habitat. This Court and the Ninth Circuit invalidated those efforts as violating the Federal Land Policy and Management Act (FLPMA), *see Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1 (9th Cir. 2025), and litigation over the validity of the last of those lease sales continues in this Court in Case No. 4:18-cv-69-BMM.

4. Its attempt to "reinterpret" the 2015 Plans thwarted, the BLM has now attempted a different gambit: issuing new plan amendments to simply eliminate the leasing prioritization requirement and other avoidance measures from the agency's management framework. In December 2025, BLM issued amendments that eliminate or weaken numerous provisions of the 2015 Plans. Among other changes, BLM removed the prioritization requirement, abandoned a provision of the prior plans calling for a mineral withdrawal that would have prevented mining

2

on 10 million acres of the most important sage-grouse habitat, and weakened numerous minimization and mitigation measures.

5.     But while BLM's management prescriptions have changed, the plight of the sage-grouse has not.  The species remains in decline, with populations diminishing by 13% across eastern Wyoming and Montana, and 24% in western Wyoming, since 2013.  Nor has the scientific evidence changed regarding sage-grouse conservation needs.  To cite one central example, published scientific research consistently reports that oil and gas infrastructure negatively impacts sage-grouse use of breeding grounds (known as leks) to approximately four miles or more from such sites, prompting scientists to recommend a three-to-five-mile development buffer around lek sites, among other measures, to conserve sage-grouse.

6.     The 2025 Plans are wildly out-of-step with these findings, as they contain numerous provisions that open the door for BLM to authorize oil-and-gas development in much closer proximity to sage-grouse leks. Yet BLM offered no explanation how such a permissive approach could be reconciled with the relevant science—much less how it could secure a viable future for the sage-grouse.

7.      In sum, in promulgating the 2025 Plans BLM failed to consider the best available science, failed to consider whether the weakened plans would be

3

adequate to conserve the sage-grouse and halt its population declines, and acted contrary to evidence before it.

8.     For all of these reasons and others detailed below, BLM failed to comply with its substantive land-management mandates under FLPMA, its basic obligations to analyze and disclose the environmental impacts of its actions under the National Environmental Policy Act (NEPA), and its duty to engage in reasoned decision-making under the Administrative Procedure Act (APA).

9.     While all of the BLM's 2025 Plans suffer the same defects, Plaintiffs focus this challenge on the agency's plans for Montana and Wyoming.[2]  Montana and Wyoming represent a critical bulwark for the sage-grouse.  Together they contain more than 50% of the habitat covered by the plans, encompass over half the remaining sage-grouse population, and provide critical breeding and connectivity habitat for sage-grouse populations in other states.  Of the approximately 65 million acres covered by the 2025 Plans, more than 50% is found

---

[2] BLM, GREATER SAGE-GROUSE RANGEWIDE PLANNING: RECORD OF DECISION AND APPROVED RESOURCE MANAGEMENT PLAN AMENDMENT FOR MONTANA AND THE DAKOTAS (2025), https://eplanning.blm.gov/public_projects/%2F2016719%2F200502020%2F20148709%2F251048689%2FMontana%20Dakotas%20GRSG%20ROD-ARMPA.pdf (Montana Plan or Montana 2025 Plan); BLM, GREATER SAGE-GROUSE RANGEWIDE PLANNING: RECORD OF DECISION AND APPROVED RESOURCE MANAGEMENT PLAN AMENDMENT FOR WYOMING (2025), https://eplanning.blm.gov/public_projects/%2F2016719%2F200502020%2F20148727%2F251048707%2FWyoming%20GRSG%20ROD-ARMPA.pdf (Wyoming Plan or Wyoming 2025 Plan).

in Wyoming and Montana.  At the same time, BLM has begun aggressively expanding oil and gas leasing in both states, including in sage-grouse habitat protected under the prior plans.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 5 U.S.C. § 702 (Administrative Procedure Act (APA)), which waives the Defendants' sovereign immunity.

11.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 706.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiff Montana Wildlife Federation is based in this district, Plaintiff The Wilderness Society has an office in this district, Plaintiff Defenders of Wildlife has staff who reside and work in this district, Defendant Sonya Germann resides in this district, and Defendants BLM and the U.S. Department of the Interior maintain offices in this district.  In addition, a substantial part of the events giving rise to this case occurred in this district.

13.     Venue is proper in the Great Falls Division of this Court because this case challenges plans governing sage-grouse habitat in the Great Falls Division.

5

## PARTIES

14.    Plaintiff MONTANA WILDLIFE FEDERATION (the Federation) has for 90 years sought to protect Montana's fish and wildlife, public lands, clean waters, and fair chase hunting and fishing heritage.  The Federation, which is incorporated in Montana, has offices in Missoula, Bozeman and Helena, thousands of members and supporters across the state and 17 local affiliated sporting and wildlife clubs.  The Federation has been involved in the creation and defense of BLM's sage-grouse conservation plans.  The Federation has a long history of engagement in sage-grouse conservation, including decades of active participation in the adoption of hunting regulations to ensure that the species is scientifically managed and sustainably harvested.  Since 2004, the Federation has advocated for state-level sage-grouse management plans, worked for better oversight and funding for habitat protection, and supported on-the ground sage-grouse conservation activities.

15.    Plaintiff THE WILDERNESS SOCIETY (TWS) is a national conservation organization devoted to protecting wilderness and inspiring Americans to care for wild places.  It contributes to better protection, stewardship, and restoration of public lands, preserving the nation's rich natural legacy for current and future generations.  The Wilderness Society has an office in Bozeman, Montana, and another office in Missoula, Montana, with more than one million

members and supporters nationwide, including more than 3,900 in Montana.  TWS has been actively engaged in the federal planning efforts for conservation of the greater sage-grouse since their inception, including submission of scoping comments in April 2012, when the federal planning efforts formally commenced; commenting on the draft plans in 2013 and 2014; submitting additional comments and administrative protests on the proposed plans in 2015; and submitting additional recommendations throughout the process. TWS also met with federal and state representatives, and worked with members of the conservation community and other stakeholders to advocate for completion of the plans and for implementing a strong, science-based, landscape-level approach to conserving the greater sage-grouse and the sage-grouse ecosystem.  TWS members, responding to notifications from its WildAlert network, have submitted thousands of comments on the federal plans and also urged Congress to support the completion and implementation of these plans.

16.    Plaintiff DEFENDERS OF WILDLIFE (Defenders) is a national wildlife conservation organization founded in 1947.  Defenders is dedicated to the protection and restoration of all native U.S. species in their natural communities and the preservation of the habitats on which these species depend.  Defenders is headquartered in Washington, D.C., and Defenders' Rocky Mountain and Great Plains program has staff residing and working in Montana.  Defenders has over

two million members and supporters across the United States, of whom more than 8,200 reside in Montana and 3,500 reside in Wyoming. Defenders employs science, public education and participation, and legislative advocacy to conserve biodiversity. Defenders has been actively engaged in conservation efforts for the greater sage-grouse for over a decade including producing a report evaluating and recommending conservation alternatives for the species in 2014. Defenders has been actively engaged in federal management planning for the greater sage grouse, including commenting on draft plan amendments in 2024 and 2025 and filing administrative protests in 2019 and 2024 to proposed plan amendments and environmental impact statements. Defenders informs its members and the public about federal agency land management planning and legislative actions affecting the greater sage-grouse and its habitat.

17. Plaintiffs have campaigned for years to protect remaining sage-grouse populations and preserve their habitat, including submitting comments and participating in development of the 2015 plans and the 2025 plans, supporting scientific research, and advocating for other protections. Plaintiffs also filed comments and administrative appeals of the 2025 plans challenged in this case.

18. Plaintiffs' members and staff live, work, hunt, and recreate on lands throughout the western United States that are covered by the BLM plans, and which provide important habitat for the greater sage-grouse, including lands in

8

Montana affected by the planning decision challenged in this case. Plaintiffs' members and staff regularly observe and study the grouse and the ecosystem on which it depends, and are keenly interested in protecting it. Defendants' violations of FLPMA, NEPA, and the APA have caused and will continue to cause recreational, aesthetic, scientific, and educational injuries to Plaintiffs and their members, which this Court can redress.

19.    Defendant DOUGLAS BURGUM is the Secretary of the Interior. Plaintiffs sue Secretary Burgum in his official capacity. Secretary Burgum oversees oil and gas development on federal and tribal lands, and is responsible for the planning decisions challenged here.

20.    Defendant SONYA GERMANN is the Montana BLM State Director. Director Germann approved the Montana 2025 Plan implementing the national planning decisions challenged here. Plaintiffs sue Director Germann in her official capacity.

21.    Defendant BUREAU OF LAND MANAGEMENT is an agency of the United States government in the Department of the Interior. BLM is responsible for managing publicly owned lands and minerals in accordance with federal law. BLM issued the decisions that are challenged here.

22.    Defendant U.S. DEPARTMENT OF THE INTERIOR is an executive branch department and is the parent agency of BLM.

## BACKGROUND ON THE GREATER SAGE-GROUSE

23.    The greater sage-grouse is a large bird found in extensive areas of sagebrush.  Both sexes of this species are gray overall with very fine patterning, a black belly, and a long, pointed tail.  Males have a white breast and a black throat.  During the sage-grouse breeding season, males perform a spectacular courtship display at lek sites, involving fanning the tail, inflating yellow air sacs on the chest, and thrusting these air sacs forward to produce dramatic popping noises.  The species is most easily observed by humans at such display sites in early spring and can be very inconspicuous at other times of year.



24.    Sage-grouse once existed in great numbers across vast expanses of the North American sagebrush steppe.  It is estimated that before European settlement, grouse populations totaled millions of birds, with habitat extending for as much as

460,000 square miles over an area now covered by thirteen western states and three Canadian provinces.  Plains Indian tribes mimicked the birds in ceremonial dances, and numerous historical accounts by settlers and explorers describe the grouse.  In their journals, Lewis and Clark recorded the grouse (which they called the "Heath Cock") in 1805 and 1806 as they traveled across what is now Montana and points west: "The Heath Cock or cock of the Plains is found in the Plains of Columbia and are in great abundance from the enterance [sic] of Lewis's river to the mountains which pass the Columbia between the Great falls and Rapids of that river."[3]  Other nineteenth-century travelers reported flocks of sage-grouse so large they "darkened the skies" when taking flight.[4]  Residents in some areas report that as late as the 1950s, "they would actually darken the sky.  It was like clouds coming over."[5]

25.    Since then, greater sage-grouse populations "have declined dramatically," dropping an average of 2% annually over the 42 years between

---

[3] Joseph A. Mussulman & Mark Behan, *Sage Grouse: Centrocercus urophasianus*, DISCOVERING LEWIS & CLARK, http://www.lewis-clark.org/article/1904.

[4] Theo Stein, *Science on parade as grouse researchers flock to Elko*, U.S. FISH & WILDLIFE SERV. (June 19, 2014), https://web.archive.org/web/20140713025710/https://www.fws.gov/greatersagegrouse/06192014_Elko_Workshop.php#.WodQ2YWcGcw .

[5] Jennifer Sandmann, *So many birds, they darkened the sky (April 18, 2004)*, MAGIC VALLEY (Jan. 22, 2010), http://magicvalley.com/so-many-birds-they-darkened-the-sky-april/article_5fd28456-07b0-11df-b969-001cc4c03286.html.

1965–2007.[6]  A 2024 study reports that sage-grouse have declined by 13% across eastern Wyoming and Montana, and 24% in western Wyoming, since 2013.  The current population is estimated at less than 10% of historic levels.  As of 2015, FWS mapping showed that sage-grouse occupied only about half of their historic range.[7]



26.    More recently, the sage-grouse's decline has reached the point of extirpation in one part of its range: the State of North Dakota announced in

---

[6] D.J. MANIER ET AL., U.S. GEOLOGICAL SURVEY, OPEN-FILE REPORT 2013-1098, SUMMARY OF SCIENCE, ACTIVITIES, PROGRAMS, AND POLICIES THAT INFLUENCE THE RANGEWIDE CONSERVATION OF GREATER SAGE-GROUSE 11, 16 tbl. 2 (2013), https://pubs.usgs.gov/of/2013/1098/OF13-1098.pdf.

[7] *See* FWS, Greater Sage Grouse (Centrocercus urophasianus) Map (Aug. 15, 2014), https://www.fws.gov/species/greater-sage-grouse-centrocercus-urophasianus/map.

summer 2025 that the state's "greater sage grouse population appears to have gone extinct," with zero male birds recorded in surveys of leks there.[8]  North Dakota wildlife officials identified "habitat fragmentation caused by energy development" as one of the main factors resulting in the grouse's extirpation in the state.[9]

27.     The grouse's range is continuing to shrink: BLM now describes northeastern Wyoming (an area where the 2015 plans designated substantial priority habitat but where extensive oil and gas and other development has occurred) as "on the fringe of sage-grouse habitat."[10]

28.     Those declines have largely resulted from loss and fragmentation of the sagebrush steppe habitat on which the grouse rely.  "Sage-grouse depend on large areas of contiguous sagebrush to meet all seasonal habitat requirements."[11] Studies have "emphasize[d] the landscape nature of the species," finding that migratory populations of the grouse may use areas exceeding 1,000 square miles

---

[8] Scott Streater, *Sage grouse blink out in Burgum's North Dakota*, E&E NEWS (July 11, 2025), https://www.eenews.net/articles/sage-grouse-blink-out-in-burgums-north-dakota/.

[9] *Id.*

[10] BLM, DRAFT 2026 SECOND QUARTER COMPETITIVE LEASE SALE: ENVIRONMENTAL ASSESSMENT 58 (2025) https://web.archive.org/web/20251223002828/https://eplanning.blm.gov/public_projects/2040967/200667695/20148658/251048638/2026-06.20251219.1330.WSO.921.EA.pdf.

[11] Endangered and Threatened Wildlife and Plants; 12-Month Finding on a Petition to List Greater Sage-Grouse (Centrocercus urophasianus) as an Endangered or Threatened Species, 80 Fed. Reg. 59858, 59866 (Oct. 2, 2015).

(667,185 acres).[12]  This habitat, however, is one of the most imperiled ecosystems in North America.

29.    The greater sage-grouse also is an "umbrella species," meaning that protecting it also benefits an estimated 350 other species that depend on the same sagebrush sea.[13]  These include imperiled birds like the Brewer's sparrow and loggerhead shrike, mammals such as the kit fox and pygmy rabbit, and a variety of reptiles.

30.    The Interior Department's own research consistently identifies oil and gas development as one of the "primary threats" to greater sage-grouse.[14]  BLM's National Technical Team, composed of the agency's scientific experts, reported in 2011 that impacts to sage-grouse from oil and gas development "are universally negative and typically severe."[15]  The roads, power lines, waste pits, and other

---

[12] *Id.*

[13] FWS, *Historic Conservation Campaign Protects Greater Sage-Grouse* (Sept. 22, 2015), https://www.fws.gov/press-release/2015-09/historic-conservation-campaign-protects-greater-sage-grouse; BLM, *Greater sage-grouse*, https://www.blm.gov/programs/fish-and-wildlife/sage-grouse.

[14] 80 Fed. Reg. at 59858, 59871; *see also* MANIER ET AL., *supra* note 6, at 51–59 (discussing oil and gas as an "important threat"); U.S. DEP'T OF AG., GREATER SAGE-GROUSE 101 1, https://web.archive.org/web/20170430221214/https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprd3839884.pdf (finding "[m]ajor threats" to include habitat "fragmentation due primarily to energy development").

[15] BLM SAGE-GROUSE NATIONAL TECHNICAL TEAM, A REPORT ON NATIONAL GREATER SAGE-GROUSE CONSERVATION MEASURES 18–24 (2011), https://ir.library.oregonstate.edu/downloads/qb98mm39g?locale=en (Sage-Grouse National Technical Team Report).

disturbance associated with oil and gas development all affect grouse populations and their breeding success.  Studies have found that greater sage-grouse "[b]reeding populations are severely reduced at [oil and gas] well pad densities commonly permitted."[16]  Moreover, sage-grouse leks are negatively affected by oil and gas wells at distances of four miles or more.[17]  BLM's National Technical Team concluded that "[t]here is strong evidence from the literature to support that surface-disturbing energy or mineral development within priority sage-grouse habitats is not consistent with a goal to maintain or increase populations or distribution."[18]

31.     For example, a 2019 model developed by the U.S. Geologic Survey predicted that in the coming decades, sage-grouse populations in Wyoming will decline 39% owing to energy development alone.

## LEGAL FRAMEWORK

## I.     Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

32.     The APA authorizes judicial review of agency actions and provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be[] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or

---

[16] *Id.* at 19.
[17] *Id.* at 20–21.
[18] *Id.* at 19.

15

limitations, or short of statutory right; . . . [or] without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (C), (D).

33.    An agency acts arbitrarily and capriciously when it has:

relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  A reviewing court applying these factors must "ensure that agency decisions are founded on a reasoned evaluation of the relevant factors."  *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

34.    The APA requires agencies to engage in "reasoned decisionmaking," *Michigan v. EPA*, 576 U.S. 743, 750 (2015).  When an agency changes positions, then it must (a) "display awareness that it *is* changing position"; (b) show that the new policy is permissible under governing statutes; (c) explain why the agency believes the new policy is better than the old one; and (d) "show that there are good reasons for the new policy," which requires a more detailed explanation where the "new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance

16

interests that must be taken into account." *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original).

## II. Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.*

35.     FLPMA directs BLM to manage the public lands

> in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use.

43 U.S.C. § 1701(a)(8).

36.     FLPMA also requires BLM to "manage the public lands under principles of multiple use and sustained yield." *Id.* § 1732(a).  This duty requires BLM to maintain sustainable long-term populations of wildlife species, including the sage-grouse.  *See id.* § 1702(h) (defining "sustained yield" as "the achievement and maintenance in perpetuity of a high-level . . . output of the various renewable resources of the public lands consistent with multiple use"); *id.* § 1702(c) (defining "multiple use" to include "tak[ing] into account the long-term needs of future generations for renewable and nonrenewable resources, including . . . wildlife . . . and coordinated management of the various resources without permanent impairment of the land and the quality of the environment"); *see also* 43 C.F.R. § 6101.4(z) (2025) ("Preventing permanent impairment means that renewable

17

resources are not permanently depleted and that desired future conditions are met for future generations.").

37.     In conjunction with its obligation to manage for multiple use and sustained yield, FLPMA requires BLM to "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). This obligation requires BLM to ensure that it does not authorize actions that will cause unnecessary or undue degradation. *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 76 (D.C. Cir. 2011). And "[i]f unnecessary or undue degradation cannot be prevented by mitigating measures, BLM is required to deny approval of the plan." *Kendall's Concerned Area Residents*, 129 IBLA 130, 138 (1994); *see also Mineral Pol'y Ctr. v. Norton*, 292 F. Supp. 2d 30, 40 (D.D.C. 2003) ("FLPMA, by its plain terms, vests the Secretary of the Interior with the authority - and indeed the obligation - to disapprove of an otherwise permissible . . . operation because the operation, though necessary . . . would unduly harm or degrade the public land.").

38.     The Interior Department implements these requirements through land management plans, known as resource management plans (RMPs or plans). FLPMA requires that the Interior Department manage public lands "in accordance with the [RMPs] developed" under that statute. 43 U.S.C. § 1732(a); *see also* 43 C.F.R. § 1610.5-3(a) (requiring that BLM resource management decisions "shall

conform" to the governing plan). "The statutory directive that BLM manage 'in accordance with' land use plans, and the regulatory requirement that authorizations and actions 'conform to' those plans, prevent BLM from taking actions inconsistent with the provisions of a land use plan." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 69 (2004).

39.     When amending or revising an RMP, BLM must ensure that the plans are "consistent with the principles" established by FLPMA, such as multiple-use and sustained yield management and prevention of unnecessary or undue degradation. 43 C.F.R. § 1601.0-8; *see* 43 U.S.C. § 1712(c)(1) (requiring BLM to "use and observe the principles of multiple use and sustained yield" when revising RMPs).

40.     Under FLPMA, BLM uses a three-step process when managing oil and gas development on public lands. First, BLM develops RMPs for particular areas, specifying which lands will be open and closed to oil and gas leasing and development, and the conditions placed on any such development. 43 U.S.C. § 1712(a). Second, BLM "may grant leases for the development of specific sites within an area, subject to the requirements of the plan." *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 689 n.1 (10th Cir. 2009); *see also* 43 C.F.R. § 1610.5-3. Third, after a company has purchased oil and gas leases, it may obtain

permits to drill on those lands from BLM.  *New Mexico*, 565 F.3d at 689 n.1; 43 C.F.R. § 3162.3-1(c) (2024).

**III.    Endangered Species Act, 16 U.S.C. § 1531 *et seq.***

41.    The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).  Congress passed the ESA to "provide a program for the conservation of . . . endangered species and threatened species" and to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved."  16 U.S.C. § 1531(b).

42.    For a terrestrial species to receive protection under the ESA, it must be listed by FWS as "endangered" or "threatened."  *Id.* § 1533.  The ESA defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range."  *Id.* § 1532(6).  A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  *Id.* § 1532(20).

43.    Once a species is listed, an array of statutory protections applies.  For example, the ESA requires all federal agencies to ensure that their actions do not "jeopardize the continued existence" of any listed species or "result in the destruction or adverse modification of [the critical] habitat of such species."  *Id.* §§

20

1536(a)(2), (4).  The ESA and its regulations also prohibit, among other things, any person from intentionally or incidentally "tak[ing]" listed species without a permit from FWS.  *See id.* §§ 1532(19) (defining "take"), 1538(a); 50 C.F.R. §§ 17.3, 17.32 (2024).

## IV.   The Mineral Leasing Act and One Big Beautiful Bill Act

44.   Since 1920, oil and gas leasing and development on federal lands have been governed by the Mineral Leasing Act (MLA), 30 U.S.C. § 181 *et seq.*, which charges the U.S. Department of Interior with managing federally owned minerals to protect "the interests of the United States," and "safeguard[] . . . the public welfare."  30 U.S.C. § 187.

45.   For a century, the MLA provided that the Interior Department "may" lease lands for oil and gas development.  *Id.* § 226(a)(1) (2024).  Courts consistently recognized that this statutory language gave BLM broad discretion over whether to offer particular lands for lease.  *United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 419 (1931) (holding the MLA "goes no further than to empower the Secretary [of Interior] to execute leases . . . exercising a reasonable discretion"); *Udall v. Tallman*, 380 U.S. 1, 4 (1965) (finding the MLA gives BLM "discretion to refuse to issue any lease at all on a given tract"); *W. Energy All. v. Salazar*, 709 F.3d 1040, 1044 (10th Cir. 2013) (finding the Secretary has "considerable discretion" in leasing decisions); *Schraier v. Hickel*, 419 F.2d 663,

21

666 (D.C. Cir. 1969) (affirming BLM has "discretion to decline to lease" even if it published a notice that it would receive offers); *W. Energy All. v. Biden*, Nos. 21-cv-13, 21-cv-56, 2022 WL 18587039, at *10–11 (D. Wyo. Sept. 2, 2022) (same) (quoting *Salazar*, 709 F.3d at 1044).

46.     That discretion governed even for lands designated as open to leasing in an RMP.  As traditionally understood, such an RMP designation means that BLM *may* lease those lands, but does not *require* the agency to offer any specific lands for leasing.  *See, e.g., New Mexico ex rel. Richardson v. BLM*, 459 F. Supp. 2d 1102, 1124 (D.N.M. 2006), *aff'd in relevant part*, 565 F.3d 683 (10th Cir. 2009); *Roy G. Barton*, 188 IBLA 331, 337 (2016).  Consistent with this understanding, between 2009 and 2019, BLM offered only about 21% of the acreage nominated by oil and gas companies for leasing.[19]

47.     In 2025, however, Congress amended the MLA in an apparent effort to significantly narrow BLM's long-standing discretion over leasing.  The One Big Beautiful Bill Act (OBBBA) rewrote the central provision of the statute, 30 U.S.C. § 226(a)(1), to remove the "may be leased" language and instead directed that land

---

[19] U.S. GOV'T ACCOUNTABILITY OFF., GAO-22-103968, OIL AND GAS LEASING: BLM SHOULD UPDATE ITS GUIDANCE AND REVIEW ITS FEES 17 (2021), https://www.gao.gov/assets/gao-22-103968.pdf (finding that between 2009 and 2019 BLM offered 18 million acres at auction, out of 87 million acres nominated for leasing).

"shall be made available for leasing" within 18 months after an oil and gas company nominates it, so long as the land is designated as "open to oil or gas leasing under the approved resource management plan." *Id.* (2025); OBBBA, Pub. L. 119-21, Title V § 50101(d), 139 Stat. 138–39 (2025).

48.    In addition, the OBBBA directed BLM to hold quarterly lease sales in which the Bureau "shall offer not less than 50 percent of available parcels nominated for oil and gas development under the applicable resource management plan in effect for relevant Bureau of Land Management resource management areas within the applicable State." 30 U.S.C. § 226 note (2025), 139 Stat. 138.

49.    In recent litigation filings, BLM has asserted that this statutory change means that the MLA, as amended by OBBBA, now "requires the Bureau to offer parcels nominated by industry . . . for lease within 18 months of receipt of the nomination, so long as those lands are open to leasing under the applicable resource management plan." *See, e.g.*, Federal Appellants' Open. Br. at 36, *Mont. Wildlife Fed'n v. Haaland*, No. 22-35367 (9th Cir. Jan. 14, 2026), Dkt, No. 32.

50.    Plaintiffs do not agree with BLM's interpretation. OBBBA's amendments to the MLA, however, plainly represent some narrowing of the agency's longstanding discretion over leasing.  For this reason, the statutory amendments change the environmental impact of BLM's planning decisions in a way not contemplated in the existing RMPs.  In particular, the existing RMPs were

developed under the pre-OBBBA law, where leaving lands open to leasing *allowed* them to be leased, but *did not require* leasing of any particular public lands nominated by industry.  Based on that understanding, BLM's current RMPs designate the large majority of public lands as open: across the western United States, fully 81% of BLM lands are "open" for leasing under the existing RMPs.[20] In Montana and Wyoming, 95% and 92% of BLM lands, respectively, are open for leasing.[21]

51.    In effect, BLM's reading of the OBBBA would mean that oil and gas companies now can require the federal government to offer leases on more than 95% of BLM lands in Montana, and 92% of BLM lands in Wyoming, regardless of the broader public interest or the impacts of that leasing on sage-grouse.  OBBBA, however, did not amend or limit BLM's obligations under FLPMA to maintain sustainable populations of sage-grouse and avoid unnecessary or undue degradation of sage-grouse habitat.

V.    **National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.***

52.    NEPA reflects Congress's "broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens*

---

[20] THE WILDERNESS SOCIETY, OPEN FOR DRILLING: THE OUTSIZED INFLUENCE OF OIL & GAS ON PUBLIC LANDS 2 (2025), https://www.wilderness.org/sites/default/files/media/file/Open%20for%20Drilling_TWS%20Report_0.pdf.

[21] *Id.* at 10, 13.

24

Council, 490 U.S. 332, 348 (1989).  NEPA "ensures that the agency and the public are aware of the environmental consequences of proposed projects" and "helps agencies to make better decisions."  *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 177 (2025).  To meet those goals, NEPA requires that agencies "consider every significant aspect of the environmental impact of a proposed action" and inform the public of the environmental impacts of agency proposals.  *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983).

53.    Prior to undertaking any "major Federal action[] significantly affecting the quality of the human environment," NEPA requires federal agencies to develop an environmental impact statement (EIS), which is a "detailed statement" of "the reasonably foreseeable environmental effects of the proposed action."  42 U.S.C. § 4332(C)(i).  In conducting a NEPA analysis an agency must ensure the "scientific integrity" of its analysis and make use of "reliable data and resources."  *Id.* §§ 4332(D), (E).

25

## PROCEDURAL BACKGROUND

### I.   BLM ADOPTS RANGE-WIDE SAGE-GROUSE CONSERVATION PLANS.

54.     In 2001, and again in 2010, FWS determined that listing sage-grouse as an endangered or threatened species under the ESA was warranted by the sage-grouse's deteriorating conservation status but "precluded by higher priority listing actions."[22]  These decisions not to list the grouse were challenged in court, and as part of a 2011 settlement, FWS pledged to make a new listing decision by September 30, 2016.  *See In re Endangered Species Act Section 4 Deadline Litigation-MDL No. 2165*, 704 F.3d 972, 975 (D.C. Cir. 2013) (summarizing 2011 settlement).

55.     In anticipation of the 2016 deadline, BLM undertook a comprehensive land management planning process designed to protect greater sage-grouse habitat and make an ESA listing unnecessary.

56.     How the federal lands are managed is critical to conservation of the greater sage-grouse because public lands make up more than 50% of the bird's

---

[22] Endangered and Threatened Wildlife and Plants; 12-Month Finding for a Petition to List the Washington Population of Western Sage Grouse (Centrocercus urophasianus phaios), 66 Fed. Reg. 22984 (May 7, 2001); Endangered and Threatened Wildlife and Plants; 12-Month Findings for Petitions to List the Greater Sage-Grouse (Centrocercus urophasianus), 75 Fed. Reg. 13910 (Mar. 23, 2010).

currently occupied habitat.  Fully 45% of the grouse's habitat lies on land managed

by BLM, and another 6% lies on land managed by the U.S. Forest Service.[23]



U.S. FOREST SERV., GREATER SAGE-GROUSE RECORD OF DECISION 15 fig. 2 (2015).

57.     Management on federal lands in Montana and Wyoming is

particularly important to the future of the sage-grouse.  Of the approximately 65

million acres covered by the 2025 Plan, more than 50% is found in Wyoming and

Montana.  In addition, Wyoming and Montana together contain well over half of

all remaining sage-grouse individuals, and are key states providing breeding and

---

[23] 80 Fed. Reg. at 59866 tbl. 2.

connectivity habitat that allows gene flow between sage-grouse populations in other states such as South Dakota, Wyoming, Montana, Colorado, Utah and Idaho.

### A.    The 2015 Greater Sage-grouse Management Plans

58.    In September 2015, after a four-year planning effort, BLM issued decisions to revise or amend ninety-eight land management plans in ten Western states (the 2015 Plans) covering the bird's range across the West.  The plans were developed with extensive input from state governors, energy and grazing industry representatives, public land users, and conservation and sportsmen's organizations.

59.    The 2015 Plans assigned areas of sage-grouse habitat for varying levels of protection.  The plans designated priority habitat management areas (PHMAs or Priority Habitat), which are "[a]reas with limited impacts containing substantial and high quality [greater sage-grouse] habitat that support sustainable [greater sage-grouse] populations."[24]  PHMAs were generally considered the lands

---

[24] *See, e.g.*, BLM, BILLINGS FIELD OFFICE GREATER SAGE-GROUSE APPROVED RESOURCE MANAGEMENT PLAN 6-32 (2015), https://web.archive.org/web/20190130104852/https://eplanning.blm.gov/epl-front-office/projects/lup/72501/96659/116765/BIFO_Volume_I_version2_20150924.pdf (Billings Field Office Approved RMP).

with the "highest value,"[25] and "essential habitat for maintaining [greater sage-grouse]" populations.[26]

60.    The 2015 RMPs also designated general habitat management areas (GHMAs or General Habitat), which were "lands where some special management will apply to sustain [greater sage-grouse] populations."[27]  General Habitat included, for example, "occupied seasonal or year-round habitat outside of PHMAs."[28]

61.    A key feature of the 2015 Plans' approach to the conservation of sage-grouse was application of a mitigation hierarchy: the Plans sought first to avoid impacts to sage-grouse habitat, then to minimize impacts that cannot be avoided, and finally to use compensatory mitigation for any unavoidable residual impacts.

_____

[25] *Id.* at 2-1.
[26] *Id.* at 2-7; *see also* BLM, MILES CITY FIELD OFFICE APPROVED RESOURCE MANAGEMENT PLAN 2-9 (2015), https://web.archive.org/web/20170215180543/https://eplanning.blm.gov/epl-front-office/projects/lup/59042/86804/104007/Miles_City_Field_Office_Approved_Resource_Management_Plan_(2015).pdf.
[27] BLM, RECORD OF DECISION AND APPROVED RESOURCE MANAGEMENT PLAN AMENDMENTS FOR THE GREAT BASIN REGION 1-15 (2015), https://www.govinfo.gov/content/pkg/GOVPUB-I53-PURL-gpo78071/pdf/GOVPUB-I53-PURL-gpo78071.pdf (Great Basin ROD).
[28] BLM, CASPER, KEMMERER, NEWCASTLE, PINEDALE, RAWLINS, AND ROCK SPRINGS FIELD OFFICES: APPROVED RESOURCE MANAGEMENT PLAN AMENDMENT FOR GREATER SAGE-GROUSE 10 (2015), https://eplanning.blm.gov/public_projects/%2Flup%2F103347%2F143767%2F177179%2F002_Wyoming_ARMPA_Main-Body.pdf.

29

Where mitigation was used, it had to provide a "net conservation gain" to the sage-grouse.[29]

62.    The mitigation hierarchy of first seeking to avoid impacts to sage-grouse habitat before considering minimizing and mitigating damage is consistent with BLM policies and manuals, which established a policy of considering and implementing "the full mitigation hierarchy" at a "landscape-scale approach" through land-use planning and other measures.[30]

63.    The 2015 Plans' key features to apply the "avoidance" step of the mitigation hierarchy included the oil and gas prioritization mandate, which required BLM to give priority to leasing and developing oil and gas outside of sage-grouse habitat.[31]  The purpose of the prioritization requirement "is to further limit future surface disturbance" and "encourage new development in areas that would not conflict with" greater sage-grouse.[32]  BLM explained that prioritization

> is intended to guide development to lower conflict areas and as such protect important habitat and reduce the time and cost associated with oil and gas leasing and development by avoiding sensitive areas,

---

[29] Great Basin ROD, *supra* note 27, at 1-25.

[30] BLM, MS-1794 - MITIGATION MANUAL ¶¶ 1.6, 2.2, Ch. 5 (2021), https://www.blm.gov/sites/blm.gov/files/uploads/BLM_MS-1794%20Mitigation%20FINAL.docx; *see also* BLM, H-1794-1 - MITIGATION HANDBOOK (2021), https://www.blm.gov/sites/default/files/docs/2021-10/IM2021-046_att2.pdf; Instruction Memorandum 2021-046, BLM (Oct. 5, 2021), https://www.blm.gov/policy/im-2021-046.

[31] *See, e.g.*, Great Basin ROD, *supra* note 27, at 1-21 to 1-25.

[32] Rocky Mountain ROD, *supra* note 1, at 1-25; Great Basin ROD, *supra* note 27, at 1-23.

reducing the complexity of environmental review and analysis of potential impacts on sensitive species, and decreasing the need for compensatory mitigation.[33]

A second avoidance strategy adopted by the 2015 Plans involved the designation of Sagebrush Focal Areas (SFAs). SFAs—which span 10 million acres within Priority Habitat—were recognized "strongholds" for greater sage-grouse, containing the highest densities of grouse.[34] To protect this habitat, the 2015 Plans—except in Wyoming—prevented the construction of surface infrastructure for oil and gas development by requiring that all future oil and gas leases include no-surface occupancy (NSO) restrictions within SFAs, and BLM recommended that SFAs be withdrawn from mineral entry under the Mining Law of 1872 to prevent disturbances from new hard-rock mining as well.  Such a withdrawal would foreclose any mining in that habitat for a period of 20 years.

B.    **FWS's Finding that Listing the Sage-grouse under the ESA was not Warranted**.

64.    Following BLM's issuance of the 2015 Plans, FWS determined in October 2015 that listing the greater sage-grouse as threatened or endangered under the ESA was not warranted.[35]  That finding relied on the assumption that the protections provided in BLM's 2015 plans would remove the threats otherwise

---

[33] Rocky Mountain ROD, *supra* note 1, at 1-25; *see* Great Basin ROD, *supra* note 27, at 1-23.
[34] *See, e.g.*, Billings Field Office Approved RMP, *supra* note 24, at 2-3.
[35] 80 Fed. Reg. at 55941.

driving greater sage-grouse to the brink of extinction: "The Federal Plans provide major new regulatory mechanisms to protect sage-grouse from land use activities on more than half of the occupied range" and "ensure that high-quality sage-grouse lands with substantial populations are minimally disturbed and sage-grouse within this habitat remain protected."[36]

65.    In particular, the FWS emphasized that the mitigation hierarchy adopted by the 2015 Plans—avoid, minimize, and compensate—was fundamental to the agency's finding: "All mitigation will be achieved by avoiding, minimizing, and compensating for impacts."[37]  And FWS specifically relied on the 2015 Plans' promise to "prioritize the future leasing and development of nonrenewable-energy resources outside of sage-grouse habitats."[38]

66.    FWS noted that its determination was not a guarantee that listing of the sage-grouse under the Endangered Species Act would not be warranted in the future, as "[n]ew threats may develop, management may change, or the species may not prove as resilient as we concluded based on the currently available science."[39]  FWS therefore committed to conducting a review of the sage-grouse's status in five years.[40]  The FWS, however, has not conducted a review of the sage-

---

[36] *Id.* at 59882.
[37] *Id.* at 59881.
[38] *Id.* at 59891.
[39] *Id.* at 59941.
[40] *Id.*

grouse's status since 2015.  Nor has BLM considered or disclosed to the public how the change in management of sage-grouse habitat under its 2025 Plans will impact any determination whether the species satisfies the criteria for an endangered or threatened species under the ESA.

## II.   BLM UNDERMINES ITS OWN GREATER SAGE-GROUSE PROTECTIONS

### A.   Montana Litigation & the Prioritization Requirement

67.   Following the 2017 change in presidential administration, BLM sought to abandon the commitments it made in the 2015 Plans to keep the sage-grouse off the ESA list.  In March 2017, President Trump issued an executive order declaring it a national priority to remove "regulatory burdens that unnecessarily encumber energy production."[41]  The Administration also announced a policy of pursuing "energy dominance" by increasing domestic production of oil and gas and other energy sources.[42]

68.   In response, BLM in December 2017 issued Instruction Memorandum 2018-026 (the 2018 IM).  The 2018 IM directed BLM staff to disregard the plain language and purpose of the 2015 Plans' prioritization requirement.  The new

---

[41] Exec. Order 13783, Promoting Energy Independence and Economic Growth, 82 Fed. Reg. 16093 (Mar. 28, 2017).

[42] White House, *President Trump Vows to Usher in Golden Era of American Energy Dominance* (June 30, 2017), https://web.archive.org/web/20171219122819/https://www.whitehouse.gov/articles/president-trump-vows-usher-golden-era-american-energy-dominance/.

guidance treated prioritization as nothing more than a procedural workload sequencing measure.  In contravention of the letter and purpose of the 2015 Plans, the 2018 IM stated "BLM does not need to lease and develop outside of [greater sage-grouse] habitat management areas before considering any leasing and development within [greater sage-grouse] habitat."[43]  BLM promptly implemented this direction by offering millions acres of oil and gas leases for sale in Priority and General Habitat between 2017 and 2020.  In those sales, BLM did not withhold a single parcel on prioritization grounds.

69.    Plaintiffs Montana Wildlife Federation and The Wilderness Society, along with other groups, filed suit in this Court in 2018 to challenge the 2018 IM and multiple oil and gas lease sales implementing it.  *Mont. Wildlife Fed'n v. Bernhardt*, No. 4:18-cv-69-BMM (D. Mont.).  In May 2020, this Court invalidated the 2018 IM as violating FLPMA because its interpretation of the prioritization requirement was inconsistent with the terms of the 2015 Plans.  In that May 2020

---

[43] Instruction Memorandum 2018-026, BLM (Dec. 27, 2017), https://web.archive.org/web/20190202023457/https://www.blm.gov/policy/im-2018-026; *see* Phase 1 Summ. J. Order at 10, *Mont. Wildlife Fed'n v. Bernhardt*, No. 4:18-cv-069-BMM (D. Mont. May 22, 2020), ECF No. 147.

ruling, and in a second decision in March 2022, this Court also set aside eight oil and gas lease sales that failed to comply with the prioritization requirement.

70.    In January 2025, the Ninth Circuit Court of Appeals affirmed this Court's May 2020 decision. *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1 (9th Cir. 2025). The Ninth Circuit recognized the overriding goal of the 2015 Plans to avoid an ESA listing of the sage-grouse while carrying out "BLM's multiple use and sustained yield mission under FLPMA." *Id*. at 21, 43. The court pointed out that BLM had "specifically identified 'oil and gas development' as a 'major threat' to sage-grouse habitat" and described prioritization as part of an "imperative to encourage and guide development outside of sage-grouse habitat." *Id.* at 21, 44 (quoting 2015 Plans). The Ninth Circuit concluded that "[a]bsent the substantive prioritization envisioned by the Prioritization Objective, the effort to avoid further risk to a threatened species could fail." *Id.* at 44.

### B.    The 2019 Sage-grouse Plan Amendments.

71.    Even as it sought to reinterpret the 2015 Plans' prioritization requirement out of existence, BLM also independently worked to undermine protections for greater sage-grouse by formally amending the 2015 Plans to allow more oil and gas and other development.

72.    In March 2019, the BLM issued new Plan Amendments that revised the BLM's 2015 Plans in Idaho, Colorado, Wyoming, Utah, Nevada/Northeastern

California, and Oregon (2019 Plans).[44]  The 2019 Plans significantly reduced the protections of the 2015 Plans, including by weakening the prioritization requirement and eliminating the Sagebrush Focal Area designation and the 2015 Plans' proposed mineral withdrawal of those areas.

73.     Conservation groups immediately challenged the 2019 Plans, and in October 2019 the District Court for the District of Idaho granted a preliminary injunction prohibiting the BLM from implementing the 2019 Plan Amendments. *See W. Watersheds Project v. Schneider*, 417 F. Supp. 3d 1319 (D. Idaho 2019).

74.     In light of the Idaho District Court's injunction, the 2019 Plans have not been implemented.

## III.   2025 SAGE-GROUSE PLAN AMENDMENTS

75.     In November 2021, the BLM announced it was undertaking a new greater sage-grouse planning process. The Agency explained that it had found the 2019 Plans (and for Montana, North Dakota, and South Dakota, the 2015 Plans) to be "potentially inconsistent with new science and rapid changes affecting the

---

[44] *See* 84 Fed. Reg. 10332, 10322–10330 (Mar. 20, 2019).

BLM's management of the public lands, including the effects of climate change (e.g., drought, loss of habitat, more frequent wildland fires, less riparian areas)."[45]

76.  BLM also stated that its decision to revisit the greater sage-grouse plan amendments was in part motivated by the agency's October 2021 Rangewide Monitoring Report for 2015-2020 (Monitoring Report). That Report found that despite the 2015 Plans, sage-grouse habitat was continuing to decline—losing approximately 2 million acres (3%) between 2012 and 2018 with most of the loss occurring on BLM-managed lands.

77.  After circulating draft Plan Amendments in March 2024, BLM published a proposed Plan Amendment and final EIS in November 2024.  The EIS acknowledged the need to "address continued [sage-grouse] habitat losses contributing to [sage-grouse] population declines."[46]  The proposed Plan Amendments strengthened the protection of sage-grouse in certain respects, including by adding a new category of Priority Habitat with additional development restrictions, and adopting a new adaptive management framework

---

[45] Notice of Intent to Amend Land Use Plans Regarding Greater Sage-Grouse Conservation and Prepare Associated Environmental Impact Statements, 86 Fed. Reg. 66331, 66331 (Nov. 22, 2021).

[46] BLM, GREATER SAGE-GROUSE RANGEWIDE PLANNING: PROPOSED RMP AMENDMENT AND FINAL ENVIRONMENTAL IMPACT STATEMENT ES-3 (2024), https://eplanning.blm.gov/public_projects/%2F2016719%2F200502020%2F20123 241%2F251023221%2FGRSG_FEIS_Chapters%201- 5%20and%20Appendices.pdf (2024 FEIS).

based on the peer-reviewed and published Targeted Annual Warning System (TAWS), a new monitoring and adaptive management framework designed to improve the consistency of management of sage-grouse habitat.

78.    On January 17, 2025, BLM issued final revised sage-grouse plans for Oregon and Colorado.

79.    Following the change in presidential administration, in September 2025, the BLM announced that it was revising the proposed amendments for the remaining state plans in several regards, including abandoning the new category of Priority Habitat with additional development restrictions, and the TAWS adaptive management framework. BLM explained that these changes were made in response to concerns raised by state governors, rather than in response to the needs of the sage-grouse.  BLM asserted the changes did not require supplementation of its November 2024 final EIS, but accepted additional public comment on the changes.

80.    On December 22, 2025, BLM issued final plans for Montana, Wyoming, and several other states (the 2025 Plans).[47]  As set forth below, these 2025 Plans abandoned key aspects of the BLM sage-grouse conservation

---

[47] *See* BLM, *Documents for 2021 Greater Sage-grouse Rangewide Planning Effort*, https://eplanning.blm.gov/Documents/?id=d8b882cc-a7f2-f011-8406-001dd8008d46&spid=a26c137d-a8f2-f011-8407-001dd80c29f3 (collecting all 2025 Plan Records of Decision (RODs)).

framework that FWS relied upon to deem ESA listing of the species not warranted in 2015, while failing to explain how the weakened approach they adopted could save the species from a looming threat of extinction.

### A. The 2025 Plans Depart from the Mitigation Hierarchy.

81.     The 2025 Plans depart from the "avoid, minimize, mitigate" hierarchy that underpinned the 2015 Plans and which FWS specifically cited in finding an ESA listing not warranted. Under the 2025 Plans, application of the mitigation hierarchy exists in name only, watered down by undefined "practicability" caveats and requirements to obtain state approvals and/or the voluntary agreement of oil and gas companies.  For example, in Priority Habitat under the 2025 Wyoming Plan, BLM is to "avoid *when practicable*, then minimize and *voluntarily* compensate for adverse impacts to [sage-grouse] habitat *to the extent required under the law and BLM jurisdiction*."[48]  And in General Habitat in Wyoming, the Wyoming 2025 Plan appears to entirely abandon the mitigation hierarchy.

### B. The 2025 Plans Eliminate the Avoidance Components of the Mitigation Hierarchy.

82.     In addition to undercutting the mitigation hierarchy, the 2025 Plans eliminate two of the key "avoidance" components of the 2015 Plans: the Sagebrush

---

[48] Wyoming 2025 Plan, *supra* note 2, at 34 (emphasis added); *see also* Montana 2025 Plan, *supra* note 2, at 50 ("Manage fluid mineral leasing and development in [sage-grouse] habitat management areas to avoid when practicable, then minimize,

Focal Area (SFA) designation and mineral withdrawal, and the oil and gas leasing prioritization requirement.

### 1.    Sagebrush Focal Areas

83.    As noted above, the 2015 Plans designated the most important sage-grouse habitat as SFAs.  In these areas, the plans—except Wyoming's—imposed no-surface occupancy restrictions without exceptions on new oil and gas leases, and the plans recommended that BLM pursue the withdrawal of these areas from mineral entry under the Mining Law of 1872 to prevent disturbances from new hard-rock mining.

84.    In 2017, the first Trump administration began undermining these protections by cancelling the proposed withdrawal.[49]  That cancellation was subsequently invalidated by the District Court for the District of Idaho, which ordered the agency to resume consideration of the proposal.[50]  However, BLM never completed its analysis or made a final decision regarding the proposed withdrawal.

---

and compensate for adverse impacts to [sage-grouse] habitat to the extent practical required under the law and BLM jurisdiction.").

[49] Notice of Cancellation of Withdrawal Application and Withdrawal Proposal and Notice of Termination of Environmental Impact Statement for the Sagebrush Focal Area Withdrawal in Idaho, Montana, Nevada, Oregon, Utah and Wyoming, 82 Fed. Reg. 47248 (Oct. 11, 2017).

[50] *W. Watersheds Project v. Bernhardt*, 519 F. Supp. 3d 763 (D. Idaho 2021).

85.    The 2025 Plans now eliminate the SFA classification entirely and indicate that the BLM will not recommend withdrawal of these critical sage-grouse habitat areas from location and entry under the United States mining laws. BLM's environmental analysis for the 2025 Plans, however, fails to grapple with the impacts of this decision, claiming the withdrawal recommendation "already occurred in the 2015 Plans and had no impact."[51] This conclusion omits the fact that the withdrawal recommendation accompanying the 2015 Plans "had no impact" only because BLM failed to act on it in the years since those plans were adopted.

86.    Contrary to BLM's current claim that the withdrawal of SFAs would have no impact, the FWS has emphasized in comments to BLM that the "planned withdrawal was included and relied upon in the 2015 not warranted finding to show the reduction in risk of habitat loss and fragmentation due to locatable mineral development in [sage-grouse] habitat." *Bernhardt*, 519 F. Supp. 3d at 776. BLM offered no response to, or any indication that it considered, FWS's comment on this issue.

87.    Moreover, to the extent BLM did analyze the removal of the SFA designation, its analysis focused entirely on the fact that the agency will no longer pursue withdrawal of those lands from the 1872 Mining Law. It entirely ignored

---

[51] 2024 FEIS, *supra* note 46, at 4-84.

the key point that removal of the SFA designation also reduces the protection of those important sage-grouse habitat areas in Montana from oil and gas leasing and development.

### 2.  Prioritization

88.  Although it was a key basis for the FWS's 2015 finding that listing the sage-grouse under the ESA was not warranted, the 2025 Plans also abandon the requirement to prioritize oil and gas leasing outside of sage-grouse habitat.  The 2025 Plans state: "In addition to the changes in [other terms], the over-arching fluid mineral objective no longer requires prioritization outside of PHMA and GHMA."[52]

89.  BLM failed to provide a reasoned explanation for removing the prioritization requirement or to analyze the impacts that removing the requirement will have on sage-grouse habitat and populations.

90.  BLM claimed that eliminating prioritization will have no impact on greater sage-grouse populations or their habitat.  BLM based this position on the arbitrary assumption in the agency's 2024 FEIS that eliminating prioritization would have no impact on the level of future oil and gas development in sage-grouse habitat. To the contrary, experience with the BLM's 2018 IM makes clear

---

[52] Montana 2025 Plan, *supra* note 2, at 15; Wyoming 2025 Plan, *supra* note 2, at 12.

that removal of the prioritization requirement will substantially increase leasing and oil and gas development in sage-grouse habitat.  Indeed, BLM attempted to interpret the prioritization requirement as an insignificant procedural requirement, instead of a substantive limit on leasing, precisely for the purpose of enabling substantial new oil and gas leasing in sage-grouse habitat.  In the *Montana Wildlife Federation* litigation, this Court and the Ninth Circuit both rejected that interpretation, and in doing so established that the prioritization requirement represents a "substantive" mandate that "imposes an affirmative requirement on [BLM] to 'guide' and 'encourage' development away from sage-grouse habitat." *Mont. Wildlife Fed'n*, 127 F.4th at 42–43.  Having lost in court on that issue, BLM cannot now pretend that the prioritization requirement had no substantive impact on oil and gas leasing as a justification for repealing it.

91.    Nor has BLM evaluated and ensured that removal of the prioritization requirement is consistent with the agency's substantive sustained-yield and unnecessary and undue degradation obligations under FLPMA, or considered whether removal of the prioritization requirement undercuts the 2015 "not warranted" finding under the ESA such that extinction of the sage-grouse is threatened. FWS deemed the prioritization requirement an important element of BLM's management framework supporting FWS's 2015 determination that ESA listing of the sage-grouse was not warranted.  Given BLM's obligations to achieve

43

and maintain "in perpetuity" a high-level output of public-land resources, including wildlife, 43 U.S.C. § 1702(h), and to avoid unnecessary and undue degradation of such lands, *id.* § 1732(b), BLM cannot repeal central elements of its former sage-grouse conservation framework without explaining how its new, weaker approach will protect the sage-grouse from an acknowledged threat of extinction.

92.    BLM has also failed to address the impact that the OBBBA will have on oil and gas leasing and development in sage-grouse habitat under the 2025 Plans.  BLM developed its final EIS for the amendments in 2024, prior to passage of the OBBBA, which appears to narrow BLM's long-standing discretion over leasing.  Following passage of the OBBBA in July 2025, BLM claimed that OBBBA severely reduced its leasing discretion, but never supplemented the 2024 EIS or otherwise analyzed how OBBBA's requirements will affect the amount of oil and gas leasing and drilling in sage-grouse habitat under the new plans.

93.    Despite not having analyzed the impacts of OBBBA in its 2024 FEIS, BLM claimed in its decision adopting the 2025 Plans that the prioritization requirement is inconsistent with the OBBBA, because—BLM asserted—that Act requires the agency to offer parcels for lease whenever oil and gas companies nominate those parcels.  At the same time, however, BLM also assured the public in the 2025 Plan decisions that the agency would continue to exercise "the Secretary's discretion to consider leasing or not leasing available public lands" in

the interest of conserving the sage-grouse.[53]  BLM failed to explain how it would retain discretion under OBBBA to implement steps to consider sage-grouse habitat management in fluid mineral leasing decisions, but would not retain discretion to prioritize leasing outside of sage-grouse habitat as required by the 2015 RMPs. Nor did BLM analyze and disclose what its reading of OBBBA (as requiring offering for lease any lands nominated by oil and gas companies, so long as they are "open" under the RMP) will mean for the amount of expected leasing and drilling in sage-grouse habitat under the 2025 Plans.

### C.   The 2025 Plans Weaken the Minimization and Compensation Components of the Mitigation Hierarchy.

94.   In addition to eviscerating the "avoidance" components in the 2015 Plans, the 2025 Plans also weaken the minimization and compensation components of the BLM's former mitigation hierarchy, including abandoning the proposed "PHMA with limited exceptions" classification and weakening the adaptive management and compensatory mitigation provisions it previously proposed.

### 1.   PHMA with Limited Exceptions

95.   The 2025 Plans abandon the BLM's 2024 proposal to provide enhanced protection to approximately 4 million acres of PHMA. In the 2024 FEIS and draft Plan Amendments, BLM proposed to create a new designation of areas

---

[53] Montana 2025 Plan, *supra* note 2, at 16; Wyoming 2025 Plan, *supra* note 2, at 13.

within PHMA requiring additional protections because they offer the "highest value to maintaining sustainable [sage-grouse] populations," which would be classified as "PHMA with limited exceptions."[54] Among other protections, in PHMA with limited exceptions, the BLM proposed that, for new oil and gas leases, lease stipulations prohibiting surface occupancy of the leasehold (termed "no surface occupancy" or "NSO" stipulations) would not be subject to waivers, exceptions, or modifications.[55] In its 2024 proposal, BLM emphasized that these additional protections "will provide the necessary conservation of these key areas of GRSG habitat given anticipated development threats."[56]

96.    In the final 2025 Plan decisions, BLM abandoned the designation of PHMA with limited exceptions, explaining that "several states" objected and removing the protections was necessary to "allow the BLM and the states to move forward together."[57] Yet, even in those decision documents, BLM openly admitted that this decision is contrary to the best science:

> BLM maintains that the approach set out in the Proposed RMP Amendment, including PHMA with limited exceptions, is consistent with both best available science and state and local plans, policies, and

---

[54] 2024 FEIS, *supra* note 46, at ES-6, 2-21.

[55] *Id.* at 2-53.

[56] *Id.* at ES-8–ES-9.

[57] Wyoming 2025 Plan, *supra* note 2, at 17; *see also* Montana 2025 Plan, *supra* note 2, at 22 ("[I]n the spirit of promoting consistent and coordinated [sage-grouse] conservation across its range and to allow the BLM and the states to move forward together, consistent with 43 CFR 1610.3-12, the BLM removed PHMA with limited exceptions and all associated management direction. . . .").

programs. Additionally, BLM stands by the science and process used to identify the PHMA with limited exception areas, which indicates that these areas are more likely to be negatively impacted by development, potentially reducing their value for [sage-grouse].[58]

97.    Despite its recognition that the designation of PHMA with limited exceptions is supported by the best available science and is important to sage-grouse conservation, the BLM failed to analyze and disclose to the public how its decision not to include the designation of these areas in the final 2025 Plans will impact the sage-grouse and its habitat, either alone or in combination with the agency's decision to abandon the designation of SFAs and the prioritization requirements.

98.    Nor has BLM evaluated and ensured that, without the designation of PHMA with limited exceptions, the agency's management of sage-grouse habitat is consistent with the agency's substantive sustained-yield and unnecessary and undue degradation obligations under FLPMA, discussed *supra*, or considered whether the FWS's 2015 "not warranted" finding under the ESA could continue to be justified under BLM's new management approach.

### 2.    Adaptive Management

99.    Under the 2015 Plans, BLM adopted an adaptive management strategy based on habitat and population thresholds or "triggers," which if tripped

---

[58] Wyoming 2025 Plan, *supra* note 2, at 17–18.

obligated BLM to take additional management actions to benefit the sage-grouse. For example, under those plans, population triggers were tripped when monitoring revealed a sage-grouse population had dropped below certain defined levels. When a trigger was tripped, the 2015 Plans directed BLM to take responsive actions, such as adjusting project-level activities or deferring authorizations of new activities in the area and developing a response strategy.

100.   In its 2015 finding that listing the greater sage-grouse under the ESA was not warranted in light of protections afforded by the 2015 Plans, the FWS stated that this adaptive management program supported the agency's finding that the 2015 Plans would ensure the conservation of the sage-grouse.

101.   BLM's experience implementing the 2015 Plans, however, casts serious doubt on the efficacy of their adaptive management provisions, and the wisdom of FWS's stated reliance. In its 2015-2020 Monitoring Report, BLM found declines in sage-grouse habitat had tripped 16 habitat-related triggers. For example, a habitat trigger was tripped in Utah when more than 10% of sage-grouse habitat was lost in a Priority Habitat Management Area. The Monitoring Report also found that 42 triggers focused on sage-grouse population declines had been tripped, indicating that population declines had exceeded thresholds set forth in the plans. But, with only two exceptions, the report does not identify any specific adaptive management responses taken by the BLM in response to these warning

48

signs. Thus, the Monitoring Report indicated that the promise of the adaptive management provisions, which was identified and relied upon by FWS, had not actually been realized under BLM management.

102.   Accordingly, in the 2024 FEIS, BLM proposed to improve its adaptive management framework.  Noting that in the prior plans the adaptive management strategies varied by state, and the metrics used to measure trends varied widely so that results could not be compared across political boundaries, the 2024 FEIS proposed to uniformly adopt the Targeted Annual Warning System (TAWS) for all states.  Developed with the cooperation of state wildlife agencies, TAWS provides a consistent range-wide tool to alert land managers to potential habitat concerns affecting grouse populations.

103.   Although TAWS represents the best available science, and although the BLM recognized the need to improve adaptive management under the plans, the agency nonetheless opted to abandon the requirement to use the TAWS framework in the 2025 Plans in response to state protests. BLM did so despite the evidence from its own Monitoring Report, discussed *supra*, indicating that a stronger adaptive management framework is needed.  Instead, the 2025 Plans weaken the adaptive management process, leaving the responses to triggers undefined, and deferring to state processes that BLM does not control. The result is

an inconsistent patchwork, where monitoring, triggers, and responses are uncertain and vary by state.

104.   In Montana, for example, BLM will only use TAWS "[t]o the extent . . . consistent with State adaptive management processes,"[59] despite recognizing that TAWS "is currently the best available science."[60] The Montana plan also lacks specific management responses that are required when population or habitat triggers are tripped, and contemplates that new projects can continue to be approved in such areas. Instead of mandating effective response measures, the Plan provides specific pathways allowing for those triggers to be "deactivated," or for the thresholds to be "modified."[61]

105.   The Montana plan also does not require application of adaptive management at a regional or range-wide scale. Where BLM's adaptive management analysis and responses (if any) are done at a local scale they will be ineffective at addressing causes of declines that are regional in nature, such as expanding oil and gas development.

106.   In Wyoming, BLM's 2025 adaptive management approach opted to entirely defer to the State's existing adaptive management plan.  Wyoming's plan, however, relies on large population units that can mask localized population

---

[59] Montana Plan App'x 10, *supra* n.2, at 10-3.
[60] *Id.* App'x 11 at 11-3.
[61] *Id.* App'x 10 at 10-2 to 10-5.

problems, and allows longer and steeper population declines to occur before response thresholds are triggered.  Under the State's plan, Local Working Groups are tasked with identifying when and where a trigger may be tripped.  Upon identifying that a trigger has been tripped, the Local Working Group reports to the Statewide Adaptive Management Working Group, which assembles a technical team to decide on a response strategy.  The State's plan does not appear to mandate a response to triggers, leaving it unclear whether and how, the State—and ultimately BLM—will respond.

107.   Moreover, the inadequate and illusory nature of BLM's reliance on such State programs to fulfill essential sage-grouse conservation needs was highlighted only a month after BLM issued the 2025 Plans.  In January 2026, the Wyoming Game and Fish Department dissolved the State's Local Working Groups, which are responsible under Wyoming's adaptive management plan for identifying whether an adaptive management trigger has been tripped.[62]

### 3.    Compensatory Mitigation

108.   The 2025 Plans also weaken the compensatory mitigation component of BLM's sage-grouse conservation framework.  The mitigation hierarchy established by the 2015 Plans included the use of compensatory mitigation to

---

[62] Mike Koshmrl, *Wyoming abruptly defunds, dissolved sage grouse conservation groups after 21-year run*, WYOFILE (Jan. 23, 2026), https://wyofile.com/wyoming-abruptly-defunds-dissolves-sage-grouse-conservation-groups-after-21-year-run/.

address impacts to sage-grouse habitat that remain after applying avoidance and minimization measures.  Under the 2015 Plans, compensatory mitigation was required to result in a "net conservation benefit" to the sage-grouse.

109.   The FWS explicitly recognized the importance of compensatory mitigation and the net conservation benefit standard in the 2015 Plans when it concluded in 2015 that listing the sage-grouse under the ESA was not warranted.[63]

110.   The 2025 Plans retreat from the net conservation benefit standard, instead adopting a "no net loss" standard for compensatory mitigation.[64] This lower standard is unlikely to protect the sage-grouse.  FWS has noted that mitigation "[p]rograms that are structured with a goal of only no net loss … are unlikely to positively influence the conservation status of the species," and that "a mitigation program for sage-grouse should address how impacts will be avoided and how a net conservation gain will be achieved by compensatory mitigation for unavoidable impacts to sage-grouse across all habitats."[65]  BLM failed to acknowledge, much less to explain its departure from, FWS's conclusion.

111.   In addition to lowering the standard for compensatory mitigation, the new plans make compensatory mitigation voluntary.  For example, the Wyoming

---

[63] 80 Fed. Reg. at 59881.
[64] Montana 2025 Plan, *supra* note 2, at 18.
[65] FWS, GREATER SAGE-GROUSE RANGE-WIDE MITIGATION FRAMEWORK 4 (2014), USFWS_GRSG RangeWide_Mitigation_Framework20140903.pdf.

2025 Plan provides "that compensatory mitigation must be voluntary unless required by other applicable law and in recognition that State authorities may also require compensatory mitigation."[66]  This too represents a significant unexplained departure from the management framework that underlay FWS's 2015 not-warranted finding.

112.    The Montana 2025 Plan now directs that compensatory mitigation be implemented "to the extent practical," and relies on state directives rather than clear federal protections.[67]

113.    BLM's retreat from the compensatory mitigation requirements of the 2015 Plans is also contrary to the Agency's regulations, which require the use of compensatory mitigation to offset adverse impacts to public land. *See* 43 C.F.R. § 6102.5.1(a); *see also id*. § 6101.5(d); *id*. § 6102.5.1(c)(5).

### 4.    Other Mitigation Measures

114.    The 2025 Plans purport to minimize and mitigate impacts of oil and gas development on sage grouse habitat through no surface occupancy (NSO) stipulations on oil and gas leases and disturbance caps.  But the purposed measures are contrary to best available science and wholly inadequate to protect sage grouse habitat.

---

[66] *See* Wyoming 2025 Plan, *supra* note 2, at 43.
[67] Montana 2025 Plan, *supra* note 2, at 50.

115.    In Montana, Priority sage-grouse habitat is open to new oil and gas leasing, subject to an NSO stipulation.  In General sage-grouse habitat, this NSO stipulation is reduced to a 0.6-mile perimeter around active leks.  These NSO stipulations are subject to waiver, exception, and modification.

116.    In Wyoming, even Priority sage-grouse habitat is open to new oil and gas leasing, subject to an NSO stipulation within 0.6 miles of a lek.  In General sage-grouse habitat this NSO stipulation is reduced to a mere 0.25 miles of a lek.  And these limited NSO stipulations are subject to waiver, exception, and modification.

117.    These NSO buffer distances are inadequate to protect the sage-grouse and its habitat.  The best available science makes clear that buffer distances should be at least three to five miles from leks, and that the lower end of that range may be insufficient to protect nesting and other seasonal habitat.  Even BLM's own 2024 FEIS reported that buffer distances from 0.5 to 2 miles from oil and gas infrastructure have been shown to be inadequate to prevent declines of sage-grouse at leks.  BLM offered no explanation how its prescriptions for lek buffers that fail to comport with the agency's own recognition of necessary buffer distances demonstrated by the best available science will provide effective conservation of the sage-grouse.

118.   Further, BLM's implementation of the 2015 Plans casts doubt on the extent to which the minimization and mitigation measures of the 2025 Plans will even be followed.  In many parts of Montana and Wyoming, federal lands and minerals are interspersed with private lands and minerals.  BLM has taken the position that where a federal oil and gas lease is drilled with a horizontal subsurface wellbore from a surface location on nearby private property, the requirements of the 2015 Plans limiting surface activities do not apply.  These situations, known as "fee-fee-fed" wells, are increasingly common and (under BLM's approach) allow companies to drill in important sage-grouse habitat while avoiding protections mandated in the Plans.  Because the fee-fee-fed situation only arises where there is a federal lease, it did not impact the 2015 Plans' prioritization requirement, which simply avoided issuance of new leases in sage-grouse habitat.  In adopting the 2025 Plans, however, BLM failed to analyze the extent to which its reliance solely on minimization and mitigation measures, such as NSO prescriptions, would be undercut by companies using fee-fee-fed drilling strategies.

119.   The 2025 Plans also establish disturbance caps in Priority Habitat which purport to limit the overall amount of disturbance from development projects to between 3% and 5% of a delineated habitat area.  Once the caps are met, new infrastructure projects are to be deferred "to the extent allowable under

55

applicable laws."[68] The Plans, however, allow BLM to except projects from disturbance caps, making their utility uncertain and questionable.

120.  Even assuming they are not exceeded via exceptions, the disturbance caps fall far short of the 1%–2.5% disturbance cap threshold needed to avoid impacts to the sage-grouse, according to the best available science.  Indeed, research demonstrates that oil and gas development at the density permitted under the 2025 Plan in Wyoming would lead to sage-grouse population declines of 1.4% per year in core habitat areas.  Again, BLM offered no explanation of how these patently insufficient measures will conserve sage-grouse.

121.  BLM also failed to address how the OBBBA interacts with the disturbance caps set by the 2025 Plans.  The Plans provide that disturbance caps are only applicable "to the extent allowable under applicable law."  Now BLM has asserted that the applicable law, OBBBA, mandates oil and gas leasing when industry requests it.  BLM, however, failed to analyze or address the extent to which the new requirements of OBBBA will cause the agency to exceed the disturbance caps, or what impact that will have on the sage-grouse and its habitat.

122.  The 2025 Plans rely heavily on the assumption that BLM can exercise site-specific discretion and will conduct robust NEPA analysis to inform

---

[68] Wyoming 2025 Plan, *supra* note 2, at 15; Montana 2025 Plan, *supra* note 2, at 18.

that discretion when developing and authorizing new activities in sage-grouse habitat.  For example, rigorous project-level NEPA analysis that considers public and local knowledge is necessary to ensure the adaptive management process outlined in the 2025 Plans functions as intended.  Before finalizing the Plans, however, BLM made substantial changes to its long-standing NEPA regulations and procedures and proposed the use of emergency provisions to rapidly approve projects without full NEPA analysis.[69]  In promulgating the 2025 Plans, BLM failed to consider the impact of its new NEPA processes on the efficacy of the Plans in protecting sage-grouse habitat.

123.   As the foregoing makes clear, BLM's 2025 plans are contrary to the best available science. The best available science shows that sage-grouse habitat and populations have continued to decline across the historic range of the species since the adoption of the 2015 Plans.  But rather than strengthen protections, the 2025 Plans weaken them. Both current science and science long available to the BLM make clear that the 2025 Plans will not protect the sage-grouse or its habitat. Instead, scientific research repeatedly demonstrates that the Plans' minimization

---

[69] *See, e.g.,* National Environmental Policy Act Implementing Regulations, 90 Fed. Reg. 29498 (July 3, 2025); DOI, *Department of the Interior Implements Emergency Permitting Procedures to Strengthen Domestic Energy Supply* (Apr. 23, 2025), https://www.doi.gov/pressreleases/department-interior-implements-emergency-permitting-procedures-strengthen-domestic

and mitigation measures—including lek buffers and density caps—are inadequate. BLM offered no rationale to explain a contrary conclusion.

124.    Although conservation of the greater sage-grouse is the central purpose of the BLM's planning effort, and the 2015 Plans were the basis for FWS's finding that the sage-grouse did not qualify as an endangered or threatened species under the ESA, the BLM has not consulted with the FWS or otherwise determined whether the weakened 2025 Plans are sufficiently protective to avoid pushing sage-grouse into an endangered or threatened status. Numerous public comments noted that BLM was abandoning many of the components of the 2015 Plans that FWS explicitly relied on in finding that listing the sage-grouse was not warranted and commenters urged the agency to coordinate with the FWS to ensure the 2025 Plans maintain the "not warranted" status of the species.  Despite being alerted to this concern, BLM did not even address this central issue.

### FIRST CLAIM FOR RELIEF
*(Violation of APA and FLPMA)*

125.    The allegations in all preceding paragraphs are incorporated by reference.

126.    FLPMA directs BLM to manage the public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values."  43 U.S.C. § 1701(a)(8).  FLPMA also requires BLM to "manage the public lands under

principles of multiple use and sustained yield," 43 U.S.C. § 1732(a), which includes maintaining sustainable long-term populations of wildlife species, including the sage-grouse. *See id.* §§ 1702(c), (h); *see also* 43 C.F.R. § 6101.4(z) (2025) (sustained yield obligation includes ensuring that renewable resources are not permanently depleted and that desired future conditions are met for future generations). In addition, FLPMA requires BLM to "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b).

127. BLM must ensure that resource management plans are "consistent with the principles" established by FLPMA, including the obligation to provide for multiple-use and sustained yield management and to avoid unnecessary and undue degradation. 43 C.F.R. § 1601.0-8; *see* 43 U.S.C. § 1712(c)(1).

128. The APA requires agencies to engage in "reasoned decisionmaking," *Michigan v. EPA*, 576 U.S. at 750. An agency decision is arbitrary and capricious where an agency "entirely failed to consider an important aspect of the problem" or offers "an explanation for its decision that runs counter to the evidence." *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43.

129. BLM failed to comply with these requirements in developing and adopting the 2025 Plans. While the plans purport to manage for "rangewide conservation" of the sage-grouse,[70] they reduce protection for sage-grouse in

---

[70] 2024 FEIS, *supra* note 46, at ES-1.

numerous regards that defy the best available science, and BLM never rationally assessed whether the 2025 Plans would maintain sustainable long-term populations of sage-grouse or instead leave the species on a trajectory toward extirpation. BLM did not analyze and ensure that the plans were consistent with the sustained yield policy of FLPMA, or that they avoid unnecessary and undue degradation of sage-grouse habitat, despite weakening the 2015 Plans. Nor did BLM consider whether the 2015 "not warranted" finding under the ESA could be sustained in light of current conditions and BLM's own elimination of protections relied on by FWS in its 2015 finding.

130. BLM's adoption of the 2025 Plans therefore violated FLPMA and its implementing regulations and was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law. 5 U.S.C. §§ 706(2)(A), (D).

## SECOND CLAIM FOR RELIEF
### *(Violation of APA and NEPA – Elimination of Prioritization and Mineral Withdrawal in Sagebrush Focal Areas)*

131. The allegations in all previous paragraphs are incorporated by reference.

132. NEPA "ensures that the agency and the public are aware of the environmental consequences of proposed projects" and "helps agencies to make better decisions." *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 177.

60

133.   An agency's NEPA analysis must identify and address "the reasonably foreseeable environmental effects" of the proposed action.  42 U.S.C. § 4332(C)(i).  In conducting a NEPA analysis, an agency must ensure the "scientific integrity" of its analysis and make use of "reliable data and resources."  *Id.* §§ 4332(D), (E).

134.   The APA requires agencies to engage in "reasoned decisionmaking," *Michigan v. EPA*, 576 U.S. at 750.  An agency decision is arbitrary and capricious where an agency "entirely failed to consider an important aspect of the problem" or offers "an explanation for its decision that runs counter to the evidence."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43; *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) (holding that a regulation that changes an agency's position without "provid[ing] a reasoned explanation for the change" is arbitrary, capricious, and unlawful).

135.   In promulgating the 2025 Plans, BLM ignored and/or failed to rationally assess the impacts from eliminating the two central mandates from its 2015 Plans for avoiding sage-grouse habitat: leasing prioritization and the mineral withdrawal in sagebrush focal areas.  The BLM's EIS for the 2025 Plans arbitrarily asserted that eliminating prioritization and the SFA mineral withdrawal will have no effect on the extent of oil and gas development and mining in sage-grouse habitat.  This stance allowed BLM to misleadingly portray the 2024 FEIS

61

alternatives that eliminated these key conservation measures as *more* protective than the 2015 RMPs that prescribed them.  To the contrary, the evidence before the agency makes clear that prioritization of leasing outside sage-grouse habitat and the protections of SFA, including the SFA withdrawal from mineral development, are needed to adequately protect the species.

136.   BLM's adoption of the 2025 Plans therefore violated NEPA and the APA and was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.  5 U.S.C. §§ 706(2)(A), (D).

### THIRD CLAIM FOR RELIEF
*(Violation of NEPA and APA – Failure to Analyze and Consider Whether Mitigation Measures Will be Effective and Enforced)*

137.   The allegations in all previous paragraphs are incorporated by reference.

138.   An agency's NEPA analysis must identify and address "the reasonably foreseeable environmental effects" of the proposed action.  42 U.S.C. § 4332(C)(i).  In conducting a NEPA analysis, an agency must ensure the "scientific integrity" of its analysis and make use of "reliable data and resources."  *Id.* §§ 4332(D), (E).

139.   NEPA "ensures that the agency and the public are aware of the environmental consequences of proposed projects" and "helps agencies to makes better decisions."  *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 177.

140.   The APA requires agencies to engage in "reasoned decisionmaking," *Michigan v. EPA*, 576 U.S. at 750.  An agency decision is arbitrary and capricious where an agency "entirely failed to consider an important aspect of the problem" or offers "an explanation for its decision that runs counter to the evidence."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc..*, 463 U.S. at 43; *see also Encino Motorcars, LLC*, 579 U.S. at 221–22 (holding that a regulation that changes an agency's position without "provid[ing] a reasoned explanation for the change" is arbitrary, capricious, and unlawful).

141.   Instead of requiring avoidance of sage-grouse habitat through prioritization and designation of SFA accompanied by a withdrawal from mineral development, the 2025 Plans rely on a series of mitigation measures to reduce impacts to sage-grouse populations.  These include, for example, oil and gas lease stipulations, disturbance caps, adaptive management requirements, and compensatory mitigation.  The agency's 2024 FEIS, however, failed to consider whether these measures will be effective in preventing impacts to sage-grouse.  Nor did the 2024 FEIS assess the impacts to grouse if mitigation measures are ineffective or not fully enforced.

142.   BLM also failed to address the impacts that changes to its NEPA regulations and procedures, and its use of expedited emergency processes, will have on the efficacy of the mitigation measures included in the 2025 Plans.

63

143.   This failure was arbitrary and capricious because the record shows that those measures (such as the lek buffers and disturbance caps) are inadequate, and that BLM has failed to enforce similar measures under the 2015 Plans. *See Gulf Restoration Network v. Haaland*, 47 F.4th 795, 803 (D.C. Cir. 2022); *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 715 (10th Cir. 2009).

144.   BLM's adoption of the 2025 Plans therefore violated NEPA and the APA and was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.  5 U.S.C. §§ 706(2)(A), (D).

## FOURTH CLAIM FOR RELIEF
### *(Violation of FLPMA, NEPA and APA – Failure to Address the OBBBA)*

145.   The allegations in all previous paragraphs are incorporated by reference.

146.   BLM failed to address the impact of the OBBBA—especially the Bureau's assertion that it requires all lands designated as open under the RMP to be offered for leasing when companies nominate them—on implementation of the RMP amendments.  The FEIS for the 2025 Plans was issued in late 2024, prior to the passage of OBBBA.  In developing the FEIS, BLM assumed that it could exercise discretion over where to offer leases in sage-grouse habitat even without prioritization and without closing that habitat to leasing.  BLM acknowledged that the RMP amendments would "not specify a fluid mineral leasing strategy" but

64

asserted it would exercise its leasing discretion under the Mineral Leasing Act to protect sage-grouse habitat.[71]

147.   According to BLM's own assertion about the law's impact, that discretionary authority was reduced by the subsequent passage of OBBBA, *see supra*, ¶¶ 44–51, but BLM never supplemented its NEPA analysis to reflect that fundamental change in the law governing the plans.  Nor has BLM analyzed and disclosed how OBBBA would affect oil and gas leasing and sage-grouse populations under the new RMP amendments.

148.   Finally, BLM has not demonstrated that it will meet its substantive FLPMA mandates to provide for sustained yield and avoid undue degradation under the 2025 Plans in light of BLM's asserted position about OBBBA's limits on the agency's discretion.

149.   BLM's adoption of the 2025 Plans therefore violated FLPMA, NEPA and the APA and was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.  5 U.S.C. §§ 706(2)(A), (D).

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

---

[71] BLM, DIRECTOR'S PROTEST RESOLUTION REPORT: GREATER SAGE-GROUSE RANGEWIDE PLANNING PROPOSED RMP AMENDMENT AND FEIS 115–18 (Jan. 2025), https://www.blm.gov/sites/default/files/docs/2025-01/GRSG%20PRMPA%20FEIS_Protest%20Resolution%20Report.pdf.

1.    Issue a declaratory judgment that Defendants violated FLPMA, NEPA, and the APA, and acted arbitrarily and capriciously, abused their discretion, and contrary to law by issuing the Montana and Wyoming 2025 Plans;

2.    Set aside the Montana and Wyoming 2025 Plans and the RODs approving those plans, as well as the 2024 FEIS supporting the RODs;

3.    Reinstate the 2015 Plans to govern sage-grouse conservation and management on BLM lands in Montana and Wyoming pending BLM's compliance with governing law;

4.    Award temporary, preliminary, and permanent injunctive relief prohibiting BLM from implementing the Montana and Wyoming 2025 Plans or relying on them to authorize public-land management activities that are harmful to the sage-grouse;

5.    Award Plaintiffs' costs, expenses, and reasonable attorney fees; and

6.    Provide such other relief as the Court deems just and proper.

Respectfully submitted this 26th day of March, 2026,

/s/ Timothy J. Preso
Timothy J. Preso
Earthjustice
1716 West Babcock Street
P.O. Box 4743
Bozeman, MT 59772-4743
Phone: (406) 586-9699
Fax: (406) 586-9695
tpreso@earthjustice.org

*Counsel for Plaintiffs Montana Wildlife Federation, The Wilderness Society, and Defenders of Wildlife*