Shannon Leininger, Montana Bar No. 14589
Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Ph. (307) 777-7895
shannon.leininger@wyo.gov

*Attorney for Defendant-Intervenor, State of Wyoming*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**

| | |
|---|---|
| MONTANA WILDLIFE FEDERATION, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>DOUGLAS BURGUM, in his official capacity as Secretary of the Interior, *et al.*,<br><br>Defendants,<br><br>STATE OF WYOMING,<br><br>Defendant-Intervenor. | Case No. CV-26-133-GF-BMM<br><br>**INTERVENOR-DEFENDANT STATE OF WYOMING'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO SEVER AND TRANSFER** |

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

EXHIBIT INDEX ..... viii

INTRODUCTION ..... 1

BACKGROUND ..... 1

ARGUMENT ..... 3

I. The Groups' claims challenging the 2025 plan amendments for Wyoming should be dismissed for improper venue ..... 3

A. Where Defendants reside in this case is insufficient to make venue proper in Montana and a substantial part of the events or omissions giving rise to the Groups' claims did not occur in Montana ..... 4

B. The Groups' residences cannot serve to make venue proper in Montana when real property is involved ..... 7

C. This Court should not exercise pendent venue ..... 9

II. In the alternative, the Groups' claims challenging the 2025 plan amendments for Wyoming should be severed and transferred to the District of Wyoming ..... 10

A. This Court should sever the Wyoming claims ..... 11

B. This Court should transfer the Wyoming claims to the District of Wyoming ..... 17

1. The District of Wyoming is the proper venue ..... 18

2. The convenience of the parties favors transfer ..... 19

3. The Groups' forum choice should not be given deference ..... 20

4. The interest of justice strongly favors transfer to Wyoming ........................................................................ 22

III. The first to file rule further supports severance and transfer ............. 26

CONCLUSION ........................................................................................ 29

# TABLE OF AUTHORITIES

## Cases

*Agri-Sys. v. W. Nat'l Assurance Co.*,
No. CV 20-44-BLG-SPW-TJC, 2020 WL 6781685
(D. Mont. Nov. 18, 2020) .......... 26, 27, 28, 29

*Anderson v. Thompson*,
634 F.Supp. 1201 (D. Mont. 1986) .......... 22

*Animal Legal Def. Fund v. U.S. Dep't of Agric.*,
No. CV 12-4407-SC, 2013 WL 120185 (N.D. Cal. Jan. 8, 2013) .......... 21, 22, 24

*Bay.org v. Zinke*,
No. 17-CV-03739-YGR, 2017 WL 3727467 (N.D. Cal. Aug. 30, 2017) .......... 23

*Campos v. Fresno Deputy Sheriff's Ass'n*,
535 F.Supp.3d 913 (E.D. Cal. 2021) .......... 11

*Chesapeake Climate Action Network v. Exp.-Imp. Bank of the U.S.*,
No. C 13-03532 WHA, 2013 WL 6057824 (N.D. Cal. Nov. 15, 2013) .......... 20, 21

*City & Cnty. of Butte-Silver Bow v. 3M Co.*,
No. CV-25-36-BU-BMM, 2026 WL 34458 (D. Mont. Jan. 6, 2026) .......... 26

*Coughlin v. Rogers*,
130 F.3d 1348 (9th Cir. 1997) .......... 11

*Ctr. for Biological Diversity & Pac. Env't v. Kempthorne*,
No. C-07-0894 EDL, 2007 WL 2023515 (N.D. Cal. July 12, 2007) .......... 22

*Ctr. for Biological Diversity v. BLM*,
No. 08-cv-05646 JSW, 2009 WL 1025606 (N.D. Cal. Apr. 14, 2009) .......... 9

*Ctr. for Biological Diversity v. Pirzadeh*,
No. C09-1719-JCC, 2010 WL 11691840 (W.D. Wash. Apr. 28, 2010) .......... 5

*Decker Coal Co. v. Commonwealth Edison Co.*,
805 F.2d 834 (9th Cir. 1986) ........ 17, 18

*Doe v. Tenet Healthcare Corp.*,
789 F.Supp.3d 814 (E.D. Cal. 2025) ........ 27, 28

*Hatch v. Reliance Ins. Co.*,
758 F.2d 409 (9th Cir. 1985) ........ 18

*Intersearch Worldwide, Ltd. v. Intersearch Grp., Inc.*,
544 F.Supp.2d 949 (N.D. Cal. 2008) ........ 27

*Jones v. GNC Franchising, Inc.*,
211 F.3d 495 (9th. Cir. 2000) ........ 18

*Kohn L. Grp., Inc., v. Auto Parts Mfg. Miss., Inc.*,
787 F.3d 1237 (9th Cir. 2015) ........ 26, 27, 29

*Lou v. Belzberg*,
834 F.2d 730 (9th Cir. 1987) ........ 20

*Mont. Wildlife Fed'n v. Bernhardt*,
No. CV-18-69-GF-BMM, 2022 WL 2438963
(D. Mont. July 5, 2022) ........ 4, 6, 7, 8, 9, 12, 17

*Mont. Wildlife Fed'n v. Zinke*,
No. CV-18-69-GF-BMM, 2018 WL 5810502 (D. Mont. Nov. 6, 2018).. 5, 17, 18

*Murphy v. Schneider Nat'l, Inc.*,
362 F.3d 1133 (9th Cir. 2004) ........ 3

*Nat. Res. Def. Council, Inc., v. Tenn. Valley Auth.*,
340 F.Supp 400 (S.D.N.Y. 1971) ........ 8

*Nat. Res. Def. Council, Inc., v. Tenn. Valley Auth.*,
459 F.2d 255 (2d Cir. 1972) ........ 8

*Nat'l Parks Conservation Ass'n v. BLM*,
No. 5:23-cv-01844-SSS-SHKx, 2024 WL 4834287
(C.D. Cal. May 20, 2024) ........ 21

*Pac. Car & Foundry Co. v. Pence*,
403 F.2d 949 (9th Cir. 1968) ....................................................................20

*Pac. Coast Fed'n of Fishermen's Associations v. Ross*,
No. 19-cv-07897-LB, 2020 WL 1322947 (N.D. Cal. Mar. 20, 2020) .... 21, 22, 29

*Piedmont Label Co. v. Sun Garden Packing Co.*,
598 F.2d 491 (9th Cir. 1979) ....................................................................3

*Sasaki v. Inch*,
No. 18-cv-00270-DKW-KJM, 2019 WL 923880 (D. Haw. Feb. 25, 2019)........10

*Sierra Club v. Angelle*,
No. 19-cv-03263-RS, 2019 WL 9899513 (N.D. Cal. Nov. 26, 2019) .................24

*Stewart Org., Inc., v. Ricoh Corp.*,
487 U.S. 22 (1988) ....................................................................................17

*Theodore Roosevelt Conservation P'ship v. Salazar*,
661 F.3d 66 (D.C. Cir. 2011)....................................................................15

*Visendi v. Bank of Am., N.A.*,
733 F.3d 863 (9th Cir. 2013) ....................................................................17

*W. Energy All. v. Burgum*,
1:25-cv-00299-KHR (D. Wyo. 2025) ............................................... 26, 27, 28, 29

*W. Org. of Res. Councils v. BLM*,
No. 4:20-cv-76-BMM, 2021 WL 718857 (D. Mont. Feb. 24, 2021).......... 7, 8, 21

*W. Org. of Res. Councils v. BLM*,
No. CV 16-21-GF-BMM, 2017 WL 374705 (D. Mont. Jan. 25, 2017).. 12, 17, 21

*W. Watersheds Project v. Bernhardt*,
No. 1:18-cv-00187-REB, 2019 WL 3022188 (D. Idaho July 9, 2019)... 11, 18, 25

*W. Watersheds Project v. Burgum*,
No. 1:18-cv-00187-REP, 2025 WL 3853055 (D. Idaho Dec. 29, 2025) 7, 8, 9, 10

*W. Watersheds Project v. Lueders*,
No. 1:13-CV-00261-EJL, 2014 WL 12788740
(D. Idaho Mar. 13, 2014) .......... 19, 20, 22

*Zhang v. DeHart*,
No. C24-0064-KKE, 2024 WL 3027739 (W.D. Wash. June 17, 2024) .......... 5

**Statutes**

28 U.S.C. § 1391 .......... 3, 5, 6, 7, 8, 19

28 U.S.C. § 1404 .......... 10, 17, 18, 29

28 U.S.C. § 1406 .......... 3, 10

43 U.S.C. § 1702 .......... 14

WYO. STAT. ANN. § 30-5-104 .......... 16

**Other Authorities**

WYO. EXEC. ORDER NO. 2019-3, *Greater Sage-Grouse Core Area Protection*,
(Aug. 21, 2019) .......... 2, 13, 16, 25

**Rules**

Federal Rule of Civil Procedure 12(b)(3) .......... 3, 10

Federal Rule of Civil Procedure 21 .......... 11

RULES, WYO. OIL & GAS CONSERVATION COMM'N, ch. 3, § 8 .......... 16

RULES, WYO. OIL & GAS CONSERVATION COMM'N, ch. 4, § 1 .......... 16

**Regulations**

75 Fed. Reg. 13910 (Mar. 23, 2010)....................................................................25

80 Fed. Reg. 59858 (Oct. 2, 2015).................................................................... 23, 25

# EXHIBIT INDEX

| | |
|---|---|
| Exhibit A | BLM'S RESPONSE RE CONSISTENCY REVIEW |
| Exhibit B | WYOMING GOVERNOR MARK GORDON'S CONSISTENCY REVIEW Excerpts |
| Exhibit C | INSTRUCTION MEMORANDUM NO. 2016-143 |

## INTRODUCTION

The 2025 Wyoming Record of Decision ("ROD") and Resource Management Plan Amendment ("RMPA") implicates local natural resources, local decision-making, and local interests that are best resolved in Wyoming. This Court should dismiss the Plaintiffs' ("Groups") claims regarding the Wyoming ROD/RMPA or, in the alternative, sever and transfer them to the United States District Court for the District of Wyoming.

## BACKGROUND

As the State with the largest population and share of sage-grouse habitat, Wyoming has spent nearly three decades developing a tailored management. (ECF No. 14 at 19–20); ESTHER WAGNER & UNIV. OF WYO. SCH. OF ENERGY RES., THE HISTORY OF GREATER SAGE-GROUSE MANAGEMENT IN WYOMING 6, 7, 15 (Angi Bruce et al. eds., 2024) [hereinafter CERPA REPORT].[1] Since federal planning began, Wyoming has worked with federal partners to align federal plans with its core area strategy. *See* CERPA REPORT at 22–27. As part of this process, Wyoming and its federal partners have continued to build and refine multiple layers of sage-grouse protections.

[1] https://www.uwyo.edu/ser/_files/docs/research/publications/cerpa-greatersage-paper.pdf.

In Wyoming, sage-grouse are protected through four complementary layers of conservation. First, the State has a comprehensive framework under Executive Order 2019-3, which sets oversight mechanisms and management standards. *See generally*, WYO. EXEC. ORDER NO. 2019-3, *Greater Sage-Grouse Core Area Protection*, (Aug. 21, 2019). State agencies must follow these measures when permitting activities, using a rigorous and costly review process designed to avoid impacts to sage-grouse. *See id.* at 2. This approach has successfully steered oil and gas development away from critical habitat. CERPA REPORT at 32–34.

Second, there are regional sage-grouse conservation plans and county level plans that manage the landscape on a more localized scale. BUREAU OF LAND MGMT., GREATER SAGE-GROUSE RANGEWIDE PLANNING PROPOSED RESOURCE MANAGEMENT PLAN AMENDMENT AND FINAL ENVIRONMENTAL IMPACT STATEMENT, APPENDIX 23: CONSISTENCY WITH STATE AND LOCAL LAND USE PLANS, at 23-21 (Nov. 2024) [hereinafter 2024 FEIS].

Third, BLM Wyoming field offices have their own resource management plans ("RMP") that also protect sage-grouse habitat. *See* BUREAU OF LAND MGMT., GREATER SAGE-GROUSE RANGEWIDE PLANNING RECORD OF DECISION AND APPROVED RESOURCE MANAGEMENT PLAN AMENDMENT FOR WYOMING at 1 (Dec. 22, 2025) [hereinafter WYOMING ARMPA].

Finally, in 2015, the BLM created a statewide RMP that overlays these mechanisms. *See id.* Together, these four Wyoming-specific layers function as an integrated system that a court cannot evaluate in isolation. Like a four-legged table, each layer supports the others, and the system's stability depends on how they work together.

## ARGUMENT

### I. The Groups' claims challenging the 2025 plan amendments for Wyoming should be dismissed for improper venue.

Under Federal Rule of Civil Procedure 12(b)(3), a complaint may be dismissed if it is brought in an improper venue. A plaintiff bears the burden of demonstrating that venue is proper. *Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979). A court need not accept the allegations in the pleadings as true and may consider supplemental written materials and facts outside of the pleadings. *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1137 (9th Cir. 2004). If venue is improper, a district court must either dismiss the case or transfer it. *See* 28 U.S.C. § 1406(a).

Venue in civil actions against an agency or officer of the United States lies where "(A) a defendant . . . resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, . . . or (C) the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1). A plaintiff bringing multiple

claims must establish venue for each claim. *Mont. Wildlife Fed'n v. Bernhardt*, No. CV-18-69-GF-BMM, 2022 WL 2438963, at *3 (D. Mont. July 5, 2022).

### A. Where Defendants reside in this case is insufficient to make venue proper in Montana and a substantial part of the events or omissions giving rise to the Groups' claims did not occur in Montana.

The Groups allege that venue is proper because Defendants reside in Montana. (ECF No. 1 at 6). Similarly, they claim "a substantial part of the events giving rise to this case occurred in this district." (*Id.*).

In this case, the Groups challenge two different RODs approving two different RMPAs in two different states — Wyoming and Montana. (*See* ECF No. 1 at 5, 39). The Wyoming ROD/RMPA is unique, specifically tailored by BLM Wyoming staff in coordination with State officials to address Wyoming-specific sage-grouse threats and align with Wyoming-level conservation plans. *See* WYOMING ARMPA at 10, 28. This uniqueness is evident in the Groups' complaint, as many of their challenges raise issues that are local to Wyoming. *See infra*, Severance and Transfer Discussion. Additionally, the BLM Wyoming State Director was the sole approver of the Wyoming ROD/RMPA. WYOMING ARMPA at 31. As the challenges to the Wyoming ROD/RMPA are separate claims, venue needs to be proper as to these specific claims. *See Bernhardt*, 2022 WL 2438963, at *3.

Sonya Germann's residence cannot establish venue in Montana, as she has no connection to the Wyoming ROD/RMPA. "Venue with respect to a federal officer

or employee remains proper in the place of their official residence—in other words, where they perform their official duties." *Mont. Wildlife Fed'n v. Zinke*, No. CV-18-69-GF-BMM, 2018 WL 5810502, at *5 (D. Mont. Nov. 6, 2018). Because Director Kirby performed the duties underlying the Wyoming claims in Wyoming—not Director Germann in Montana—venue in Montana is improper under § 1391(e)(1)(A). *See Zhang v. DeHart*, No. C24-0064-KKE, 2024 WL 3027739, at *2 (W.D. Wash. June 17, 2024) (explaining that when a federal officer performs her official duties outside of a given district, venue is not proper in that district because the federal officer does not reside there).

BLM and DOI's Montana offices do not establish venue under § 1391(e)(1)(A). "[F]ederal courts have not been willing to adopt an expansive interpretation of residency and have rejected arguments that an agency resides wherever it has a regional office[.]" *E.g.*, *Ctr. for Biological Diversity v. Pirzadeh*, No. C09-1719-JCC, 2010 WL 11691840, at *3 (W.D. Wash. Apr. 28, 2010) (citation omitted); *Zinke*, 2018 WL 5810502, at *5.

Moreover, none of the events or omissions underlying the Groups' claims regarding the Wyoming ROD/RMPA occurred in Montana. The plan was developed by BLM Wyoming, approved in Wyoming, and will be implemented only in Wyoming. *See* WYOMING ARMPA at 1–2, 31. Therefore, venue is improper in Montana under § 1391(e)(1)(B).

Finally, this case is distinguishable from *Mont. Wildlife Fed'n v. Bernhardt*. There, this Court reasoned that the "object" of the case was not "the individual leasing decisions or the leases themselves," but the claims instead challenged "national directives—the 2018 IM and the Zinke Memo." *See Bernhardt*, 2022 WL 2438963, at *5. Consequently, this Court concluded that venue was proper under § 1391(e)(1)(A) or (B). *See id.* at *5, *6.

Here, by contrast, the "object[s]" of this case are the individual state RODs/RMPAs, not a uniform national directive. The Groups identify multiple alleged deficiencies unique to each ROD/RMPA. (*See, e.g.*, ECF No. 1 at 41–43, 51–54). Although the Groups also challenge the 2024 FEIS, it is not a uniform national directive because its analysis expressly accounts for unique local conditions. *See infra* Severance Discussion. Likewise, although some claims implicate the One Big Beautiful Bill Act ("OBBBA") and BLMs' amended NEPA regulations, resolving those claims still requires consideration of state-specific conditions. *See id.* In short, the Groups ask this Court to address localized issues rather than a broad national question. Therefore, the "object" of the Groups' claims is not a national directive and venue cannot be maintained in Montana under § 1391(e)(1)(A) or (B). *See Bernhardt*, 2022 WL 2438963, at *5.

### B. The Groups' residences cannot serve to make venue proper in Montana when real property is involved.

The Groups further allege that venue is proper because they reside in this district. (ECF No. 1 at 6). However, venue can be proper only "if no real property is involved in the action." 28 U.S.C. § 1391(e)(1)(C).

The State acknowledges this Court's skepticism that land use plans involve real property. *See W. Org. of Res. Councils v. BLM*, No. 4:20-cv-76-BMM, 2021 WL 718857, at *3–4 (D. Mont. Feb. 24, 2021) [hereinafter *WORC II*]; *Bernhardt*, 2022 WL 2438963, at *6–7. However, the State respectfully requests that this Court revisit those decisions considering a recent decision from the District of Idaho. *See W. Watersheds Project v. Burgum*, No. 1:18-cv-00187-REP, 2025 WL 3853055, at *9–16 (D. Idaho Dec. 29, 2025). Although *Burgum* addressed federal oil and gas lease sales rather than RMPAs, the reasoning bears on whether this case involves real property.

In conducting its analysis, the *Burgum* court first observed that the 1990 amendment created a distinction between "property that is the ***subject*** of the action" in § 1391(e)(1)(B) and "real property [that] is ***involved*** in the action" in § 1391(e)(1)(C). *See id.* at *11 (alterations in original).

Next, the court considered the plain meanings of "involved in the action" and "subject of the action." It determined that "real property is involved" when it is "a part of, included in, or associated with the action," while real property is "subject of

the action" when it is the "property at issue in a lawsuit; the basis of a legal claim." *Id*. at *12, *13 (citations omitted). This distinction led the court to conclude that the "ordinary meaning of 'subject of the action' in § 1391(e)(1)(B) – and its close proximity to 'involved in the action' in § 1391(e)(1)(C) – strongly suggest that Congress purposely intended to distinguish between the two concepts and for 'involved' to be read more broadly, and according to its ordinary dictionary meaning." *Id.* at *12.

Finally, the court rejected the plaintiffs' argument that "real property is involved" only when a lawsuit "centers directly on real property as with actions concerning right, title or interest in real property." *Id.* at *13, *14. The court noted that this interpretation largely traces to a single Southern District of New York decision. *Id.* at *13 (citing *Nat. Res. Def. Council, Inc., v. Tenn. Valley Auth.*, 340 F.Supp 400 (S.D.N.Y. 1971) [hereinafter *NRDC*], *rev'd on other grounds*, 459 F.2d 255 (2d Cir. 1972)). The court held that *NRDC*'s "dubious statutory interpretation" leaves both it and its progeny resting upon the same "shaky foundation." *Id.* at *14 (citing *WORC II*, 2021 WL 718857, at *4; *Bernhardt*, 2022 WL 2438963, at *6–7).

The Wyoming RMPA governs rights-of-way, lease sales, where different natural resources can be developed, grazing rights, and other real property interests. *See* WYOMING ARMPA at 1, 2, 3, 4, 35–38. The Groups specifically allege the Wyoming RMPA violates the Federal Land Policy and Management Act

("FLPMA") by failing to adequately restrict public land access tied to real property interests. (*See* ECF No. 1 at 40–61).

Real property is "part of, included in, or associated with" this action. *See Burgum*, 2025 WL 3853055, at *12, *13; *Ctr. for Biological Diversity v. BLM*, No. 08-cv-05646 JSW, 2009 WL 1025606, at *1, *3 (N.D. Cal. Apr. 14, 2009). Consequently, venue is improper in Montana under § 1391(e)(1)(C).

**C. This Court should not exercise pendent venue.**

This Court should not exercise pendent venue over the Wyoming claims. Plaintiffs generally must establish venue for each claim. *Bernhardt*, 2022 WL 2438963, at *3. However, courts sometimes apply pendent venue to closely related claims. *Burgum*, 2025 WL 3853055, at *17. Those claim must share a "common nucleus of facts." *Id.* (citation omitted). Also pendent venue must further judicial economy, convenience, and fairness. *Id.*

The Wyoming claims are not closely related to the Groups' Montana challenges. The Wyoming RMPA overlays different local plans, was developed in Wyoming in coordination with local officials to reflect the State's unique circumstances, applies only to land in Wyoming, and was approved by a separate ROD by BLM officials in Wyoming. *See* WYOMING ARMPA at 10, 28. Adjudicating the Wyoming claims will require a Wyoming-specific FLPMA/NEPA analysis based on Wyoming-specific plans and the Wyoming administrative record. Pendent

venue is unwarranted. *Burgum*, 2025 WL 3853055, at *17 (declining pendent venue where claims involved "different geographic areas, different administrative processes, different decision makers, and different administrative records.").

As discussed below, judicial economy, convenience, and local interest confirm that pendent venue is inappropriate here. *See infra* Severance and Transfer Discussion; *Sasaki v. Inch*, No. 18-cv-00270-DKW-KJM, 2019 WL 923880, at *4 n.10 (D. Haw. Feb. 25, 2019) (declining to exercise pendent venue where other states had "far more interest in resolving" the claims at issue).

Thus, venue in the District of Montana is improper and, pursuant to Rule 12(b)(3) and 28 U.S.C. § 1406(a), the Wyoming claims should be dismissed. Alternatively, as discussed below, this Court should sever and transfer the Wyoming claims under 28 U.S.C. § 1404(a).

## II. In the alternative, the Groups' claims challenging the 2025 plan amendments for Wyoming should be severed and transferred to the District of Wyoming.

If the Court does not dismiss the Wyoming claims, it should sever and transfer those claims to the District of Wyoming, pursuant to 28 U.S.C. § 1404(a). All of the land at issue lies within the District of Wyoming, where the Wyoming RMPA was developed and approved and will be implemented. Wyoming has a strong interest in

local resolution of any dispute concerning the RMPA, having played an integral role in its development and retaining a substantial stake in its proper implementation.

**A. This Court should sever the Wyoming claims.**

This Court should sever the Wyoming claims because they are factually, substantively, and procedurally distinct. Severance is the first step before transferring part of a case. *W. Watersheds Project v. Bernhardt*, No. 1:18-cv-00187-REB, 2019 WL 3022188, at *3 (D. Idaho July 9, 2019) [hereinafter *NPL Project*]. Courts have broad discretion to "sever any claim against a party." *Id.*; Fed. R. Civ. P. 21. A complaint asserting the same legal theories to distinct factual scenarios may be treated as pleading multiple claims and can be severed under Rule 21. *See Coughlin v. Rogers*, 130 F.3d 1348, 1350–51 (9th Cir. 1997).

Misjoinder is not a pre-requisite and severance is appropriate where claims arise from different factual situations or are "otherwise logically distinct." *Campos v. Fresno Deputy Sheriff's Ass'n*, 535 F.Supp.3d 913, 928 (E.D. Cal. 2021). Even where claims arise from the same legal or factual situations, a court may sever them to promote convenience, judicial economy, or the ends of justice. *Id.*; *NPL Project*, 2019 WL 3022188, at *3.

Severance is warranted because the Wyoming RMPA is procedurally distinct, and does not stem from an overarching national directive creating identical issues consistent across states. BLM approved the Wyoming RMPA through a Wyoming-

specific ROD. *See* WYOMING ARMPA at 1–2, 31; *cf. W. Org. of Res. Councils v. BLM*, No. CV 16-21-GF-BMM, 2017 WL 374705, at *7, *8 (D. Mont. Jan. 25, 2017) [hereinafter *WORC I*] (denying severance where Federal Defendants "opted to approve the eight RMP revisions and four RMP amendments in a single ROD signed in Washington, D.C."). As a "ROD represents a final agency action," the Groups challenge two separate, state-specific agency actions. *See WORC I*, 2017 WL 374705, at *8; (ECF No. 1 at 67); *cf. Bernhardt*, 2022 WL 2438963, at *7 (denying severance where "Plaintiffs' challenge targets a single action").

The 2024 FEIS is not a national directive. The FEIS conducted a Wyoming-specific analysis and accounts for Wyoming's unique conditions rather than a uniform national policy. *See, e.g.*, 2024 FEIS, APPENDIX 3: GREATER SAGE-GROUSE HABITAT MANAGEMENT AREA STATE-BY-STATE MAPPING STRATEGIES, at 3-26 (evaluating HMAs "developed by the State of Wyoming" and adopting Wyoming's "core area designated habitats"). The Groups' claims likewise turn on Wyoming's unique conditions.

The Groups allege that BLM unlawfully eliminated the sagebrush focal area ("SFA") designation from the 2015 plans. (ECF No. 1 at 41–43, 62–63). Unlike other states, the 2015 Wyoming RMPA treated SFAs the same as priority habitat management areas ("PHMA") and did not categorically prohibit fluid mineral development in those areas. *See* BUREAU OF LAND MGMT., APPROVED RESOURCE

MANAGEMENT PLAN AMENDMENT FOR GREATER SAGE-GROUSE 38 (Sept. 2015) [hereinafter 2015 WYOMING ARMPA]; (ECF No. 1 at 32). Therefore, the Groups argument that removing the SFA designation reduced fluid-mineral protections does not apply to the Wyoming RMPA. (*See* ECF No. 1 at 41–43).

The Groups also allege BLM unlawfully eliminated the 2015 plans' prioritization requirement. (ECF No. 1 at 43–46, 56). To resolve this issue, a court must consider that the 2015 Lander Wyoming RMPA never included that requirement. *See, e.g.*, EXHIBIT C: INSTRUCTION MEMORANDUM NO. 2016-143 1, 3 n.4. Accordingly, a court must evaluate the Groups' prioritization and OBBBA claims in light of Wyoming-specific conditions.

The Groups also assert that the Wyoming RMPA's compensatory mitigation framework is a "significant unexplained departure" from the 2015 plans because it makes mitigation "voluntary." (ECF No. 1 at 53–54). But the 2015 plans, consistent with the State's strategy, required compensatory mitigation only when protective stipulations were insufficient. *See* 2015 WYOMING ARMPA at 35. The 2025 Wyoming RMPA similarly requires compensatory mitigation when the State's plan does. *See* WYOMING ARMPA at 43. Under the State's plan, mitigation is required when a permitted project does not comply with protective stipulations. *See, e.g.*, WYO. EXEC. ORDER NO. 2019-3 at 2–3; *id.*, Appendix F, at 1. Accordingly, to resolve

this issue, a court must consider that the 2015 and 2025 mitigation frameworks operate similarly in Wyoming.

The Groups claim that BLM unlawfully eliminated PHMA with limited exceptions. (ECF No. 1 at 46–48). But in 2024, BLM's Rock Springs Field Office designated the South Wind River Area of Critical Environmental Concern ("ACEC"). BUREAU OF LAND MGMT., ROCK SPRINGS FIELD OFFICE RECORD OF DECISION AND APPROVED RESOURCE MANAGEMENT PLAN at 1-5, 1-10, 2-74 (Dec. 2024). As the map below shows, the proposed PHMA with limited exceptions area almost perfectly overlaps the South Wind River ACEC. The overlap is important because BLM could not designate the same area as both an ACEC and PHMA with limited exceptions. *See* 43 U.S.C. § 1702(a) (defining an ACEC as an area "where special management attention is required . . . to protect and prevent irreparable damage."). Consequently, in determining whether BLM lawfully eliminated PHMA with limited exceptions, a court must consider Wyoming-specific regulatory mechanisms.




*Prepared by the Wyoming Game and Fish Department ("WGFD")*[2]

The Groups argue that the Wyoming RMPA violates FLPMA by failing to prevent unnecessary or undue degradation of sage-grouse habitat. (ECF No. 1 at 59–61). They contend fee-fee-fed development scenarios, OBBBA, and BLMs' amended NEPA regulations undermine BLM's reliance on minimization and mitigation measures. (*See id.* at 25, 56, 59–61, 66).

Development is not undue or unnecessary degradation when it is "appropriately mitigated." *See Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 76 (D.C. Cir. 2011). In Wyoming, fluid mineral development is subject to appropriate mitigation on all lands. The Wyoming Oil and Gas Conservation Commission ("WOGCC") must issue a State Application for Permit to Drill ("APD") before any well pad construction or drilling operations may begin. RULES,

---

[2] EXHIBIT B: WYOMING GOVERNOR MARK GORDON'S CONSISTENCY REVIEW 8.

WYO. OIL & GAS CONSERVATION COMM'N, ch. 3, § 8. The WOGCC regulates all oil and gas wells on federal, fee, and State trust lands in Wyoming. *See* WYO. STAT. ANN. § 30-5-104(a).

As part of enforcing rules to protect the environment, the WOGCC implements sage-grouse protections by approving permit conditions according to Wyoming's core area protection strategy. *See* RULES, WYO. OIL & GAS CONSERVATION COMM'N, ch. 4, § 1(c)(v); *see also* CERPA REPORT at 32–33. Because the federal plans largely track Wyoming's core area strategy, the stipulations in WOGCC permits subject operators to many of the same protections found in the federal plans. *See* WYO. EXEC. ORDER NO. 2019-3, Appendix E, at 7–12. This generally remains true even outside of the oil and gas context. *See, e.g.*, WYO. EXEC. ORDER NO. 2019-3 at 2–3; *id.*, Appendix E, at 7–12. Therefore, to properly evaluate the Groups' claims, a court must also consider the State's mitigation framework.

For instance, Wyoming's permitting framework applies across all lands, reducing the practical impact of OBBBA and fee-fee-fed development scenarios and helping prevent unnecessary or undue degradation of sage-grouse habitat. (*See* ECF No. 1 at 25, 66). Likewise, in evaluating the Groups' claim that BLMs' amended NEPA regulations weaken mitigation measures like NSO stipulations, a court must

also consider Wyoming's permitting programs which apply on all lands—even under expedited emergency procedures. (*See* ECF No. 1 at 58–61, 64).

As a result, this case does not exclusively raise broad national questions. *Cf. Zinke*, 2018 WL 5810502, at *3 (denying severance where the challenged lease sales followed a uniform national directive — "the Zinke Memo and the 2018 IM"). Nor do the Groups' claims present "identical questions, consistent across" both RMPAs. *Cf. Bernhardt*, 2022 WL 2438963, at *7 (denying severance where the claims presented "identical questions, consistent across the lease sales" surrounding the application of the "2018 IM's prioritization requirement").

Thus, severance is appropriate because it will not create "multiple cases involving the same questions of law and fact." *See Zinke*, 2018 WL 5810502, at *4; *Visendi v. Bank of Am., N.A.*, 733 F.3d 863, 870 (9th Cir. 2013) (finding severance appropriate where each claim required "particularized factual analysis"). Severance is also warranted for convenience, judicial efficiency, and Wyoming's local interests. *See infra*, Transfer Discussion; *WORC I*, 2017 WL 374705, at *7.

**B. This Court should transfer the Wyoming claims to the District of Wyoming.**

This Court has broad discretion under 28 U.S.C. § 1404(a) to transfer claims to another judicial district based on considerations of convenience and fairness. *Stewart Org., Inc., v. Ricoh Corp.*, 487 U.S. 22, 29–30 (1988); *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986).

Courts apply a two-step analysis under § 1404(a). *Zinke*, 2018 WL 5810502, at *4. First, the court evaluates whether the action could have been brought in the proposed transferee district. *Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 414 (9th Cir. 1985). If so, "the second step calls for a case-specific analysis that balances the plaintiff's interest in choosing a forum against the aggregate considerations of convenience and the interest of justice/fairness." *NPL Project*, 2019 WL 3022188, at *4; *see also Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498–99 (9th. Cir. 2000). In conducting this assessment relevant factors include: (1) convenience of the parties and witnesses; (2) the plaintiffs' choice of forum; (3) the parties contacts with the forum; and (4) the local interest in the action. *Zinke*, 2018 WL 5810502, at *4; *see also Decker Coal Co.*, 805 F.2d at 843.

**1. The District of Wyoming is the proper venue.**

"In determining whether an action 'might have been brought' in a district, the court looks to whether the action initially could have been commenced in that district." *Hatch*, 758 F.2d at 414 (citation omitted). Here, the Wyoming ROD/RMPA was developed, signed, and approved in Wyoming. *See* WYOMING ARMPA at 1–2, 10, 31. The Groups specifically challenge how the local Wyoming BLM office developed the Wyoming RMPA; they do not challenge a broad national directive that authorized the Wyoming RMPA's development. (*See* ECF No. 1 at 41–43, 51–52, 55); *cf. Zinke*, 2018 WL 5810502, at *5 ("Plaintiffs do not challenge how a local

BLM office handled a lease sale. Plaintiffs challenge, rather, the 2018 IM and the Zinke Memo that allowed the leasing decisions."). Accordingly, venue would have been proper in the District of Wyoming. *See* 28 U.S.C. § 1391(e)(1)(B); *W. Watersheds Project v. Lueders*, No. 1:13-CV-00261-EJL, 2014 WL 12788740, at *3 (D. Idaho Mar. 13, 2014).

**2. The convenience of the parties favors transfer.**

In environmental cases, courts typically rely on an administrative record, which makes convenience considerations less important in the transfer analysis. *See, e.g., Lueders*, 2014 WL 12788740, at *4. Even so, to the extent convenience matters, it favors transfer.

Many of the interested parties are in or frequently visit the District of Wyoming. Defenders of Wildlife ("Defenders") is a national organization and has 3,500 members who reside in Wyoming. (ECF No. 1 at 9). The Wilderness Society ("TWS") is a national organization and has members nationwide. (*See id.* at 7). Presumably, to have standing, the Montana Wildlife Federation ("Federation") has members who "live, work, hunt, and recreate on lands" in Wyoming. (*See id.* at 9). Therefore, many of the interested parties are in or frequently visit Wyoming—undermining the convenience of Montana as the forum state. *See Lueders*, 2014 WL 12788740, at *4. Accordingly, because the challenged Wyoming RMPA was

developed and approved in Wyoming, and the facts underlying those decisions arose there, Wyoming is, on balance, the more convenient forum. *See id.*

**3. The Groups' forum choice should not be given deference.**

Generally, a plaintiff's choice of forum receives deference. *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987). However, where the "operative facts have not occurred within the forum and the forum has no interest in the parties or subject matter" plaintiff's choice "is entitled to only minimal consideration." *Id.* (citing *Pac. Car & Foundry Co. v. Pence*, 403 F.2d 949, 954 (9th Cir. 1968)); *Chesapeake Climate Action Network v. Exp.-Imp. Bank of the U.S.*, No. C 13-03532 WHA, 2013 WL 6057824, at *2 (N.D. Cal. Nov. 15, 2013).

None of the operative facts underlying the Groups' claims against the Wyoming ROD/RMPA occurred in Montana. The operative facts occurred in Wyoming, where officials developed the ROD/RMPA with input from Wyoming agencies, local governments, and the public. *See* WYOMING ARMPA at 10, 28. The plan applies only to Wyoming's sage-grouse habitat. *Lueders*, 2014 WL 12788740, at *4.

Likewise, Montana has little interest in the subject matter or the parties: all but one of the Plaintiffs are regional or national organizations headquartered outside Montana, while the habitat managed by the Wyoming RMPA lies entirely within

Wyoming.[3] *See Pac. Coast Fed'n of Fishermen's Associations v. Ross*, No. 19-cv-07897-LB, 2020 WL 1322947, at *4 (N.D. Cal. Mar. 20, 2020); *Nat'l Parks Conservation Ass'n v. BLM*, No. 5:23-cv-01844-SSS-SHKx, 2024 WL 4834287, at *3 (C.D. Cal. May 20, 2024); *Chesapeake Climate Action Network*, 2013 WL 6057824, at *2; *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, No. CV 12-4407-SC, 2013 WL 120185, at *4 (N.D. Cal. Jan. 8, 2013).

Finally, there is no risk of inconsistent judgments warranting deference to the Groups' chosen forum. Although courts in Montana and Wyoming could reach different conclusions about separate RMPAs approved through different RODs, they cannot issue conflicting rulings on the same ROD/RMPA as each plan was based on different underlying facts and local plans. *Cf. WORC I*, 2017 WL 374705, at *9 (acknowledging that severance and transfer could result in inconsistent judgments concerning the same ROD).

Nor is there any related "litigation history" raising such concerns; the Groups' claims are geographically distinct, implicating unique local questions. *See supra*, Severance Discussion; (ECF No. 1 at 51–58); *cf. WORC II*, 2021 WL 718857, at *7 ("The litigation history and geography in this case distinguishes it from other cases where courts severed and transferred ***geographically distinct claims***." (emphasis

---

[3] TWS has its national headquarters in Washington D.C. as does Defenders. The only organization based in Montana is the Federation.

added)). For example, the Groups' challenge to the removal of the SFA designation applies only to the Montana RMPA, underscoring the claim's geographic distinctness and the minimal risk of inconsistent judgments. *See supra*, Severance Discussion. Therefore, the Court should give the Groups' forum choice minimal consideration.

**4. The interest of justice strongly favors transfer to Wyoming.**

Courts typically give greatest weight to the "interests of justice" in transfer decisions. *See, e.g., Anderson v. Thompson*, 634 F.Supp. 1201, 1204 (D. Mont. 1986). This factor encompasses judicial economy and resolving local controversies at home. *See, e.g., Ctr. for Biological Diversity & Pac. Env't v. Kempthorne*, No. C-07-0894 EDL, 2007 WL 2023515, at * 5 (N.D. Cal. July 12, 2007). The pendency of related actions in the proposed transferee forum is highly persuasive. *Pac. Coast Fed'n of Fishermen's Associations*, 2020 WL 1322947, at *5 (citation omitted). Ultimately, courts weigh "a plaintiff's choice of forum against the competing interest in having localized controversies decided at home." *See, e.g., Ctr. for Biological Diversity & Pac. Env't*, 2007 WL 2023515, at *5 (citation and quotations omitted).

Wyoming's local interests outweigh the Groups' forum choice. Wyoming has a strong interest in having controversies implicating its wildlife-management strategy decided at home. *Lueders*, 2014 WL 12788740, at *5; *Animal Legal Def. Fund*, 2013 WL 120185, at *6 ("The localized nature of certain cases concerning

specific environmental locales or individual animals—as opposed to cases based on more all-encompassing phenomena like global warming—can give certain districts an especially acute interest in having cases decide there, where they would have the most localized impact.”).

That interest is particularly compelling here: Wyoming contains roughly 38% of the sage-grouse population and 24% of its habitat, “making it home to the highest number of birds and the most habitat across its 11-state range.” CERPA REPORT at 15; *see Bay.org v. Zinke*, No. 17-CV-03739-YGR, 2017 WL 3727467, at *4 (N.D. Cal. Aug. 30, 2017) (finding stronger local interest where the district contained more of the species’ habitat).

Wyoming’s economy depends heavily on mineral extraction. As seventy percent of its surface is sage-grouse habitat—more than any other state—Wyoming created a unique “all lands” approach for sage-grouse conservation. *See* 80 Fed. Reg. 59858, 59882 (Oct. 2, 2015). This approach balances economic development with sage-grouse protection. *See id.*

For example, by pairing protective stipulations with advanced drilling techniques, the State and its federal partners have led federal mineral leasing without compromising sage-grouse conservation. CERPA REPORT at 32–33, 43–44. Between fiscal years 2017 through 2024, Wyoming had more federal oil and gas

leases in effect than any other state.[4] Every year, BLM returns roughly half of the mineral royalties associated with these leases to Wyoming.[5]

Many of the Groups' claims seek to bar development in parts of Wyoming. (*See* ECF No. 1 at 41–48). However, limiting development options would reduce the State's ability to make the best decisions for its wildlife. As explained by WGFD: "Game and Fish's ability to protect wildlife habitat and have mineral development relies on maintaining maximum flexibility to determine where and when drilling or mining occur."[6] Wyoming's interest in preserving the federal plans "all lands" approach—supporting its economy while maintaining management flexibility that benefits sage-grouse—clearly outweighs any Montana interest in the Wyoming RMPA. *See Sierra Club v. Angelle*, No. 19-cv-03263-RS, 2019 WL 9899513, at *3–4 (N.D. Cal. Nov. 26, 2019); *Animal Legal Def. Fund*, 2013 WL 120185, at *6.

Wyoming has a significant local interest given its substantial investment in sage-grouse conservation. Initially developed in 2008, the core area strategy

---

[4] BUREAU OF LAND MGMT., OIL AND GAS STATISTICS FOR FISCAL YEAR 2024 TABLE 1 (Oct. 1, 2024), https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/oil-and-gas-statistics.

[5] BUREAU OF LAND MGMT., BLM WYOMING OIL AND GAS, https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/about/wyoming (last visited May 4, 2026).

[6] Brian Nesvik, *Presidential suspension on mineral development bad for Wyoming's wildlife*, Wyo. Game & Fish Dep't (Feb. 10, 2021), https://wgfd.wyo.gov/News/Presidential-suspension-on-mineral-development-bad.

represents Wyoming's regulatory template for managing greater sage-grouse. CERPA Report at 21. Wyoming has pursued nearly three decades of conservation efforts costing more than $100 million. *Id.* at 6, 42.

Those investments have proven worthwhile; federal partners consistently find that aligning federal plans with the State's strategy benefits both sage-grouse and all stakeholders involved. *See* 80 Fed. Reg. at 59874, 59882–83; WYOMING ARMPA at 10; 75 Fed. Reg. 13910, 13974 (Mar. 23, 2010). Indeed, the Fish and Wildlife Service's 2015 listing decision expressly relied on the effectiveness of the State's plan and its incorporation into federal planning. 80 Fed. Reg. at 59874, 59882–83. This collaboration continued with the development of the 2025 plans.

The Groups challenge several unique aspects of the Wyoming RMPA, including its adaptive management and compensatory mitigation frameworks, maintenance of 0.6-mile NSO buffers in PHMA, five-percent disturbance caps at the project scale, and its approach to defining habitat management boundaries. *See* (ECF No. 1 at 40-41, 47, 51–52, 55-56); EXHIBIT A: BLM'S RESPONSE RE CONSISTENCY REVIEW 3. Many of these measures were adopted from or shaped by the State's core area strategy and Executive Order 2019-3. *See* WYOMING ARMPA at 10, 12, 15, 25, 42. Consequently, the Groups' challenge to the Wyoming RMPA effectively challenges the State's core area strategy and Executive Order 2019-3, giving Wyoming a strong local interest. *See NPL Project*, 2019 WL 3022188, at *9; *cf. id.*

(distinguishing the situation where a plaintiffs' "claims are not specific to any particular transferee district").

Thus, this Court should transfer the Wyoming claims to the District of Wyoming. As explained below, the interest of justice also weighs in Wyoming's favor considering the pendency of a related action and judicial economy.

**III. The first to file rule further supports severance and transfer.**

The first-to-file rule supports transferring the Wyoming claims to the District of Wyoming. Under this doctrine of federal comity, a court may transfer a case when a similar action is already pending elsewhere to promote efficiency, prevent duplicative litigation, and "avoid the embarrassment of conflicting judgments." *See, e.g., Agri-Sys. v. W. Nat'l Assurance Co.*, No. CV 20-44-BLG-SPW-TJC, 2020 WL 6781685, at *2 (D. Mont. Nov. 18, 2020) (citation omitted); *see also Kohn L. Grp., Inc., v. Auto Parts Mfg. Miss., Inc.*, 787 F.3d 1237, 1239–40 (9th Cir. 2015). In deciding whether to apply the rule, courts consider: "(1) the chronology of the lawsuits; (2) the similarity of the parties; and (3) the similarity of the issues." *City & Cnty. of Butte-Silver Bow v. 3M Co.*, No. CV-25-36-BU-BMM, 2026 WL 34458, at *2 (D. Mont. Jan. 6, 2026).

On December 23, 2025 Western Energy Alliance ("WEA") filed a case in Wyoming asking the court to resolve questions surrounding the Wyoming RMPA, the same as the one in this case. *W. Energy All. v. Burgum*, 1:25-cv-00299-KHR (D.

Wyo. 2025), (ECF Nos. 1, 6). On March 26, 2026 the Groups filed the case at bar. (ECF No. 1 at 1). Therefore, the chronology factor is satisfied and weighs in favor of applying the rule. *Agri-Sys.*, 2020 WL 6781685, at *3.

In regards to the second factor, the first-to-file rule does not mandate that the parties be exactly the same; rather, it "requires only substantial similarity of parties." *Kohn L. Grp., Inc.*, 787 F.3d at 1240. "The rule is satisfied if some [of] the parties in one matter are also in the other matter, regardless of whether there are additional unmatched parties in one or both matters." *E.g.*, *Intersearch Worldwide, Ltd. v. Intersearch Grp., Inc.*, 544 F.Supp.2d 949, 959 n.6 (N.D. Cal. 2008).

The Defendants in the WEA suit include the BLM, Doug Burgum, and the DOI. *W. Energy All.*, 1:25-cv-00299-KHR. The present case also names BLM, Doug Burgum, and the DOI as Defendants. (ECF No. 1 at 1–2). Moreover, the State of Wyoming is a party in both actions. Accordingly, the similarity of the parties factor is satisfied. *See Doe v. Tenet Healthcare Corp.*, 789 F.Supp.3d 814, 832 (E.D. Cal. 2025) (finding sufficient similarity between the parties where "two of the same parties are named as defendants in both actions").

In terms of the third factor, the "issues in both cases also need not be identical, only substantially similar." *Agri-Sys.*, 2020 WL 6781685, at *3 (citation omitted). "To determine whether the issues are substantially similar, 'courts look at whether there is substantial overlap between the two suits.'" *Id.* (citation omitted). The

inquiry "focuses on the facts and issues raised in the actions, not on the specific claims pled" and the "rule can apply even if one action includes claims not included in the other action." *Id.* (citation omitted); *Doe*, 789 F.Supp.3d at 833.

The facts and issues between this case and the WEA suit overlap. Both involve the 2025 Wyoming ROD/RMPA and ask whether BLM complied with its obligations under FLPMA. *W. Energy All.*, 1:25-cv-00299-KHR, (ECF No. 6 at 2, 5, 14–15); (*See* ECF No. 1 at 40–61). Specifically, each case examines whether BLM properly conformed the RMPA to Executive Order 2019-3 and Wyoming's core area strategy, which in turn requires assessing whether BLM had an obligation to align the RMPA with the State's plan. *W. Energy All.*, 1:25-cv-00299-KHR, (ECF No. 6 at 2, 5, 14–17); (*see* ECF No. 1 at 47–48, 51, 53–55).

For example, in this case, the Groups claim that deferring to Wyoming's compensatory mitigation and adaptive management regimes results in inadequate protections for sage-grouse violating FLPMA and/or its implementing regulations. (*See* ECF No. 1 at 51–54, 60–61). In comparison, the WEA suit asks whether BLM complied with FLPMA in conforming its federal RMPA to the State's management plans, and to what extent the BLM must defer to those State plans in the future. *W. Energy All.*, 1:25-cv-00299-KHR, (ECF No. 6 at 15-16).

The risk of inconsistent judgments further underscores the similarity between the suits. Specifically, if the Wyoming court holds that BLM properly conformed its

federal RMPA to the State's core area strategy, but this Court finds that BLM improperly deferred to the State's plan, the resulting rulings would conflict. *See id.*; (ECF No. 1 at 51–54, 60–61).

While the actions do not involve exactly the same parties and issues, the question is simply whether the overlap is meaningful enough to create a risk of duplicative proceedings and inconsistent judgments the rule is designed to prevent. *See Kohn L. Grp., Inc.*, 787 F.3d at 1239–40.

Accordingly, all the factors for the first-to-file rule have been satisfied and justify transferring this action to the District of Wyoming to promote judicial efficiency, prevent duplicative litigation, and "avoid the embarrassment of conflicting judgments." *Agri-Sys.*, 2020 WL 6781685, at *2 (citation omitted); *see Pac. Coast Fed'n of Fishermen's Associations*, 2020 WL 1322947, at *5 (explaining that similar considerations and the "pendency of related actions" promoted the interests of justice which, in part, justified transfer under 28 U.S.C. § 1404(a)).

**CONCLUSION**

For the foregoing reasons, the State of Wyoming respectfully requests that this Court grant its motion to dismiss the Wyoming claims. In the alternative,

Wyoming requests that this Court sever the claims related to the Wyoming ROD/RMPA and transfer them to the United States District Court for Wyoming.

DATED this 26th day of May, 2026.

*/s/ Shannon Leininger*

Shannon Leininger (MT Bar No. 14589)
Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, Wyoming 82002
Ph. (307) 777-7895
shannon.leininger@wyo.gov

## CERTIFICATE OF SERVICE

I certify that on this 26th day of May, 2026, I filed the foregoing with the Clerk of the U.S. District Court for the District of Montana and caused to be served all parties using the CM/ECF system.

*/s/ Shannon Leininger*
Shannon Leininger

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the requirements of Local Civil Rule 7.1(d)(2). The brief is double spaced, except for footnotes and quoted/idented material, and utilizes size 14 font in Times New Roman. The total word count is 6,430, excluding the caption, certificate of compliance, exhibit index, table of contents and authorities, and any certificate of service. The undersigned relies on the word count of the word processing system used to prepare this document.

*/s/ Shannon Leininger*
Shannon Leininger