Timothy J. Preso, MT Bar No. 5255
Earthjustice
1716 West Babcock Street
P.O. Box 4743
Bozeman, MT 59772-4743
Phone: (406) 586-9699
Fax: (406) 586-9695
tpreso@earthjustice.org

Michael S. Freeman (*admitted pro hac vice*)
Ameya Gehi (*admitted pro hac vice*)
Earthjustice
1125 17th Street, Suite 1010
Denver, CO 80202
Phone: (303) 623-9466
Fax: (303) 623-8083
mfreeman@earthjustice.org
agehi@earthjustice.org

*Counsel for Plaintiffs Montana Wildlife Federation, The Wilderness Society, and Defenders of Wildlife*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| MONTANA WILDLIFE FEDERATION; THE WILDERNESS SOCIETY; and DEFENDERS OF WILDLIFE<br><br>Plaintiffs,<br><br>v.<br><br>DOUGLAS BURGUM, in his official capacity as Secretary of the Interior; JERRY DAVIS, in his capacity as Montana Bureau of Land Management State Director;[1] UNITED STATES BUREAU OF LAND MANAGEMENT; and UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>Defendants. | Case No. 4:26-cv-00133-BMM<br><br>**PLAINTIFFS' CONSOLIDATED BRIEF IN OPPOSITION TO INTERVENOR-DEFENDANT STATE OF WYOMING'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, TO SEVER AND TRANSFER [ECF 19] AND TO FEDERAL DEFENDANTS' MOTION TO TRANSFER [ECF 23]** |

[1] Jerry Davis has replaced Sonya Germann as BLM Montana State Director and is "automatically substituted as a party" under Fed. R. Civ. P. 25(d).

# TABLE OF CONTENTS


INTRODUCTION .......... 1

BACKGROUND .......... 3

ARGUMENT .......... 7

I. Venue is Proper in the District of Montana .......... 7

- A. Defendant Jerry Davis Resides in Montana .......... 8
- B. A Substantial Portion of the Sage-Grouse Habitat Covered by the 2025 Plans Is in Montana .......... 11
- C. The Federation Resides in Montana, and This Action Does Not Involve Real Property .......... 13
- D. Pendent Venue Also Applies Here .......... 14

II. The Court Should Not Transfer All or Part of This Case to Wyoming .......... 16

- A. Wyoming's Motion to Sever Should be Denied .......... 16
- B. The Court Should Not Transfer any Claims to Wyoming .......... 22
  - 1. The Section 1404(a) Factors Favor Venue in This Court .......... 22
    - a. This Case Does Not Involve a "Localized Controversy" in Wyoming .......... 23
    - b. Transfer Does Not Serve the Interests of Judicial Economy or Reduce the Risk of Inconsistent Judgements .......... 25
    - c. Transferring the Case in Whole or Part to Wyoming Is Inconvenient for the Parties .......... 27

d. Relative Congestion Does Not Support Transfer ..........28

III. The First-To File Rule Does Not Support Transferring All or Part of This Case to Wyoming ..........28

CONCLUSION ..........35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adoma v. Univ. of Phx.*,
711 F. Supp. 2d 1142 (E.D. Cal. 2010) ....................35

*Allstar Mktg. Grp., LLC v. Your Store Online, LLC*,
666 F. Supp. 2d 1109 (C.D. Cal. 2009) ....................28

*Alltrade, Inc. v. Uniweld Prods., Inc.*,
946 F.2d 622 (9th Cir. 1991) ....................29, 32

*Anderson v. Thompson*,
634 F. Supp. 1201 (D. Mont. 1986) ....................22

*California v. BLM*,
286 F. Supp. 3d 1054 (N.D. Cal. 2018) ....................22

*Commodity Futures Trading Comm'n v. Savage*,
611 F.2d 270 (9th Cir. 1979) ....................22

*Ctr. for Biological Diversity* (*CBD*) *v. Germann*,
No. 4:26-cv-21 (D. Mont. filed Mar. 2, 2026) ....................2, 31

*Decker Coal Co. v. Commonwealth Edison Co.*,
805 F.2d 834 (9th Cir. 1986) ....................22, 23

*Earth Island v. Quinn*,
56 F. Supp. 3d 1110 (N.D. Cal. 2014) ....................14

*Ferger v. C.H. Robinson Worldwide, Inc.*,
No. 06-cv-174RSL, 2006 WL 2091015 (W.D. Wash. July 25, 2006) ....................18

*Gates Learjet Corp. v. Jensen*,
743 F.2d 1325 (9th Cir. 1984) ....................28

*Greater Yellowstone Coal. v. Kempthorne*,
No. 07-cv-2111(EGS), 2008 WL 1862298 (D.D.C. Apr. 24, 2008) ....................23, 24

*Hologram USA, Inc. v. Pulse Evolution Corp.*,
No. 2:14-cv-0772-GMN-NJK, 2016 WL 779105 (D. Nev. Feb. 29, 2016) ....................17

*Initiative and Referendum Inst. v. U.S. Postal Serv.*,
154 F. Supp. 2d 10 (D.D.C. 2001) ....................17

*Kane County v. Salazar*,
562 F.3d 1077 (10th Cir. 2009) ....................26, 27

*Mont. Wildlife Fed'n v. Bernhardt*,
No. 4:18-cv-69-GF-BMM, 2022 WL 2438963 (D. Mont. July 5, 2022) ....................8, 9, 11, 12

*Mont. Wildlife Fed'n v. Haaland*,
127 F.4th 1 (9th Cir. 2025) ....................2

*Mont. Wildlife Fed'n v. Zinke*,
No. 4:18-cv-69-BMM, 2018 WL 5810502 (D. Mont. Nov. 6, 2018) ....................17, 18, 19, 24

*Nw. Airlines, Inc. v. Am. Airlines, Inc.*,
989 F.2d 1002 (8th Cir. 1993) ....................34

*Oceana v. Bureau of Ocean Energy Mgmt.*,
962 F. Supp. 2d 70 (D.D.C. 2013) ....................23

*Ohio Forestry Ass'n Inc. v. Sierra Club*,
523 U.S. 726 (1998) ....................14

*Powder River Basin Res. Council v. U.S. Dep't of Interior*,
No. 22-cv-2696 (TSC), 2024 WL 195760 (D.D.C. 2024) ....................34

*Qualls v. Prewett Enters., Inc.*,
594 F. Supp. 3d 813 (S.D. Tex. 2022) ....................28

*Rosebud Sioux Tribe v. Trump*,
428 F. Supp. 3d 282 (D. Mont. 2019) ....................15

*Safer Chems., Healthy Families v. U.S. Env't Prot. Agency*,
943 F.3d 397 (9th Cir. 2019) ....................33

*Shell Gulf of Mexico v. Center for Biological Diversity,*
771 F.3d 632 (9th Cir. 2014) ....................................................................32, 33, 34

*Sorenson v. Big Lots Stores, Inc.*,
638 F. Supp. 2d 1219 (S.D. Cal 2009)...........................................................30, 35

*The Wilderness Soc'y v. Babbitt*,
104 F. Supp. 2d 10 (D.D.C. 2000)................................................................23, 24

*United Mine Workers of Am. v. Gibb*s,
383 U.S. 715 (1966)...........................................................................................17

*United States v. One Oil Painting Entitled Femme en Blanc by Pablo Picasso,*
362 F. Supp. 2d 1175 (C.D. Cal. 2005) .............................................................29

*W. Energy All. v. U.S. Dep't of the Interior* (*WEA*),
No. 1:25-cv-299 (D. Wyo. filed Dec. 23, 2025)..........................................*passim*

*W. Org. of Res. Councils v. BLM* (*WORC I*),
No. 16-cv-21-GF-BMM, 2017 WL 374705 (D. Mont. Jan. 25, 2017) ...............................................................................................25

*W. Org. of Res. Councils v. BLM* (*WORC II*),
No. 4:20-cv-76-BMM, 2021 WL 718857 (D. Mont. Feb. 24, 2021) ..........*passim*

*W. Watersheds Project v. Burgum*,
No. 1:18-cv-00187-REP, 2025 WL 3853055 (D. Idaho Dec. 29, 2025) ...........................................................................................14, 15

*W. Watersheds Project v. Salazar*,
No. 08-cv-0516-E-BLW, 2009 WL 1299626 (D. Idaho May 7, 2009) .......................................................................................14, 23, 24

*W. Watersheds Project v. Schneider*,
No. 1:16-cv-83-BLW, 2019 WL 4863483 (D. Idaho Oct. 2, 2019)...................14

*W. Watersheds Project v. Schneider* (*WWP II*),
No. 1:16-cv-083-BLW, 2017 WL 874568 (D. Idaho Mar. 3, 2017) ...................................................................................2, 18, 24, 25

*Z-Line Designs, Inc. v. Bell'O Int'l, LLC*,
218 F.R.D. 663 (N.D. Cal. 2003)........................................................29, 30, 34

**Statutes**

28 U.S.C. § 1391(e)(1)..........................................................................8

28 U.S.C. § 1391(e)(1)(B) ....................................................................11, 12

28 U.S.C. § 1391(e)(1)(C) ........................................................................13

28 U.S.C. § 1404(a) ...............................................................................22

43 U.S.C. § 1712(c)(9).............................................................................26

43 U.S.C. § 1732 ...............................................................................26, 27

**Other Authorities**

Fed. R. Civ. P. 18(a)................................................................................17

Fed. R. Civ. P. 21 ....................................................................................17

80 Fed. Reg. 59858, 59866 ....................................................................3, 24

86 Fed. Reg. 66331 ....................................................................................3

89 Fed. Reg. 90311 ........................................................................1, 3, 4, 24

BLM, *BLM Finalizes Updated Sage-Grouse Plans That Expand Energy Access and Support Western Communities* (Dec. 22, 2025), https://www.blm.gov/press-release/blm-finalizes-updated-sage-grouse-plans-expand-energy-access-and-support-western-communities .........................................................................................4

BLM, *BLM National NEPA Register* (Feb. 25, 2026), https://eplanning.blm.gov/Project-Home/?id=d8b882cc-a7f2-f011-8406-001dd8008d46 .........................................................................30

U.S. District Court — Judicial Caseload Profile 72 (2026), https://www.uscourts.gov/sites/default/files/document/fcms_na_distprofile0331.2026.pdf ........................................................................28

## INTRODUCTION

This case addresses the U.S. Bureau of Land Management's (BLM) adoption of resource management plan amendments (the 2025 Plans) that span ten western states and weaken BLM's prior sage-grouse conservation plans (the 2015 Plans). BLM developed the 2025 Plans through a national planning effort with the stated purpose of "provid[ing] for consistent and effective rangewide conservation" of the sage-grouse. 89 Fed. Reg. 90311, 90311 (Nov. 15, 2024). As adopted, however, the 2025 Plans reflect a national decision by BLM to walk away from commitments the agency made to protect sage-grouse in the 2015 Plans. To hold BLM to its commitment to conserve the species, Plaintiffs Montana Wildlife Federation, *et al*. (collectively, the Federation) brought this case challenging the 2025 Plans as they apply in two states whose habitat on BLM lands is crucial for sage-grouse survival: Montana and Wyoming.

BLM and Defendant-Intervenor State of Wyoming contest the Federation's choice of venue. Wyoming contends that venue is improper to the extent the Federation's claims challenge the Wyoming Plan and asks the Court to either dismiss those claims or sever and transfer them to the District of Wyoming. ECF 19 (WY Br.). BLM does not dispute that venue is proper or that the claims against both plans should be heard together, but seeks to transfer the entire case to Wyoming. ECF 23 (BLM Br.).

The Court should deny both motions. The Wyoming Plan is not a "localized" Wyoming controversy, unconnected to the other 2025 Plans. WY Br. 2, 22–23; BLM Br. 10, 17–22. It is part of an overarching, *range-wide* approach to sage-grouse management that does "not break down neatly into 'home' judicial districts." *W. Watersheds Project v. Schneider* (*WWP II*), No. 1:16-cv-083-BLW, 2017 WL 874568, at *3 (D. Idaho Mar. 3, 2017) (internal quotation omitted). Reflecting national policy decisions, the 2025 Plans weaken the 2015 Plans in the same ways across multiple states—often using identical language to do so—and the Federation's complaint alleges legal flaws that are common to all of the 2025 Plans. As a result, the Federation's claims challenging the Wyoming and Montana plans should be heard together. And they should be heard here: the Federation and Defendant Davis reside here, a substantial part of events at issue took place here, and this case marks the next phase in the Federation's long-running effort in this Court to hold BLM to its obligations to conserve sage-grouse. *See, e.g.*, *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 19–27 (9th Cir. 2025).[2]

---

[2] The Center for Biological Diversity also filed suit in this District challenging multiple 2025 Plans. *Ctr. for Biological Diversity* (*CBD*) *v. Germann*, No. 4:26-cv-21 (D. Mont. filed Mar. 2, 2026). Wyoming and BLM have filed nearly identical venue motions in that case. *CBD*, ECFs 21, 24. Given the overlapping issues and arguments, the Federation joins CBD's arguments and focuses this brief on non-duplicative points concerning the particular circumstances of this case. *See CBD*, ECF 30.

## BACKGROUND

In 2015, after completing "the largest single planning effort in BLM history," the BLM adopted the 2015 Plans to conserve the sage-grouse and prevent listing of the species under the Endangered Species Act (ESA). Pls. Resp. Defs.' Venue Mot. at 3, *Mont. Wildlife Fed'n v. Bernhardt* (*Bernhardt*), No. 4:18-cv-69-BMM (D. Mont. July 27, 2018), ECF 40; Compl., ECF 1 ¶¶ 1, 54–58.

The sage-grouse is a "landscape" species that depends on large, interconnected expanses of sagebrush habitat. 80 Fed. Reg. 59858, 59866 (Oct. 2, 2015). For that reason, rather than "just . . . protect[ing] populations in particular states or BLM field offices," BLM took a "coordinated approach," ensuring key provisions were "consistent across numerous [plans]." Holloran Decl. ¶ 7, *Bernhardt*, ECF 40-2.

In 2021, BLM announced a new planning effort to "address continued [sage-grouse] and sagebrush habitat loss and [sage-grouse] population declines," and to incorporate "new science and rapid changes affecting the BLM's management of the public lands." 86 Fed. Reg. 66331, 66331–32 (Nov. 22, 2021). Consistent with BLM's range-wide approach to the species, the new initiative addressed BLM lands across all ten states covered by the 2015 Plans. *Id.* at 66331.

In 2024, BLM released a proposed amendment to the 2015 Plans. 89 Fed. Reg. at 90311. The amendment covered all ten habitat-containing states and was

supported by a single Environmental Impact Statement (EIS). *Id.* BLM described the new plan as a singular "amendment," and provided an administrative protest opportunity for the entire amendment. *Id.* at 90312.

Following the change in presidential administration in January 2025, BLM announced changes to the proposed plan amendment that weakened a number of sage-grouse protections in response to comments from state governors. Compl. ¶ 79. In December 2025, BLM finalized the 2025 Plans, issuing records of decision (RODs) for eight states, including Wyoming and Montana. *Id.* ¶ 80. BLM announced the plans as a single effort to "protect key habitat across approximately 65 million acres of sagebrush lands" throughout the western United States while "support[ing President Trump's] Executive Order 14154, Unleashing American Energy" by "mak[ing] more acres available . . . for development."[3] The Plans are supported by the same EIS, and BLM has explained that the administrative record for the 2025 Plans is largely "the same [across multiple states] due to the nature of BLM's planning and NEPA process." BLM Br. 14.

The 2025 Plans eliminate several key protections from the 2015 Plans that the U.S. Fish and Wildlife Service (FWS) relied upon to deem an ESA listing

---

[3] BLM, *BLM Finalizes Updated Sage-Grouse Plans That Expand Energy Access and Support Western Communities* (Dec. 22, 2025), https://www.blm.gov/press-release/blm-finalizes-updated-sage-grouse-plans-expand-energy-access-and-support-western-communities.

unwarranted in 2015, including the critical requirement to prioritize leasing outside of sage-grouse habitat. Compl. ¶¶ 80, 88. The 2025 Plans also uniformly abandoned a mineral withdrawal that would have prevented mining on 10 million acres of the most important sage-grouse habitat and an adaptive management tool called the "targeted annual warning system" (TAWS), and weakened or eliminated numerous minimization and mitigation measures, including the requirement that compensatory mitigation provide a "net conservation benefit." *Id.* ¶¶ 81–87, 94–124. In doing so, BLM frequently used identical language across multiple plans. *Infra*, Section I.A.

In March 2026, the Federation filed this challenge to the 2025 Plans. The Federation asserts four claims addressing flaws that exist across all the states covered by those plans:

1. In weakening protections for sage-grouse, BLM never addressed whether the 2025 Plans would maintain sustainable populations of sage-grouse and avoid unnecessary and undue degradation of its habitat, as required by the Federal Land Policy and Management Act (FLPMA), or whether the FWS's 2015 finding that an ESA listing was "not warranted" could be sustained under the 2025 Plans. *Id.* ¶¶ 125–130.

2. BLM violated the National Environmental Policy Act (NEPA) and Administrative Procedure Act (APA) by failing to address the impacts of the 2025 Plans' elimination of conservation requirements. *Id.* ¶¶ 131–36.
3. With measures requiring avoidance of sage-grouse habitat eliminated, the 2025 Plans improperly rely instead on a series of inadequate mitigation measures to reduce impacts to sage-grouse from development in their habitat. *Id.* ¶¶ 137–44.
4. BLM ignored the impact of the 2025 One Big Beautiful Bill Act (OBBBA). The 2024 EIS rests on the assumption that the agency will be able to exercise discretion over where to offer oil and gas leases in sage-grouse habitat even without the prioritization requirement, and without closing that habitat to leasing. *Id.* ¶ 146. OBBBA limited that discretion, but BLM never considered this change or whether the analysis in the 2024 EIS remained valid. *Id.* ¶¶ 145–49.

While all the 2025 Plans suffer from these same defects, the Federation challenged BLM's plans for Montana and Wyoming because those states represent a critical bulwark for sage-grouse survival. *Id.* ¶ 9. Together, they contain more than 50% of the habitat covered by BLM's plans, encompass over half the remaining sage-grouse population, and provide critical breeding and connectivity habitat for sage-grouse populations in other states. *Id.*

BLM, moreover, has long recognized that Montana and Wyoming cannot be evaluated separately for purposes of sage-grouse conservation. BLM's EIS for the 2025 Plans applied regional "Habitat Assessment Framework" (HAF) units to assess impacts to sage-grouse from its planning decisions. Final EIS, App'x 14 at 14-1 to 14-2 (2024) (mapping "mid-scale" HAF units).[4] Much of eastern Wyoming and Montana are part of a single HAF unit (Unit 1) spanning both states. *Id.* BLM took a similar approach in the 2015 Plans, using regional "management zones" that covered both Montana and Wyoming. Defs.' Reply ISO Mot. to Sever and Transfer at 8–10 fig.1, *Bernhardt*, ECF 44 (Management Zones I and II/VII covered large areas of both Wyoming and Montana). Thus, BLM itself has long recognized that key considerations for sage-grouse conservation in Montana and Wyoming span state boundaries.

## ARGUMENT

### I. Venue is Proper in the District of Montana.

At the outset, venue is proper in this District. Venue in actions where the defendant is a federal official or agency is proper in a judicial district in which (A) a defendant resides; (B) "a substantial part of the events or omissions giving rise to the claim occurred"; or (C) "the plaintiff resides if no real property is

[4] Documents related to the 2025 Plans are available at https://eplanning.blm.gov/Documents/?id=d8b882cc-a7f2-f011-8406-001dd8008d46&spid=a26c137d-a8f2-f011-8407-001dd80c29f3#.

involved in the action." 28 U.S.C. § 1391(e)(1). Plaintiffs need only establish venue under one criterion (A, B, *or* C), and courts afford "substantial deference to a plaintiff's choice of forum." *W. Org. of Res. Councils v. BLM* (*WORC II*), No. 4:20-cv-76-BMM, 2021 WL 718857, at *3 (D. Mont. Feb. 24, 2021). Although "[m]ultiple proper venues may exist for a claim," "[n]o requirement exists that the chosen venue represents the best choice." *Id.*

Here venue is proper on all three grounds.

### A. Defendant Jerry Davis Resides in Montana

First, venue is proper because Defendant Davis resides in Montana and his predecessor signed the ROD finalizing the Montana Plan. Compl. ¶¶ 12, 20. A Montana-based BLM state director is "sufficient to confer venue in this Court." *Mont. Wildlife Fed'n v. Bernhardt*, No. 4:18-cv-69-GF-BMM, 2022 WL 2438963, at *5 (D. Mont. July 5, 2022).

Wyoming asserts that Defendant Davis's residence cannot establish venue for the claims against the Wyoming 2025 Plan because the Montana Director "has no connection" to the Wyoming plan. WY Br. 4. This argument rests on Wyoming's incorrect characterization of the Wyoming Plan as an independent, state-specific decision. As explained above, while each Plan was ultimately signed by a separate official, they all rely on a single EIS, implement a single range-wide management strategy, and suffer from the same legal defects.

This Court has readily rejected a similar attempt to dissect plaintiffs' claims for venue purposes. In *Bernhardt*, plaintiffs challenged a BLM policy that violated the prioritization requirements of the 2015 Plans, as well as several lease sales in Montana and Wyoming implementing that policy. 2022 WL 2438963, at *1. BLM sought to sever and transfer the Wyoming lease sales, arguing that the Montana BLM director "played no role" in the Wyoming sales. *Id.* at *5. The Court rejected BLM's argument, noting that the leases were "as-applied challenges" to the overarching national policy challenged by plaintiffs and concluding that the Montana State Director's residence properly conferred venue because he oversaw and approved Montana leasing decisions pursuant to the challenged policy. *Id.*

*Bernhardt* is dispositive here. BLM undertook the sage-grouse plan amendment process to manage the species across its range. The 2025 Plans for both Montana and Wyoming acknowledge that each applies to "portion[s]" of the larger "planning area" under the "Rangewide Planning effort." Montana Plan at PDF 5 and Wyoming Plan at PDF 5. They explain that planning area "includes all lands . . . that contain [sage-grouse] habitat." Montana Plan at 3; Wyoming Plan at 3. Each plan contains a nearly identical summary of how BLM created the plans, including the same methods for evaluation of plans, public involvement, organizing information on the same project website, and scoping process. Montana Plan at 32–35; Wyoming Plan at 29–31. Reflecting their common purpose, the

Plans rely on a single EIS, were issued for public review as a single draft amendment, and will be reviewed on largely the same administrative record. *WORC II*, 2021 WL 718857, *5 (finding the "unique procedural history" of two RMPs initially issued as one decision supported venue over both).

This centralized initiative resulted in the uniform elimination of multiple protective measures. *Supra* at 3–7. Indeed, on central points—such as rescission of the prioritization requirement and other key sage-grouse conservation measures—BLM employed identical language to justify its actions in both the Montana and Wyoming Plans. Wyoming Plan at 12 and Montana Plan at 14 (identically asserting "the over-arching fluid mineral objective no longer requires prioritization"); Wyoming Plan at 7 and Montana Plan at 9 (identically explaining "Areas previously identified as SFAs are generally managed as PHMA"); Wyoming Plan at 25 and Montana Plan at 22 (identically explaining states expressed "concern with using the targeted annual warning system (TAWS) model and a desire to use models maintained and controlled by state wildlife agencies"). Thus, the 2025 Plans for Wyoming and Montana do not reflect independent state-specific planning determinations, but a nationally directed process that resulted in range-wide decisions to abandon central components of prior sage-grouse management.

Like the challenge to the Montana and Wyoming leases at issue in *Bernhardt*, the challenge to the Montana and Wyoming plans here presents "common questions of law and fact," and venue is proper. 2022 WL 2438963, at *5; *see also WORC II*, 2021 WL 718857, at *6 (finding challenge to two RMPs was properly heard together because plans involved same legal deficiencies).

### B. A Substantial Portion of the Sage-Grouse Habitat Covered by the 2025 Plans Is in Montana.

Second, venue is proper because millions of acres of sage-grouse habitat covered under—and threatened by—the 2025 Plans are in Montana. Venue is proper where "a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(e)(1)(B).

Here, more than 5.5 million acres of BLM-managed sage-grouse habitat covered by the 2025 Plans lie within Montana. Montana Plan App'x 1 at I-1; *see* Compl. ¶ 56. They represent a "substantial part" of this dispute and provide a basis for venue in Montana. *See Bernhardt*, 2022 WL 2438963, at *6 (holding "substantial part of [the] alleged violations of administrative law occurred in Montana" because BLM's Montana state office processed leases implementing challenged national policy).

Together, the Montana and Wyoming Plans prescribe land management practices that apply to more than 50% of the remaining sage-grouse habitat nationwide. Compl. ¶ 57. Plaintiffs' members are concerned about sage-grouse,

and harm to the "interconnected ecology" in Montana and Wyoming on which the species relies will harm those members' recreational, aesthetic, scientific, and educational interests. *Id.* ¶ 18; *WORC II*, 2021 WL 718857, at *5. Harm is an "essential element of any legal claim" and the locus and nature of the Federation's injury supports venue. 2021 WL 718857, at *5.

Wyoming offers only a two-sentence argument on Section 1391(e)(1)(B), again improperly parsing the Federation's claims to argue that "none" of the events related to the "Wyoming claims" occurred in Montana. WY Br. 5. As explained above, the Montana and Wyoming Plans grew out of a centralized BLM planning process reflecting national determinations on key issues, and thus "suffer from identical [] deficiencies" that should be resolved together. *WORC II*, 2021 WL 718857, at *5.

BLM emphasizes that the agency manages more acres of sage-grouse habitat in Wyoming than in Montana. BLM Br. 18–19. But this Court previously rejected a similar argument and should do so again here. *Bernhardt*, 2022 WL 2438963, at *6 (holding that venue statute does not require that "a majority" of the events have taken place in the district).

### C. The Federation Resides in Montana, and This Action Does Not Involve Real Property.

Third, venue is proper because this district is the home forum for the Federation, and the 2025 Plans do not implicate the "real property" limitation of the venue statute. 28 U.S.C. § 1391(e)(1)(C).

An associational plaintiff resides in a district where "it maintains its principal place of business." *Id.* § 1391(c)(2). Here, venue is proper in Montana because it is the Federation's home: its principal place of business and offices are here. Compl. ¶ 14.[5]

Wyoming does not dispute that the Federation resides in Montana and instead attempts to invoke the real property exception by asserting that the 2025 Plans "govern[] rights-of-ways [and] lease sales." WY Br. 8. But the Federation does not challenge rights-of-ways or lease sales; it challenges BLM's approval of programmatic planning decisions. This Court in *WORC II* denied a similar motion to dismiss challenges to two RMPs for improper venue, holding that "general environmental challenges, including actions relating to public land management, do not involve real property." *WORC II*, 2021 WL 718857, at *4 (collecting cases). The same reasoning applies here.

Wyoming asks the Court to "revisit" its prior venue decisions—and most

---

[5] In addition, Plaintiff The Wilderness Society has an office in Montana, and Defenders of Wildlife staff are based here. Compl. ¶ 12.

other authority[6] —based on a District of Idaho ruling that a challenge to a mineral lease sale involved real property. WY Br. 7–8 (citing *W. Watersheds Project v. Burgum*, No. 1:18-cv-00187-REP, 2025 WL 3853055, at *11–13 (D. Idaho Dec. 29, 2025)). The Court recently declined BLM's invitation to abandon its well-reasoned precedents on this basis, Order on Phase Three at 10, *Bernhardt*, ECF 570, and should do so again here. But even if *Burgum*'s analysis were sound, its holding is inapposite because this case does not concern any interest in oil and gas leases, which all parties in *Burgum* agreed constitute real property interests. 2025 WL 3853055, at *11 n.9. Instead, the Federation challenges regionwide planning decisions that do not convey any property interests. *See, e.g.*, *Ohio Forestry Ass'n Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998) (noting federal land use plans "do not grant, withhold, or modify any formal legal license, power, or authority").

**D. Pendent Venue Also Applies Here.**

Even if the foregoing were not sufficient to establish venue for all claims—which it is—the Court may exercise pendent venue over the Federation's challenges to the Wyoming Plan because "they arise out of a common nucleus of

[6] *See, e.g.*, *W. Watersheds Project v. Schneider*, No. 1:16-cv-83-BLW, 2019 WL 4863483, at *3 (D. Idaho Oct. 2, 2019) (holding challenge to 2015 sage grouse plans did not involve real property); *Earth Island v. Quinn*, 56 F. Supp. 3d 1110, 1115–16 (N.D. Cal. 2014) (holding NEPA challenge to federal timber sale did not involve real property); *W. Watersheds Project v. Salazar*, No. 08-cv-0516-E-BLW, 2009 WL 1299626, at *1–2 (D. Idaho May 7, 2009) (holding challenge to 18 BLM RMPs did not involve real property).

operative facts" that also led to the Montana Plan. *Rosebud Sioux Tribe v. Trump*, 428 F. Supp. 3d 282, 295 (D. Mont. 2019). To determine whether a court may exercise pendent venue, courts also consider "principles of judicial economy, convenience, avoidance of piecemeal litigation, and fairness to the litigants." *Burgum*, 2025 WL 3853055, at *17.

Here, the Federation's claims all arise out of a national BLM planning process. As described above, that process was centrally driven and resulted in across-the-board determinations to abandon key sage-grouse protections of the 2015 Plans. As a result, BLM violated FLPMA, NEPA, and the APA in the same ways in Montana and Wyoming, and the Federation challenges these common defects.

Nevertheless, Wyoming again invokes the Idaho court's decision in *Burgum*. WY Br. 10. But the facts here are distinct from *Burgum*: the two Plans challenged here involve the same geographic areas (contiguous sage-grouse habitat), same administrative process (one EIS and a unified planning process), and substantially the same administrative record. *Cf. Burgum*, 2025 WL 3853055, at *17 (finding that leases did not arise from the same nucleus of facts).

In addition, the other pendent venue factors favor the Federation. The Federation's claims raise common defects across the Montana and Wyoming Plans and their resolution will turn on a single NEPA document and substantially the

same administrative record. This Court already has a deep background and familiarity with the issues that will aid the efficient resolution of this case because the Court adjudicated the Federation's related case challenging BLM's non-compliance with the leasing prioritization requirements of the 2015 Plans. *See Bernhardt*, Dkt. No. 4:18-cv-69-BMM (D. Mont.). Judicial efficiency therefore is served by addressing both Plans together, rather than piecemeal.

Wyoming does not suggest it would be inconvenient or unfair to litigate the Wyoming and Montana Plans together. And, tellingly, BLM tacitly acknowledges that it is more efficient to litigate both plans together—seeking to transfer this entire case to Wyoming rather than sever the two Plans. As a result, even if the Court finds venue over the Wyoming Plan lacking, it should exercise pendent venue.

## II. The Court Should Not Transfer All or Part of This Case to Wyoming.

The Defendants' transfer requests are equally flawed. Wyoming asks to sever the Federation's claims against the Wyoming 2025 Plan and transfer them to the Wyoming District Court. WY Br. 10–26. BLM asks that the whole case be transferred to Wyoming. BLM Br. 12–13. Both requests should be denied.

### A. Wyoming's Motion to Sever Should be Denied.

There is no basis for severing the arguments addressing the Wyoming Plan. A plaintiff is entitled to join "as many claims as it has against an opposing party."

Fed. R. Civ. P. 18(a). Joinder "is strongly encouraged" to "entertain[] the broadest possible scope of action consistent with fairness to the parties." *United Mine Workers of Am. v. Gibb*s, 383 U.S. 715, 724 (1966). Here, the Federation properly joined the Montana and Wyoming Plans in a single action because they stem from the same national planning process, suffer the same flaws, and cover a large, contiguous, and critical region of sage-grouse habitat. And again, BLM—the agency that made the decisions—does not contend they should be severed. BLM Br. 13–15.

Even when properly joined, courts have the discretion to sever "any claim against a party." Fed. R. Civ. P. 21. In deciding whether to do so, courts consider several factors, including: (a) whether the claims arise out of a common occurrence or transaction, (b) whether the claims present common questions of law or fact, (c) judicial efficiency, (d) prejudice to the parties, and (e) whether different witnesses and documentary proof are required for the separate claims. *See Hologram USA, Inc. v. Pulse Evolution Corp.*, No. 2:14-cv-0772-GMN-NJK, 2016 WL 779105, at *2 (D. Nev. Feb. 29, 2016); *Initiative and Referendum Inst. v. U.S. Postal Serv.*, 154 F. Supp. 2d 10, 13 (D.D.C. 2001). Severance should be denied where plaintiffs' allegations focus on a common series of transactions and occurrences that raise common questions of law and fact applicable to all defendants. *Mont.*

*Wildlife Fed'n v. Zinke*, No. 4:18-cv-69-BMM, 2018 WL 5810502, at *2 (D. Mont. Nov. 6, 2018) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 724 (1966)).

These considerations all weigh against severing the Wyoming Plan. First, as noted above, the Federation's claims arise from a common occurrence or transaction: BLM's national effort to amend the 2015 sage-grouse plans. *Supra* at 3–7. Courts have refused to sever cases like this one alleging "a common policy or practice, particularly involving the same decisionmakers." *Ferger v. C.H. Robinson Worldwide, Inc.*, No. 06-cv-174RSL, 2006 WL 2091015, at *1 (W.D. Wash. July 25, 2006); *see also WWP II*, 2017 WL 874568, at *3–4 (denying motion to sever and transfer claims against the 2015 Plans).

Second, the Federation's arguments raise common questions of law and fact. In adopting the 2025 Plans, BLM eliminated numerous key components of the 2015 Plans, often based on a uniform rationale. *Supra* at 3–7. BLM also uniformly failed to address how the restrictions on BLM's discretion over oil and gas leasing under OBBBA interacts with the 2025 Plans. *See* Compl. ¶¶ 47–51, 92–93, 121. These errors raise questions of law under FLPMA, NEPA, and the APA that are common to both the Wyoming and Montana Plans. *See WORC II*, 2021 WL 718857, at *6–7 (denying severance because claims against two RMPs implementing the 2015 Plans "involve[d] common questions of law").

Third, because of their common features, it will be more efficient to litigate the Federation's challenges to both plans together. *Zinke*, 2018 WL 5810502, at *4 (noting that denying motion to sever would "relieve the judicial system of multiple cases involving the same questions of law and fact"). This Court's familiarity with the issues, developed through the *Bernhardt* litigation concerning the 2015 Plans, will further contribute to such efficiency. Nor will any party be prejudiced by litigating the plans together: Wyoming does not allege any prejudice, and BLM supports litigating both Plans in the same case. BLM Br. 14–17.

Finally, litigation of the Federation's case will not require different witnesses or documentary proof for the two Plans. To the contrary, both plans rest on the same EIS and substantially the same administrative record. BLM Br. 14.

Wyoming contends the Wyoming Plan is "factually, substantively, and procedurally distinct." WY Br. 11. But the limited distinctions cherry-picked by the State do not overcome the fact that the Federation's claims rest on legal flaws common to both plans. First, Wyoming emphasizes that the Wyoming and Montana Plans were adopted through separate RODs. WY Br. 12. But this Court rejected the same argument in *WORC II*, reasoning that it "focuses on formalistic administrative distinctions, but fails to address the broader context in which the claims arose." 2021 WL 718857, *6. There, as here, the BLM plans at issue suffered from the same overarching legal flaws. *Id.* (noting plaintiffs brought same

NEPA claims against both RMPs). Indeed, here the argument against severance is even stronger than it was in *WORC II*, because all 2025 Plans rely on the same EIS.

Wyoming also notes that the SFA category applied slightly differently in the 2015 Plan in Wyoming than it did in Montana, and that one of the ten RMPs in Wyoming did not contain the same 2015 prioritization requirements as the others. But the important factor is not that there were distinctions in how the 2015 Plans in Montana and Wyoming treated the SFA and prioritization requirements, but rather that the 2025 Plans relied on a uniform, centrally driven rationale to rescind them. The verbatim language used by BLM in the 2025 Plans to describe and justify those rescissions reflects a national policy rather than independent, state-specific, decision-making processes that could justify severance of the Wyoming issues. *Supra* at 3–7. It is this national policy, implemented in both plans, that the Federation challenges.

Wyoming also argues the Federation's claims regarding compensatory mitigation require a differentiated analysis of the Wyoming and Montana Plans due to "Wyoming-specific conditions." WY Br. 13–14. To the contrary, while Wyoming has a state-level policy on compensatory mitigation that does not exist in Montana, the germane legal fact is that in both Plans, BLM abandoned the requirement that mitigation provide "a net conservation gain to the species" and

replaced it with a weaker—and voluntary—"no net loss" standard. Compl. ¶ 110.[7] BLM's failure to analyze the impacts of that change and to ensure it can adequately protect sage-grouse under the new, weaker standard means both 2025 Plans violate FLPMA and NEPA.

Finally, Wyoming asserts that the Wyoming Oil and Gas Conservation Commission will impose protective conditions on drilling that will address the Federation's concerns with unnecessary and undue degradation under FLPMA and with impacts of the OBBBA. WY Br. 15–17. This argument is irrelevant. Neither the 2025 Wyoming Plan nor the 2024 EIS analyzes these state-level protections under NEPA or justifies a finding that they satisfy BLM's substantive FLPMA obligations or ameliorate the reduced BLM leasing discretion codified by OBBBA. Wyoming's motion to sever should therefore be denied.

---

[7] Wyoming claims its state executive order operated "similarly" under the 2015 and 2025 Plans. But this elides the fact that the 2025 Plan fundamentally alters *BLM's* role and requirements of the *federal* plans. *Compare* Wyoming 2015 Plan at 35 ("The *BLM will implement actions* to achieve the goal of *net conservation gain* consistent with the Wyoming Strategy. . .") (emphasis added), *with* Wyoming 2025 Plan at 43 (noting "compensatory mitigation must be voluntary" and BLM will "[a]nalyze *whether* the compensatory mitigation" provides habitat function "*at least equal to* the lost or degraded values in accordance with . . . Wyoming's Executive Order 2015-4") (emphasis added). Documents related to the Wyoming 2015 Plan are available at https://eplanning.blm.gov/Documents/?id=ffdb09a3-a7f2-f011-8406-001dd80ef717&spid=cf936569-a8f2-f011-8407-001dd80bcf93#.

### B. The Court Should Not Transfer any Claims to Wyoming.

Wyoming seeks to transfer the claims against the Wyoming Plan to the District of Wyoming, while BLM asks that this entire case be transferred to Wyoming. Both requests should be denied.

Transfer is governed by 28 U.S.C. § 1404(a), which provides, "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district court or division where it might have been brought." Courts have broad discretion in deciding motions to transfer, and consider factors including: the plaintiff's choice of forum, the potential for inconsistent judgments, the convenience of parties and witnesses, the relative congestion in the two forums, the ease of access to evidence, and the "interest in having localized controversies decided at home." *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986) (internal quotation omitted); *see California v. BLM*, 286 F. Supp. 3d 1054, 1059, 1062 (N.D. Cal. 2018). Neither Wyoming nor BLM carries its burden of showing that transfer is warranted. *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979).

#### 1. The Section 1404(a) Factors Favor Venue in This Court.

Where venue is proper, "a plaintiff's choice of forum should rarely be disturbed." *Anderson v. Thompson*, 634 F. Supp. 1201, 1204 (D. Mont. 1986). A

plaintiff need not choose the “best” forum, *WORC II*, 2021 WL 718857, at *3, and a case will not be transferred based on argument that another court is “superior to that chosen by the plaintiff.” *The Wilderness Soc’y v. Babbitt*, 104 F. Supp. 2d 10, 12 (D.D.C. 2000) (internal quotation omitted).

Here, venue is appropriate in Montana, *supra*, Section I, and neither BLM nor Wyoming makes the “strong showing” required to overcome the Federation’s venue choice. *Decker Coal Co.*, 805 F.2d at 843.

#### a. This Case Does Not Involve a “Localized Controversy” in Wyoming.

Both Wyoming and BLM argue that transfer is appropriate because litigation over “localized controversies” should be “decided at home.” WY Br. 21–25, BLM Br. 17–22. However, this case does not involve a localized controversy. While the plans impact Wyoming, this case challenges national planning decisions bearing on an important national resource—an imperiled keystone species whose habitat does “not break down neatly into ‘home’ judicial districts.” *Salazar*, 2009 WL 1299626, at *3. Disputes over national decisions that impact national resources are not localized controversies even if they may be felt more sharply in particular locations. *See, e.g.*, *Oceana v. Bureau of Ocean Energy Mgmt.*, 962 F. Supp. 2d 70, 77–78 (D.D.C. 2013) (holding lease sales in Gulf of Mexico following Deepwater Horizon oil spill were not localized Alabama controversy); *Greater Yellowstone Coal. v. Kempthorne*, No. 07-cv-2111(EGS), 2008 WL 1862298, at *7 (D.D.C.

Apr. 24, 2008) (holding dispute over management of Yellowstone National Park presented "nationwide concerns," not localized controversy); *The Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d 10, 13, 17 (D.D.C. 2000) (holding decision opening National Petroleum Reserve to oil and gas leasing was "a national policy decision determining the use of scarce national resources . . . not a local dispute affecting only the local residents of the Northern Slope of Alaska").

Courts have repeatedly found that disputes over sage-grouse conservation implicate such nationwide concerns. *See Zinke*, 2018 WL 5810502, at *6 (denying motion to sever out-of-state leasing decisions because they were based on a challenge to national policy); *WWP II*, 2017 WL 874568, at *6 (denying motion to sever and transfer claims challenging 2015 Plans); *Salazar*, 2009 WL 1299626, at *3 (denying motion to sever and transfer challenge to multiple RMPs where plaintiffs alleged failure to consider cumulative impacts on sage-grouse).

At bottom, while Wyoming has an interest in the outcome of sage-grouse management decisions, the sage-grouse is a "landscape" species that depends on large, interconnected expanses of sagebrush habitat that cross state lines. 80 Fed. Reg. at 59866. Accordingly, BLM promulgated coordinated state-level plans designed to provide "consistent and effective *rangewide* conservation" of the species. 89 Fed. Reg. at 90311 (emphasis added). Reflecting the expansive scope of this dispute, the Federation asserts "overarching claims" requiring a "range-wide

evaluation that extend[s] beyond the boundaries of any particular court." *WWP II*, 2017 WL 874568, at *3. Therefore, the goal of letting local disputes "be resolved in their home court" carries little weight here. *Id*.

**b. Transfer Does Not Serve the Interests of Judicial Economy or Reduce the Risk of Inconsistent Judgments.**

The State's request to transfer would split this case into two largely identical cases—one against the Montana Plan and one against the Wyoming Plan—creating the risk of inconsistent judgments. Avoiding such outcomes provides a "compelling" reason to deny transfer. *See W. Org. of Res. Councils v. BLM* (*WORC I*), No. 16-cv-21-GF-BMM, 2017 WL 374705, at *8–9 (D. Mont. Jan. 25, 2017) ("[K]eeping the claims together as pleaded will prevent the risk of inconsistent judgments[.]").

The State suggests that the risk of inconsistent judgements would be minimal because the Plans were approved in separate RODs. WY Br. 21. But both Plans rely on the same EIS, are part of same nationally coordinated planning effort, and rescind the same core protections (even using identical language to do so). And the Federation brings the same legal claims against both. Thus, if Wyoming's motion were granted, two courts in two different appellate circuits would be hearing the same claims. This creates the very real prospect of conflicting decisions. One court, for example, could hold that BLM irrationally failed to

address the OBBBA in its 2024 EIS and the other the opposite. Notably, BLM does not join Wyoming's assertion that the two Plans can be separately reviewed without risk of conflicting judgments.

Wyoming and BLM also assert that transfer will reduce the risk of conflicting rulings because there is a friendly lawsuit brought by the Western Energy Alliance pending in the District of Wyoming seeking declaratory relief *affirming* the Wyoming Plan. *W. Energy All. v. U.S. Dep't of the Interior* (*WEA*), No. 1:25-cv-299 (D. Wyo. filed Dec. 23, 2025); BLM Br. 13–16; WY Br. 26–29. As discussed below, that lawsuit suffers from fundamental jurisdictional defects and thus should be given little weight in resolving the transfer issue. Moreover, even assuming the WEA case is justiciable, it does not appear likely to yield a conflicting judgment.

The Federation raises claims under the substantive (sustained yield and undue degradation) provisions of FLPMA, 43 U.S.C. § 1732, the procedural requirements of NEPA, and the reasoned decisionmaking requirements of the APA. WEA and Wyoming, in contrast, seek a declaration that the Wyoming Plan satisfied 43 U.S.C. § 1712(c)(9)'s direction that BLM's plans "shall be consistent with State and local plans to the maximum extent [BLM] finds consistent with Federal law and the purposes of [FLPMA]." Section 1712(c)(9) affords BLM discretion to determine how much to conform its plans to state policies, *Kane*

*County v. Salazar*, 562 F.3d 1077, 1088 (10th Cir. 2009); it does not make BLM's consistency determinations dispositive of the agency's overall compliance with federal law. Thus, even if the Wyoming court were to declare that BLM conformed its Wyoming plan to state and local plans to the maximum extent *that BLM found* consistent with federal law—which is what Section 1732(c)(9) requires—that would not conflict with this Court's examination of BLM's actual compliance with federal law. Indeed, it would be particularly inequitable to allow WEA and Wyoming to justify transfer of the Federation's legitimate, adversarial litigation by filing a non-adversarial lawsuit raising a claim under a statutory provision referencing consistency with federal law, where neither of them has any incentive to argue that BLM's action was *inconsistent* with federal law.

**c. Transferring the Case in Whole or Part to Wyoming Is Inconvenient for the Parties.**

Convenience of the parties also weighs against transfer. Montana is the home forum for one of the three Plaintiffs, and the other two have offices or employees here. One of Plaintiffs' counsel is based in Montana. In contrast, none of the Plaintiffs or their attorneys are based in Wyoming and transfer would thus require Plaintiffs to hire local counsel there. Moreover, transferring only the Wyoming Plan claims would be inconvenient and expensive for Plaintiffs—which are non-profit public interest groups—as it would force them to pursue piecemeal litigation in two courts, increasing litigation and travel costs.

### d. Relative Congestion Does Not Support Transfer.

BLM suggests that court congestion favors transferring the case to Wyoming. The Ninth Circuit, however, gives this factor "little weight" in the transfer analysis. *Allstar Mktg. Grp., LLC v. Your Store Online, LLC*, 666 F. Supp. 2d 1109, 1134 (C.D. Cal. 2009). Further, congestion is not measured by the number of pending cases (as BLM posits), but the speed with which a case can be resolved. *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1337 (9th Cir. 1984). Here the difference between the two jurisdictions is "negligible"—the average disposition time in civil matters in Montana is 9.7 months compared to 8.7 months in Wyoming.[8] *See Qualls v. Prewett Enters., Inc.*, 594 F. Supp. 3d 813, 825 (S.D. Tex. 2022) (finding two-month difference in filing-to-disposition time "negligible"). For this reason too, transfer should be denied.

## III. The First-To-File Rule Does Not Support Transferring All or Part of This Case to Wyoming.

Both Wyoming and BLM wrongly invoke the friendly declaratory action filed in the District of Wyoming by WEA, and later joined by Wyoming, as grounds for transfer. WY Br. 26–29; BLM Br. 13–17.

---

[8] U.S. District Court — Judicial Caseload Profile 72, 86 (2026), https://www.uscourts.gov/sites/default/files/document/fcms_na_distprofile0331.2026.pdf.

WEA's case in Wyoming does not qualify for deference under the first-filed rule. First, the Ninth Circuit has explicitly held that efforts to obtain a friendly declaratory judgment affirming an agency's decision do not constitute a justiciable Article III case or controversy, and this Court should not defer to a non-justiciable matter. Second, even if *WEA* were cognizable, the fact that neither WEA nor Wyoming has made any real attempt to prosecute it strongly suggests that, rather than a genuine controversy, the case was an anticipatory effort to establish a toehold in Wyoming for the purpose of securing venue for any subsequent legal challenges. The equitable first-filed rule does not require deference to such gamesmanship.

The first-filed rule is a principle of judicial comity providing that when two substantially similar actions are filed in different federal courts, the court in which the first action was filed generally has priority. *Alltrade, Inc. v. Uniweld Prods., Inc.*, 946 F.2d 622, 625 (9th Cir. 1991). District courts may "in the exercise of their discretion, dispense with the rule for reasons of equity." *Z-Line Designs, Inc. v. Bell'O Int'l, LLC*, 218 F.R.D. 663, 665 (N.D. Cal. 2003). Relevant here, the rule does not require deference to a first-filed case where that case does not present a judicially cognizable action. *See, e.g.*, *United States v. One Oil Painting Entitled Femme en Blanc by Pablo Picasso*, 362 F. Supp. 2d 1175, 1184–85 (C.D. Cal. 2005) (denying motion to transfer venue where the court hearing first-filed matter

lacked jurisdiction over dispute). The first-filed rule also carries no weight where the first-filed case is a declaratory judgment action that appears calculated to preempt the natural plaintiff's choice of forum. *See Z-Line Designs, Inc.*, 218 F.R.D. at 667 (dismissing first-filed declaratory judgment action where plaintiff filed to secure its choice of forum). Nor must a court follow the first-filed rule when the plaintiff has made no genuine effort to prosecute the first case. *See Sorenson v. Big Lots Stores, Inc.*, 638 F. Supp. 2d 1219, 1221 (S.D. Cal 2009) ("Filing first and then sitting on the action . . . renders the first-filed action filed in name only and not in such substance as to accord it any priority."). All three of these exceptions to the first-filed rule militate against transfer to Wyoming.

At the outset, the WEA-Wyoming lawsuit in Wyoming does not appear to represent a controversy between adverse parties, but a friendly attempt by the nominal plaintiffs to obtain judicial approval of an agency action they support, filed to engineer a presumptive Wyoming venue. On December 23, 2025—only one day after BLM issued the 2025 Plan Amendments[9]—WEA filed suit against the agency under the APA in the District of Wyoming. Compl. ¶ 4, *WEA*, ECF 1. WEA did not object to the Wyoming 2025 Plan or allege that its members are

---

[9] The 2025 plans, except for Oregon and Colorado, were published on December 22, 2025. *See* BLM, *BLM National NEPA Register* (Feb. 25, 2026), https://eplanning.blm.gov/Project-Home/?id=d8b882cc-a7f2-f011-8406-001dd8008d46.

injured by the Wyoming 2025 Plan. Instead, WEA claimed it is harmed by the legal uncertainty caused by "serial litigation" against BLM's prior sage-grouse plans. *Id.* ¶ 66. And, fearing that the 2025 Plans will also be subject to litigation, WEA asked the Wyoming Court to issue "a declaratory judgment *upholding* the agency's actions" and confirming that BLM complied with its obligation under FLPMA to conform the Wyoming Plan with state and local plans. *Id.* ¶¶ 1, 76 (emphasis added).

The WEA case sat idle until, in March, WEA amended its complaint to add the State of Wyoming as a plaintiff. Am. Compl., *WEA*, ECF 6. Like WEA, the State readily acknowledged that it supports the Wyoming Plan. *See id.* ¶ 64. The State nevertheless asserted that it wants the Wyoming court to "clarify" how two BLM management measures—a Density Disturbance Calculation Tool (DDCT) and "HAF fine-scale disturbance caps"—will be used under the Plan, because their use "*may* conflict with the State's sage-grouse executive order, *depending on how they are interpreted*." *Id.* ¶¶ 3, 87 (emphasis added).

The WEA case then remained dormant until, on June 4—only three days after moving to transfer the *CBD* case to Wyoming and six days before moving to transfer this case—BLM and WEA filed a stipulated motion regarding the filing of the administrative record. *WEA*, ECF 21.

The first-filed rule should not be applied in these circumstances. First, this Court should not apply the rule because WEA and Wyoming's friendly litigation is likely not justiciable.[10] Indeed, the Ninth Circuit has explicitly rejected a similar industry attempt to use the Declaratory Judgment Act to "affirm" an agency decision that it agreed with, finding the matter did not constitute a case or controversy under Article III.

In *Shell Gulf of Mexico v. Center for Biological Diversity*, petroleum companies—citing harm from potential future litigation—filed a preemptive lawsuit against the prospective environmental group plaintiffs, seeking a declaration that the Department of Interior followed federal law in approving oil spill response plans. 771 F.3d 632, 634 (9th Cir. 2014).

The Court of Appeals held that this strategy "r[an] afoul of Article III's case or controversy requirement" because Shell's legal interests were not adverse to the agency's. *Id.* at 634, 636. The Court explained that the determination of whether the parties have adverse interests sufficient to satisfy Article III depends on the law underlying the plaintiff's claims. *Id.* The law underlying Shell's request for a

---

[10] The justiciability of WEA and Wyoming's case is a question that will ultimately be decided by the Wyoming District Court. The first-filed rule, however, is an equitable doctrine, and this Court may exercise its discretion to decline to follow the rule based on obvious concerns with the case's justiciability. *See Alltrade*, 946 F.2d at 628 ("The most basic aspect of the first-to-file rule is that it is discretionary.").

declaratory judgment was the APA, which limits judicial review of agency action to persons "aggrieved" by the agency action. *Id.* at 636 (citing 5 U.S.C. § 702). The Court concluded Shell was not legally "aggrieved" by the agency's action because it sought to affirm that action, and thus the case did not present a justiciable case or controversy under Article III. *Id.*

Like the plaintiffs in *Shell*, WEA and Wyoming assert the Wyoming court has jurisdiction over the 2025 Plan under the APA. Am. Compl., *WEA* ¶ 4. And, like plaintiffs in *Shell*, neither is legally "aggrieved" by the decision they ask the court to review because they support and seek to affirm it.[11] Their case in Wyoming therefore does not present a justiciable case or controversy.

While WEA members may have practical interests in the outcome of litigation by groups challenging the 2025 Plans—and may even be economically impacted if the 2025 Plans are invalidated—the Ninth Court in *Shell* explicitly held that such interests do not create an Article III case or controversy. 771 F.3d at 636–37.

Nor does it make a difference that the *Shell* plaintiffs attempted to sue non-agency environmental groups while WEA and Wyoming purport to sue BLM. Like

---

[11] Wyoming's speculative concern that BLM might interpret specific provisions of the 2025 Plan in a manner the State disagrees with does not establish jurisdiction. The Ninth Circuit has made plain that Article III standing cannot rest on speculation about how an agency will apply a rule in the future. *Safer Chems., Healthy Families v. U.S. Env't Prot. Agency*, 943 F.3d 397, 415 (9th Cir. 2019).

*Shell*, WEA and Wyoming are not legally "aggrieved" by BLM's decision to issue a plan they both support. *See, e.g.*, *Powder River Basin Res. Council v. U.S. Dep't of Interior*, No. 22-cv-2696 (TSC), 2024 WL 195760, at *4 (D.D.C. 2024) (dismissing oil and gas companies' declaratory judgment crossclaim against BLM because no controversy existed where BLM and plaintiff-companies contended permits were legal (citing *Shell*, 771 F.3d at 636–37)).

Even assuming *WEA* is justiciable, the Court should decline to transfer this case based on the first-filed rule because the case appears to be contrived to establish a jurisdictional toehold in Wyoming, rather than a legitimate effort to obtain judicial resolution of a genuine dispute. First, cases seeking only declaratory relief raise a "red flag" under the first-filed rule because "such an action may be more indicative of a preemptive strike than a suit for damages or equitable relief," *Nw. Airlines, Inc. v. Am. Airlines, Inc.*, 989 F.2d 1002, 1007 (8th Cir. 1993), and may signify an attempt to "'deprive a plaintiff of his conventional choice of forum and timing, precipitating a disorderly race to the courthouse,'" *Z-Line Designs, Inc.*, 218 F.R.D. at 665 (quoting *DeFeo v. Procter & Gamble Co.*, 831 F. Supp. 776, 778 (N.D. Cal. 1993)). WEA's case—filed one day after BLM's decision and seeking only declaratory relief—raises precisely this red flag.

Second, WEA and Wyoming's failure to prosecute their declaratory judgment action until they needed it to support their transfer claims counsels

against deferring to it under the first-filed rule. *See, e.g.*, *Adoma v. Univ. of Phx.*, 711 F. Supp. 2d 1142 (E.D. Cal. 2010) (declining for follow first-filed rule based on delays in proceeding with first filed case); *Sorenson*, 638 F. Supp. 2d at 1221 (denying motion to transfer where plaintiff failed to complete service of first-filed case until prompted by show-cause order). For all these reasons, the first-filed rule does not support transfer to the District of Wyoming.

## CONCLUSION

For the foregoing reasons, this Court should deny both pending venue motions.

Respectfully submitted on this 24th day of June, 2026,

*/s/Timothy J. Preso*
Timothy J. Preso
Earthjustice
1716 West Babcock Street
P.O. Box 4743
Bozeman, MT 59772-4743
Phone: (406) 586-9699
Fax: (406) 586-9695
tpreso@earthjustice.org

/s/ *Michael S. Freeman*
Michael S. Freeman (*admitted pro hac vice*)
Ameya Gehi (*admitted pro hac vice*)
Earthjustice
1125 17th Street, Suite 1010
Denver, CO 80202
Phone: (303) 623-9466
Fax: (303) 623-8083
mfreeman@earthjustice.org
agehi@earthjustice.org

*Counsel for Plaintiffs Montana Wildlife Federation, The Wilderness Society, and Defenders of Wildlife*

## CERTIFICATE OF COMPLIANCE

I certify with respect to the foregoing that this document complies with the type-volume limitation of L.R. 7.1(d)(2) and the Court's Order at ECF 25 because the brief contains 7,989 words.

*/s/Timothy J. Preso*
Timothy J. Preso

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **PLAINTIFFS' CONSOLIDATED BRIEF IN OPPOSITION TO INTERVENOR-DEFENDANT STATE OF WYOMING'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, TO SEVER AND TRANSFER [ECF 19] AND TO FEDERAL DEFENDANTS' MOTION TO TRANSFER [ECF 23]** was served by the Clerk of the U.S. District Court of Montana through the Court's CM/ECF system, which sent a notice of electronic filing to all counsel of record.

DATED: June 24th, 2026.

*/s/ Timothy J. Preso*
Timothy J. Preso