Adrian A. Miller
Michelle M. Millhollin
Millhollin Miller Law PLLC
2812 1st Ave. North, Suite 225
Billings, MT 59101
Ph. (406) 605-3910 (phone)
adrian.miller@millhollinmiller.com
michelle.millhollin@millhollinmiller.com

Shannon Leininger, MT Bar #14589
Assistant Attorney General
Ethan Paddison, WSB No. 8-7456 (Admitted PHV)
Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Ph. (307) 777-7895
shannon.leininger@wyo.gov
ethan.paddison@wyo.gov
*Attorneys for Defendant-Intervenor, State of Wyoming*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**GREAT FALLS DIVISION**

| | |
|---|---|
| MONTANA WILDLIFE FEDERATION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>BURGUM, *et al.*,<br><br>Defendants,<br><br>STATE OF WYOMING,<br><br>Defendant-Intervenor. | Case No. 4:26-cv-00133-BMM<br><br>**INTERVENOR-DEFENDANT STATE OF WYOMING'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO SEVER AND TRANSFER [Dkt. 18]** |

## INTRODUCTION

The challenge to the 2025 Wyoming Record of Decision ("ROD") and Resource Management Plan Amendment ("RMPA") concerns local decision-making, Wyoming-specific interests, and management of Wyoming's natural resources—issues best resolved in Wyoming. Plaintiffs ("Groups") contend this case involves a national directive, instead of a localized controversy, and that the first-to-file rule is inapplicable. However, the Groups challenge a planning process that spanned two presidential administrations and involved numerous state-specific considerations. In addition, the *WEA* suit has merit.

## ARGUMENT

### I. This is a localized controversy not focused on national directive.

#### A. The planning efforts at issue have always been state specific and localized.

In 2021, BLM under the Biden administration announced its intent to renew sage-grouse planning efforts by amending RMPAs for multiple states including Wyoming. 86 Fed. Reg. 66331, 66331 (Nov. 22, 2021).

In 2024, BLM released its Draft Environmental Impact Statement ("DEIS") for the draft RMPAs. 89 Fed. Reg. 18963, 18963 (Mar. 15, 2024). As part of its purpose and need BLM recognized "[s]ome management concerns are localized to circumstances in individual States and are influenced by the ecological diversity of the sagebrush system. As such, the purpose of this planning effort also includes

amending specific RMP management actions associated with State-specific circumstances to improve GRSG habitat conservation." *Id.* at 18965.

Later in 2024, BLM released its proposed RMPAs and Final Environmental Impact Statement ("FEIS"). 89 Fed. Reg. 90311, 90311 (Nov. 15, 2024). BLM discussed how its rangewide conservation approach would be "based on biological information that is responsive to locally relevant habitat variability" and informed, in part, by "updated scientific findings" from state and local agencies. *Id.*

In the 2024 FEIS, BLM recognized, although one goal of the RMPA was to ensure consistent rangewide management, it did "not intend to apply the management in the RMPA as a one-size-fits-all approach." BUREAU OF LAND MGMT., GREATER SAGE-GROUSE RANGEWIDE PLANNING PROPOSED RESOURCE MANAGEMENT PLAN AMENDMENT AND FINAL ENVIRONMENTAL IMPACT STATEMENT, CHAPTERS 1-5 AND APPENDICES, at 22-120 (Nov. 2024) [hereinafter 2024 FEIS] (page 2795 of PDF). Instead, BLM explained the RMPA "includes flexibility throughout the management direction to allow appropriate application of GRSG protections based on State-specific and site-specific conditions." *Id.*

On January 15, 2025, in the final days of the Biden Administration, BLM signed RODs approving RMPAs for Colorado and Oregon.[1] Following the Trump

[1] *See generally* BLM, GREATER SAGE-GROUSE RANGEWIDE PLANNING RECORD OF DECESION AND APPROVED RESOURCE MANAGEMENT PLAN AMENDMENT FOR

Administration entering office on January 20, 2025, BLM issued notice it intended to make changes to the "RMPAs for Idaho, Montana/Dakotas, Nevada/California, Utah, and Wyoming." *See* 90 Fed. Reg. 42607, 42607 (Sept. 3, 2025). For all these RMPAs, BLM changed the adaptive management language and removed the priority habitat management areas ("PHMA") with limited exceptions designation.[2] The BLM made other state-specific changes as well. *Id.* Many of the changes made throughout the planning process were responsive to localized concerns identified by states. For instance, in the Wyoming RMPA, BLM's removal of PHMA with limited exceptions was undoubtedly influenced by the substantial overlap with the South Wind River ACEC. (*See* ECF No. 19 at 23–24).

### B. The Groups' claims target management directions from the Biden Administration.

The Groups imply their challenge centers on whether the Trump Administration's "Unleashing American Energy" agenda may have influenced the development of the 2024 FEIS that the 2025 plan amendments rely on. (*See* ECF No. 29 at 11). However, this suggestion is incorrect considering BLM developed the 2024 FEIS before the Trump Administration entered office. Consequently, the

---

COLORADO (Jan. 15, 2025) [hereinafter COLORADO ROD/ARMPA] (signed by Nada Culver on page 5 of PDF).

[2] BLM, GREATER SAGE-GROUSE RANGEWIDE PLANNING CHANGES TO PROPOSED RESOURCE MANAGEMENT PLAN AMENDMENT FOR IDAHO, MONTANA/DAKOTAS, NEVADA/CALIFORNIA, UTAH, AND WYOMING at 1 (Sept. 2025).

majority of the Groups' claims trace back to management directions from the Biden Administration.

For example, the Groups fault the Biden Administration for eliminating the Sage Brush Focal Area ("SFA") designation and claim that Administration failed to adequately explain why mineral withdrawal of those lands was no longer being pursued. (*See* ECF No. 1 at 42 (citing 2024 FEIS at 4-84)); *see also* 2024 FEIS at 2-9, 2-109. Likewise, the Groups claim BLM unlawfully eliminated prioritization—but the decision to delete the prioritization requirement was also a policy choice made by the Biden Administration. *See* (ECF No. 1 at 43 (discussing the "2024 FEIS")); 2024 FEIS at 2-24; *see also* COLORADO ROD/ARMPA at 2-4.

The foregoing demonstrates that the Groups' challenge does not center on a specific overarching national directive that uniformly influenced the development of the 2024 FEIS and the 2025 plans themselves.[3]

---

[3] *Cf. Mont. Wildlife Fed'n v. Bernhardt*, No. CV-18-69-GF-BMM, 2022 WL 2438963, at *5 (D. Mont. July 5, 2022) (concluding the case's "object" was not "the individual leasing decisions or the leases themselves," but "national directives—the 2018 IM and the Zinke Memo"); *Mont. Wildlife Fed'n v.Zinke*, No. CV-18-69-GF-BMM, 2018 WL 5810502, at *3–4 (D. Mont. Nov. 6, 2018) (denying severance where plaintiffs challenged a single agency action and "the legality of the [Zinke Memo and 2018 IM] that support[ed] each lease sale"); *W. Watersheds Project v. Schneider*, No. 1:16-CV-83-BLW, 2019 WL 3877281, at *1–2 (D. Idaho Aug. 16, 2019) (denying severance where plaintiffs alleged BLM issued the 2019 sage-grouse amendments in response to Interior Secretary Zinke's directive "to relax restrictions on oil and gas development in sage-grouse habitat," demonstrating that "the challenged Plans suffer from common failings that did not result entirely from errors

### C. Contrary to the Groups' assertion, rangewide planning does not diminish the Wyoming RMPA's local nature.

While BLM undertook a rangewide planning effort, it recognized the necessity of designing management strategies responsive to localized conditions. And although the plans rely on a single EIS, that EIS also analyzed varying state-specific management directions. (ECF No. 19 at 21).

The Groups' assertion that all plans share the same legal defects ignores that state-specific circumstances bear directly on whether those alleged defects are even applicable to certain RMPAs. (ECF No. 29 at 15–17, 23–28); (ECF No. 19 at 20–26). The mere use of similar language across plans is immaterial where state-specific considerations influenced those changes, and their legality turns on state-specific conditions. (*See* ECF No. 19 at 20–26); (*id.* at 34 (citing EXHIBIT A: BLM'S RESPONSE RE CONSISTENCY REVIEW 3)).

Even the Groups' "four claims," which they contend apply across the board, will require state-specific evaluation. (ECF No. 29 at 12–13); (*see* ECF No. 1 at 40–66); (ECF No. 19 at 20–26). For instance, the Groups claim BLM never addressed whether the United States Fish and Wildlife Service's ("USFWS") "2015 finding that an ESA listing was 'not warranted' could be sustained under the 2025 Plans." (ECF No. 29 at 12). But that issue must be evaluated in light of the Wyoming

---

of local Field Offices but rather were heavily influenced by directions from the Trump Administration and the Interior Secretary.").

RMPA's close alignment with the State's core area strategy—and USFW's express reliance on the adoption of that strategy in the 2015 RMPA. 80 Fed. Reg. 59858, 59882–83 (Oct. 2, 2015) ("The adoption of the Wyoming Plan into Federal land plans provides additional assurances that protections of Core Areas will be achieved on all lands, regardless of land ownership.").

**D. The case law the Groups rely upon is distinguishable**.

Finally, the Groups' heavy reliance on *WORC II*, *WWP v. Salazar*, and *WWP v. Schneider* is misplaced. First, the 2017 *Schneider* decision is distinguishable. For one, the 2015 plan amendments in *Schneider* were approved by two region-wide RODs. 80 Fed. Reg. 57633, 57633 (Sept. 24, 2015) (notice of BLM's Great Basin Region ROD); 80 Fed. Reg. 57639, 57639 (Sept. 24 2015) (notice of BLM's Rocky Mountain Region ROD). In contrast, the 2025 Wyoming plan amendment was approved by a Wyoming-specific ROD. Moreover, the Groups' claims in *Schneider* targeted more broadly encompassing phenomena. As the court put it, "[t]he gist of plaintiffs' lawsuit is that the BLM and Forest Service artificially minimized the harms to sage grouse by segmenting their analysis into 15 sub-regions without conducting any range-wide evaluation[.]" *W. Watersheds Project v. Schneider*, No. 1:16-cv-083-BLW, 2017 WL 874568, at *1, *3 (D. Idaho Mar. 3, 2017).

Second, this case differs from *WWP v. Salazar*, which the *Schneider* court relied on heavily. As in *Schneider*, the plaintiffs in *Salazar* focused their claims on

the RMPs/EISs failure to consider "cumulative impacts" to sage-grouse and alleged "all the RMPs failed to address the cumulative impact of global warming, an impact that may extend beyond the boundaries of a judicial district." *See W. Watersheds Project v. Salazar*, No. 08-cv-0516-E-BLW, 2009 WL 1299626, at *3 (D. Idaho May 7, 2009); *Schneider*, 2017 WL 874568, at *1. Here, by contrast, Montana Wildlife Federation's complaint does not even appear to mention cumulative effects or make any claim related to climate change. (*See generally* ECF No. 1).

Third, *WORC II* is distinguishable. In that case, this Court determined the "litigation history and geography in this case distinguishes it from other cases where courts severed and transferred geographically distinct claims." *W. Org. of Res. Councils v. BLM*, No. 4:20-cv-76-BMM, 2021 WL 718857, at *7 (D. Mont. Feb. 24, 2021). This Court emphasized that the Miles City and Buffalo RMPAs governed the same "contiguous river basin" spanning both Montana and Wyoming. *See id.* at *2, *5–7 ("The Powder River Basin represents an interconnected river landscape[.]"). The Court also found common questions of law and fact, in part, because plaintiffs alleged the plans "failed to comply with the Court's" orders in the prior *WORC* cases. *Id.* at *2, *6–7.

Against that backdrop, the Court determined severance was inappropriate given the "heightened risk of inconsistent judgments" arising "from potentially conflicting interpretations of BLM's compliance with this Court's judgment in

*WORC II* and *WORC III* and corresponding demands under NEPA." *Id.* at *7. In contrast, here, the RMPAs at issue govern entirely different states—not a single "contiguous river basin"—and there is no comparable "heightened risk of inconsistent judgments" because the Groups do not allege the RMPAs fail to comply with any prior order of this Court. *See id.* at *2, *5–7.

In sum, this controversy is fundamentally localized and turns on state-specific circumstances, most notably Wyoming's core area strategy; there is no single, overarching national directive uniformly driving the challenged measures. Although BLM conducted a rangewide analysis, both the FEIS and RMPAs expressly incorporated varying state-specific and site-specific conditions. Moreover, the RMPAs were approved through separate, state-specific RODs governing distinct geographic areas. The Groups' effort to treat all plans as sharing the same legal defects therefore misapprehends that each state's plan accounts for unique local conditions, underscoring why their one-size-fits-all theory fails here. In Wyoming, where roughly seventy percent of the surface area is occupied sage-grouse habitat, this Court's decision will have the greatest impact on both Wyoming sage-grouse and Wyoming's residents, whose livelihoods often depend on balancing responsible development with sage-grouse conservation. (ECF No. 19 at 31–35); *Trout Unlimited v. U.S. Dep't of Agric.*, 944 F.Supp. 13, 19–20 (D.D.C. 1996).

## II. The first-to-file rule is applicable because the WEA suit has merit.

The first-to-file rule is applicable here because the *WEA* suit is justiciable and the State is prosecuting the case. (ECF No. 29 at 35–42); *W. Energy All. v. Burgum*, 1:25-cv-00299-KHR (D. Wyo. 2025), (ECF Nos. 1, 6 at 16). To determine whether a declaratory judgment action presents a justiciable controversy, courts consider "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Md. Cas. Co. v. Pac. Coal & Oil Co.,* 312 U.S. 270, 273 (1941).

First, BLM and Wyoming have adverse legal interests because the State is aggrieved by BLM's action.[4] FLPMA mandates that land use plans "***shall*** be consistent with State and local plans to the ***maximum extent*** [BLM] finds consistent with Federal law and the purposes of this Act." 43 U.S.C. § 1712(c)(9) (emphasis added). Since 2015, federal plans have utilized Wyoming's Density and Disturbance Calculation Tool ("DDCT") process for conducting sage-grouse calculations. *See* 2015 WYOMING ARMPA, APPENDIX D, at 139. By consistently incorporating Wyoming's DDCT approach into federal planning efforts, BLM has necessarily found that Wyoming's DDCT approach is "consistent with Federal law and the

---

[4] Wyoming provides only an overview of its DDCT claim given the word count limit.

purposes of" FLPMA. *See* § 1712(c)(9). Therefore, BLM has a duty to utilize DDCT because the land use plans "shall be consistent with State and local plans to the maximum extent[.]" *See id.*[5]

Despite this obligation, BLM now has expanded the scope of its authority by asserting it will employ a metric similar to DDCT without providing a reasoned explanation for doing so. *See Burgum*, 1:25-cv-00299-KHR, (ECF No. 6 at 16); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016); 5 U.S.C. § 702. BLM's allowance of a method other than DDCT aggrieves Wyoming. Consistency between State and federal plans is especially important in Wyoming because both the State and BLM regulate development on federal lands. *See, e.g.,* WYO. EXEC. ORDER NO. 2019-3, *Greater Sage-Grouse Core Area Protection*, Appendix E at 2 (Aug. 21, 2019); *id.,* Appendix A, at 6; WYO. STAT. ANN. § 30-5-104(a). As a result, BLM's inconsistent application of DDCT increases administrative and economic burdens, because the State will have to work more closely with BLM to ensure permit terms do not conflict.

Similar to the Groups, the State also has an interest in ensuring the RMPA aligns with the expectations USFWS articulated in its 2015 listing decision. USFWS

[5] *Cf. Powder River Basin Res. Council v. U.S. Dep't of Interior*, No. 22-cv-2696 (TSC), 2024 WL 195760, at *3 (D.D.C. 2024) ("Continental and Devon have not identified—or even tried to identify—any substantive law conferring on Plaintiffs any obligation to Continental and Devon.").

expressly relied on the incorporation of Wyoming's core area strategy—including its DDCT disturbance calculation approach—into federal plans. *See* 80 Fed. Reg. at 59882–83. USFWS recognized that sage-grouse conservation in Wyoming depends on consistent management across all lands within the State. *Id.* Inconsistent disturbance calculations across jurisdictional boundaries undermine that consistency and, in turn, sage-grouse conservation. *See id.* Accordingly, Wyoming has an interest in ensuring federal plans do not diverge from the State plan in a way that creates inconsistent disturbance calculations statewide, contrary to USFWS's emphasis on achieving consistent protections on all lands.[6]

Similarly, the Groups have raised concerns about fee-fee-fed development scenarios, and the State shares a related but distinct concern. Namely, BLM's reference to "an approach similar to DDCT" creates regulatory uncertainty. This uncertainty hampers WGFD's ability to recommend siting on previously disturbed areas because operators will be less willing to locate projects on federal lands when the development pathway there is unclear. Although such projects would still be governed by the State's core area strategy and its protections, best practice is to

[6] *Cf. Shell Gulf of Mexico v. Ctr. for Biological Diversity*, 771 F.3d 632, 636–37 (D.D.C. 2024) (finding parties lacked adverse legal interests where BLM approved "***Shell's*** oil spill response plans," and concluding "[p]ut simply, the Bureau lies at the center of the underlying controversy and is the locus of the adverse legal interests created by the APA. Without its participation, no case or controversy can exist." (emphasis added)).

cluster development where disturbance already exists. Restricting the State's ability to cluster development undermines its strategy to minimize disturbance by concentrating development in already disturbed areas. As explained by the WGFD:

> Game and Fish's ability to protect wildlife habitat and have mineral development relies on maintaining maximum flexibility to determine where and when drilling or mining occur. The department makes recommendations based on best-available data and the landscape as a whole. From a wildlife habitat conservation perspective, it makes sense to site drilling activity on lands that are already disturbed, and oftentimes those locations are on federal land. That maximum flexibility is essential. Using existing sites reduces habitat disturbance and decreases the amount of reclamation needed following project completion.[7]

Nor are Wyoming's concerns speculative. Since 2015, federal plans have consistently used Wyoming's DDCT approach. *See* 2015 WYOMING ARMPA, Appendix D, at 139. The 2025 language—calling for "an approach similar to DDCT"—breaks from that settled practice and signals an unprecedented broadening of BLM's authority, departing from the consistency rationale underlying USFWS's 2015 listing decision. *See California v. Trump*, 963 F.3d 926, 936–43 (9th Cir. 2020); *California v. Bernhardt*, 460 F.Supp.3d 875, 885–87 (N.D. Cal. 2020). That shift creates immediate regulatory uncertainty, increasing Wyoming's administrative burdens and costs and inadvertently pushing development towards

---

[7] Brian Nesvik, *Presidential suspension on mineral development bad for Wyoming's wildlife*, Wyo. Game & Fish Dep't (Feb. 10, 2021), https://wgfd.wyo.gov/News/Presidential-suspension-on-mineral-development-bad.

pristine lands. *See Nat'l Res. Def. Council v. EPA*, 437 F.Supp.2d 1137, 1151–52 (C.D. Cal. 2006).

In short, Wyoming challenges BLM's sage-grouse calculation procedure, arguing that procedure, as written, affords BLM discretion to exclude certain calculations. *See Safer Chems., Healthy Families v. EPA*, 943 F.3d 397, 416, 418–19 (9th Cir. 2019). 43 U.S.C. § 1712(c)(9) forecloses BLM's ability to diverge from the State's DDCT approach when BLM has found that approach consistent with federal law and has provided no reasoned explanation to the contrary. *See id.*

Second, despite the Groups' assertion, Wyoming has been diligently prosecuting the *WEA* suit. Under the District of Wyoming's local rules, filing the administrative record serves as the Federal Defendants' answer, and that extension request came eleven days before the record was due to be filed. Wyo. Local Civ. R. 83.6(a)(4), (b)(2), (c); EXHIBIT A: EXTENSION REQUEST at 2. The State therefore cannot be faulted for any failure to prosecute where no answer is required and the Federal Defendants reasonably sought an extension of their record filing deadline.

Moreover, despite the Groups' assertion, there is a risk of inconsistent judgments—each court could reach different conclusions about whether BLM properly conformed the Wyoming RMPA to the State's core area strategy. For instance, the *WEA* court could hold that BLM must use DDCT for all disturbance calculations. Comparatively, this Court could conclude DDCT is improper for

adaptive-management disturbance calculations and BLM must instead rely on the Targeted Annual Warning System ("TAWS"). (*See* ECF No. 1 at 51).

Thus, the first-to-file rule is applicable because the *WEA* suit has merit, Wyoming has been diligently prosecuting that suit, and there is a risk of inconsistent judgments. It is also far more efficient to resolve BLM's inconsistent application of DDCT now than to litigate the issue piecemeal through challenges to multiple Applications for Permits to Drill ("APDs"). The longer Wyoming must wait, the greater the costs it will incur to prevent conflicts between federal and state permits.

## CONCLUSION

In conclusion, the claims at issue are Wyoming-focused and must be decided in Wyoming. Thus, the State respectfully requests that this Court grant its motion to dismiss, or alternatively, grant its motion to sever and transfer.

DATED this 30th day of June, 2026.

*/s/ Adrian A. Miller*
Adrian A. Miller
Millhollin Miller Law
2812 1st Ave. North
Billings, MT 59101
Ph. (406) 605-3910
adrian.miller@millhollinmiller.com

*/s/ Ethan Paddison*
Shannon Leininger, MT Bar #14589
Assistant Attorney General
Ethan Paddison, WSB No. 8-7456
Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Ph. (307) 777-7895
shannon.leininger@wyo.gov
ethan.paddison@wyo.gov

*Counsel for Defendant-Intervenor State of Wyoming*

**CERTIFICATE OF SERVICE**

I certify that on this 30th day of June, 2026, I filed the foregoing with the Clerk of the U.S. District Court for the District of Montana and caused to be served on all parties using the CM/ECF system.

*/s/ Ethan Paddison*
Ethan Paddison

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the requirements of Local Civil Rule 7.1(d)(2). The brief is double spaced, except for footnotes and quoted/indented material, and utilizes size 14 font in Times New Roman. The total word count is 3,247, excluding the caption, certificate of compliance, and any certificate of service. The undersigned relies on the word count of the word processing system used to prepare this document.

*/s/ Ethan Paddison*
Ethan Paddison