**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | |
|---|---|
| MONTANA WILDLIFE FEDERATION, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DOUGLAS BURGUM, in his official capacity as Secretary of the Interior, et al., <br><br> Defendants. | CV-26-133-BMM <br><br><br> ORDER ON MOTIONS TO DISMISS OR TRANSFER |

**INTRODUCTION**

Plaintiffs Montana Wildlife Federation, The Wilderness Society, and Defenders of Wildlife (collectively "Plaintiffs") filed suit against Defendants Douglas Burgum, in his official capacity as Secretary of the Interior; Jerry Davis, in his official capacity as Montana Bureau of Land Management State Director; United States Bureau of Land Management ("BLM"); and United States Department of the Interior ("DOI") (collectively "Federal Defendants"). (Doc. 1.) Plaintiffs challenge BLM's 2025 amendments (the "2025 plans") to the land management plans it had issued in 2015 for greater sage-grouse focusing on the plans in Montana and

1

Wyoming. (Doc. 1 ¶¶ 1, 9.) The Court permitted the State of Wyoming to intervene as of right as a Defendant in the case on May 1, 2026. (Doc. 16.)

Intervenor-Defendant Wyoming filed a motion asking the Court to dismiss Plaintiffs' claims regarding the 2025 Wyoming Record of Decision ("ROD") and Resource Management Plan Amendment ("RMPA"), or in the alternative, to sever and transfer those claims to the District of Wyoming. (Doc. 18 at 1-2.) Federal Defendants filed a separate motion asking the Court to transfer the entire case to the District of Wyoming. (Doc. 22.) The Court permitted Plaintiffs to file a single consolidated response to both motions. (Doc. 25.) Plaintiffs oppose both motions. (Doc. 29.) The Court held a hearing on the matter on July 6, 2026. (Doc. 33.)

## BACKGROUND

Sage-grouse occupy habitat across Montana and Wyoming. Sage-grouse require sagebrush ecosystems for food, shelter, breeding, nesting, and brooding. 75 Fed. Reg. 13,987 (Mar. 23, 2010). The U.S. Fish & Wildlife Service ("FWS") listed sage-grouse as "warranted" but "precluded by higher priority listing actions" under the Endangered Species Act ("ESA") in 2010 and earlier in 2001. *Id*. at 13910; 66 Fed. Reg. 22984 (May 7, 2001). Numerous plaintiffs challenged these decisions not to list sage-grouse in court. (Doc. 1 ¶ 54.)  As part of a settlement in 2011, FWS pledged to make a new listing decision by September 30, 2016. *See In re Endangered Species Act Section 4 Deadline Litigation-MDL No. 2165*, 704 F.3d 972, 975 (D.C.

Cir. 2013) (summarizing 2011 settlement).

BLM undertook a comprehensive land management planning process in anticipation of the 2016 deadline with the intention of protecting greater sage-grouse habitat and making an ESA listing unnecessary. (Doc. 1 ¶ 55.) Forty-five percent of the greater sage-grouse's habitat lies on land managed by BLM, and another 6% lies on land managed by the U.S. Forest Service ("USFS"). (*Id*. ¶ 56.) Sage-grouse is also considered a "landscape" species meaning that it depends on large, interconnected expanses of sagebrush habitat. (Doc. 29 at 10, quoting 80 Fed. Reg. 59858, 59866 (Oct. 2, 2015).)

BLM adopted the 2015 Plans as part of these comprehensive efforts to prevent ESA listing. (Doc. 29 at 10, citing Pls. Resp. Defs.' Venue Mot. at 3, *Mont. Wildlife Fed'n v. Bernhardt* (*Bernhardt*), No. 4:18-cv-69-BMM (D. Mont. July 27, 2018), ECF 40.) BLM took a "coordinated approach" to the 2015 Plans across states and BLM field offices to ensure that key provisions were "consistent across numerous [plans]." (Doc. 29 at 10, citing Holloran Decl. ¶ 7, *Bernhardt*, ECF 40-2.) Despite these 2015 Plans, sage-grouse populations in Montana have decreased to a concerning degree recently, and over the past two decades. Sage-grouse species have diminished since 2013 by 13% across eastern Wyoming and Montana and by 24% in western Wyoming. (Doc. 1 ¶ 5.) Habitat loss contributes greatly to declines in

sage-grouse populations. (Doc. 1 ¶¶ 76, 101.)

BLM announced in 2021 that it would be undertaking a new planning effort to "address continued [sage-grouse] and sagebrush habitat loss and [sage-grouse] population declines," and to incorporate "new science and rapid changes affecting the BLM's management of the public lands." (Doc. 29 at 10, quoting 86 Fed. Reg. 66331, 66331-32 (Nov. 22, 2021).) The 2021 initiative addresses BLM lands across all ten states covered by the 2015 Plans. (*Id*.) Plaintiffs believe that BLM decided to issue new rules to avoid the leasing prioritization requirements and other avoidance measures contained in the 2015 Plans. (Doc. 1 ¶ 4, 3, citing *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1 (9th Cir. 2025) (invalidating BLM's efforts as a violation of the Federal Land Policy and Management Act ("FLPMA")); *see also Bernhardt*, No. 4:18-cv-69-BMM (litigation over lease sales).)

BLM proposed a new amendment to the 2015 Plans in 2024. (Doc. 29 at 10, citing 89 Fed. Reg. 90311, 90311 (Nov. 15, 2024).) The amendment covered all ten habitat-containing states and was supported by a single Environmental Impact Statement ("EIS"). (*Id*., citing 89 Fed. Reg. at 90311.) BLM proposed new changes to the proposed plan amendment in January 2025 and finalized the 2025 Plans in December 2025. (Doc. 29 at 11, citing Doc. 1 ¶ 78-79.) The 2025 Plans issued new RODs for eight states, including Wyoming and Montana, based on one Final

Environmental Impact Statement (the "FEIS"). (Doc. 1 ¶ 80.)

Plaintiffs allege the 2025 Plans eliminate or weaken numerous provisions of the 2015 Plans. (Doc. 1 ¶ 4.) Plaintiffs allege that BLM's 2025 Plans remove the previous lease prioritization requirement, abandon a provision of the prior plans calling for a mineral withdrawal that would have prevented mining on 10 million acres of sage-grouse habitat, and weaken numerous minimization and mitigation measures. (*Id*.) The same FEIS supports all the 2025 Plans.

BLM has explained that the administrative record for the 2025 Plans remains largely "the same [across multiple states] due to the nature of BLM's planning and NEPA process." (Doc. 23 at 20.) BLM's FEIS for the 2025 Plans "applied regional 'Habitat Assessment Framework' (HAF) units to assess impacts to sage-grouse from its planning decisions. (Doc. 29 at 14, citing FEIS, App'x 14 at 14-1 to 14-2 (2024) (mapping "mid-scale" HAF units).) "Much of eastern Wyoming and Montana are part of a single HAF unit (Unit 1) spanning both states" like BLM's approach in the 2015 Plans which used regional "management zones" that covered both Montana and Wyoming. (Doc. 29 at 14 (internal citation omitted).)

The Western Energy Alliance ("WEA") filed suit in the District of Wyoming on December 23, 2025, challenging the 2025 Plans. *See Complaint*, *W. Energy All. v. U.S. Dept. of the Interior ("WEA")*, No. 1:25-cv-299-KHR (D. Wyo. Dec. 23, 2025), ECF 1. WEA amended the complaint in early March to add the State

5

Wyoming as a plaintiff. *See* Am. Compl., *W. Energy All. v. U.S. Dept. of the Interior*, No. 1:25-cv-299-KHR (D. Wyo. Mar. 10, 2026), ECF 6 ("*WEA* Am. Compl."). The *WEA* "complaint seeks a declaratory judgment that BLM complied with the requirement of the FLPMA to ensure consistency with state plans 'to the maximum extent [the secretary] finds consistent with Federal law and the purposes of the act.'" (Doc. 23 at 13, citing *WEA*, *WEA* Am. Compl., No. 1:25-cv-299-KHR, at ¶¶ 72-88.)

The two other pending suits challenging the 2025 Plans remain filed in the District of Montana, including this case and *Ctr. for Biological Diversity v. Germann ("CBD")*, No. 4:26-cv-21-BMM (D. Mont. Mar. 2, 2026). Plaintiffs filed both suits in March 2026. Environmental groups brought both these suits. Wyoming, as an intervenor-defendant, and the federal defendants in CBD have filed similar motions to dismiss or transfer. *See Brief for Motion Dismiss*, CBD, No. 4:26-cv-21-BMM (D. Mont. May 18, 2026), ECF 22; *see also Brief for Motion to Transfer to the District of Wyoming*, CBD, No. 4:26-cv-21-BMM (D. Mont. June 1, 2026), ECF 25.

## LEGAL STANDARD

A court may dismiss a Complaint if it is brought in an improper venue pursuant to Fed. R. Civ. P. 12(b)(3). *Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979). The plaintiff bears the burden of demonstrating that venue is proper. *Id.* A plaintiff must establish proper venue as to each claim where multiple claims are presented. *W. Org. of Res. Councils v. BLM*,

No. CV 16-21-GF-BMM, 2021 WL 718857, at *11 (D. Mont. Jan. 24, 2017). Where venue is improper, a district court has the discretion to dismiss the case under Rule 12(b)(3) or transfer the case in the interests of justice to an appropriate jurisdiction under 28 U.S.C. § 1406(a). *See King v. Russell*, 963 F.2d 1301, 1304 (9th Cir. 1992); *Pac. Coast Dist., M.E.B.A. v. Alaska*, 682 F.2d 797, 799 (9th Cir. 1982). A court draws all reasonable inferences in favor of the non-moving party if the claims present genuine contested facts. *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1138-40 (9th Cir. 2004)

District courts possess broad discretion when evaluating whether to sever claims pursuant to Fed. R. Civ. P. 21. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1297 (9th Cir. 2000). Claims against different parties may be severed for trial or other proceedings if the court determines that the interests of justice would be better served by severance. *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 154 F. Supp.2d 10, 13 (D.D.C. 2001). Severance should be denied where plaintiffs' allegations involve a common series of transactions and occurrences that raise common questions of law and fact applicable to all defendants. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 724 (1966).

## DISCUSSION

The Court addresses separately the question of whether venue proves proper in Montana, and if it is, whether the Court nonetheless should transfer the case to the

7

District of Wyoming for the convenience of the parties pursuant to 28 U.S.C. § 1404(a).

### I.        Whether Venue Proves Proper in Montana

Wyoming asserts that the Court properly must either dismiss or sever and transfer Plaintiffs' claims related to the Wyoming ROD/RMPA to the District of Wyoming due to improper venue. (Doc. 19 at 12-13.) Plaintiffs contend that venue remains proper in the District of Montana. (Doc. 29 at 14.) In civil actions against an agency or officer of the United States, venue is proper "in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1); *see also Bernhardt*, 2022 WL 2438963, at *4. A plaintiff must establish proper venue for each claim where multiple claims are presented. *W. Org. of Res. Councils v. BLM ("WORC I")*, No. CV 16-21-GF-BMM, 2021 WL 718857, at *11 (D. Mont. Jan. 24, 2017).

A court affords substantial deference to a plaintiff's choice of forum so long as the forum represents a proper venue. *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987); *Anderson v. Thompson*, 634 F. Supp. 1201, 1204 (D. Mont. 1986). Multiple proper venues may exist for a claim. *WORC I*, 2017 WL 374705, at *4 (D. Mont. Jan. 25, 2017) (citing *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995)). No

requirement exists that the chosen venue represents the best choice. *WORC I*, 2017 WL 374705, at *4 (citing *Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994)). Venue merely must be proper in the relevant federal district to survive a motion to dismiss. *W. Org. of Res. Councils v. U.S. Bureau of Land Mgmt. ("WORC II")*, No. 4:20-CV-76-BMM, 2021 WL 718857, at *3 (D. Mont. Feb. 24, 2021).

Plaintiffs contend that venue proves proper in Montana on the following three grounds: (1) Defendant Jerry Davis, Montana Bureau of Land Management State Director, resides in Montana; (2) a substantial portion of the sage-grouse habitat covered by the 2025 Plans lies in Montana; and (3) Plaintiff Montana Wildlife Federation resides in Montana and this action involves no real property. (Doc. 29 at 15-20.) The Court will address each ground in turn.

### A. Defendant in Action Resides in Montana.

Plaintiffs contend that Defendant Davis resides in Montana and "his predecessor signed the ROD finalizing the Montana Plan" which proves "sufficient to confer venue in this Court." (Doc. 29 at 15, quoting *Bernhardt*, 2022 WL 2438963, at *5.) Wyoming contends that the residence of the Montana BLM State Director proves inadequate to establish venue in Montana for the challenges to the Wyoming ROD/RMPA because Defendant Davis lacks any connection to the Wyoming ROD/RMPA. (Doc. 19 at 13-14.) Wyoming asserts that the Wyoming

9

BLM State Director "was the sole approver of the Wyoming ROD/RMPA." (*Id*. at 13.)

The Court adopts the reasoning that it previously applied in *Bernhardt*. The Court recognizes that Plaintiffs must establish venue over individual claims when multiple, distinguishable claims exist. *WORC II*, 2021 WL 718857, at *3 (citing *Martensen v. Koch*, 942 F. Supp. 2d 983, 996 (N.D. Cal. 2013)). The Court concludes, however, that Plaintiffs' challenge here applies to BLM's 2025 Plans, as a whole, based on the single FEIS and range-wide management approach. The defendants in *Bernhardt* argued that the plaintiffs' challenges presented separate claims against each individual leasing sale/lease. *Bernhardt*, 2022 WL 2438963, at *5. The Court disagreed and reasoned that the plaintiffs' claims challenged national directives and specifically alleged that the defendants violated a particular federal statute by issuing and following a single federal instruction memorandum that BLM released to guide oil and gas leasing decisions. *Id*.

Wyoming's arguments mirror the arguments rejected in *Bernhardt*. Wyoming attempts to distinguish *Bernhardt* by arguing that the objects of this case "are the individual state RODs/RMPAs, not a uniform national directive." (Doc. 19 at 15.) Wyoming concedes that Plaintiffs challenge the 2024 FEIS, which addressed all the relevant RODs/RMPAs, but argues that the 2024 FEIS "is not a uniform national directive [like that challenged in *Bernhardt*] because its analysis expressly accounts

for unique local conditions." (*Id*.) Wyoming further concedes that Plaintiffs' Complaint includes claims that implicate federal statutes but asserts that "resolving those claims still requires consideration of state-specific conditions" and "localized issues." (*Id*.)

The Court remains unpersuaded by Wyoming's attempts to distinguish this case from *Bernhardt*. This case, like *Bernhardt*, involves a wide-scale federal management plan and analysis. Like the instruction memorandum and agency memorandum at issue in *Bernhardt*, the 2024 FEIS presents decision-making beyond the state-level, and rather, represents a centralized approach to sage-grouse management. The Court recognizes that BLM issued individual RODs/RMPAs for Montana and Wyoming, yet those plans themselves indicate regional planning, coordination, and nearly identical analysis and reasoning. (Doc. 29 at 16.) The Court concludes that both *Bernhardt* and *WORC II* support this decision.

*WORC II* similarly involved challenges to separate RODs/RMPAs. 2021 WL 718857, at *5. *WORC II* reasoned that venue proved proper partially due to the "interconnected ecology" and the shared "unique procedural history" of the case. *Id*. at *5-6. *WORC II* determined that severance proved improper because the plaintiffs "allege[d] identical NEPA flaws" and the BLM had issued "'mirror' SEISs." *Id*. Wyoming emphasizes that the 2024 Draft EIS and 2024 FEIS recognized that "[s]ome management concerns are localized to circumstances in individual States."

(Doc. 32 at 2, quoting 89 Fed. Reg. at 18965.)

The Court concludes that Plaintiffs' claims do not challenge "independent state-specific planning determinations, but a nationally directed process that resulted in range-wide decisions." (Doc. 29 at 17.) The Court emphasizes that EISs typically involve consideration of local impacts in addition to wider-scale effects. Wyoming provides no evidence that the 2024 Draft EIS or FEIS proved unique or different from a typical EIS or any of the EISs referenced in cited authority. A thorough EIS necessarily must address both range-wide and site-specific concerns. Wyoming fails to distinguish case law persuasively. The Court concludes that it properly can exercise venue over Plaintiffs' challenges to the Wyoming ROD/RMPA. The Court will address each remaining ground for venue for the sake of thoroughness.

**B. Whether a Substantial Part of the Events Giving Rise to Plaintiffs' Claims Occurred in Montana.**

Plaintiffs' second ground for venue rests upon the fact that a substantial portion of the sage-grouse habitat covered by the 2025 Plans lies in Montana. (Doc. 29 at 18.) Plaintiffs contend that BLM manages more than 5.5 million acres of sage-grouse habitat covered by the 2025 Plans in Montana. (*Id*.) Plaintiffs assert that the "Montana and Wyoming Plans prescribe land management practices that apply to more than 50% of the remaining sage-grouse habitat nationwide. (*Id*.) Wyoming again counters that none of the Wyoming specific issues occurred in Montana. (Doc.

19 at 14.) Wyoming focuses on the distinction between the Wyoming ROD/RMPA and the Montana ROD/RMPA. (*Id.*)

Federal Defendants also argue that BLM manages more sage-grouse habitat in Wyoming than in Montana. (Doc. 23 at 24-25.) Federal Defendants assert that "BLM manages 17,253,011 acres of surface lands and 9,352,727 acres of split estate lands in [s]age [g]rouse habitat in Wyoming under the 2025 Wyoming Plan" and "5,553,000 acres of surface lands and 5,834,000 split estate lands in [s]age [g]rouse habitat in Montana." (*Id.* at 24, Ex. 2 [Wyoming Plan, App. 1 at 1-1 (Table 1)] and Ex. 3 [Montana Plan, App. 1 at 1-1 (Table 1)].) BLM further asserts that it manages more acres of surface lands in Priority Habitat ("PHMA") in Wyoming than Montana—with 8,323,599 acres of surface lands in Wyoming and 3,233,000 acres of surface lands in Montana. (Doc. at 24-25, citing Ex. 2 and Ex. 3.)

Wyoming's arguments mirror those rejected by the Court in *Bernhardt*. The Court again emphasizes that Plaintiffs' challenges do not involve claims specific to the Montana and Wyoming RODs/RMPAs but rather challenges to the wide-scale plan, approach, and results for the 2025 Plans. It proves clear that "[a] substantial part of Plaintiffs' alleged violations of administrative law occurred in Montana" as Montana's BLM office approved the 2025 Plans. *Bernhardt*, 2022 WL 2438963, at *6. The Court also reiterates that "[§] 1391(e)(1)(B) of Title 28 'does not require that a majority of the events have occurred in the district where suit is filed.'" *Id.*,

quoting *United Tactical Sys. LLC v. Real Action Paintball, Inc.*, 108 F. Supp. 3d 733, 752 (N.D. Cal. 2015).

A significant amount of the sage-grouse habitat at issue lies in Montana. In fact, the percentage of sage-grouse habitat at issue in this case in Montana compared to Wyoming proves larger than the percentage of lease sale revenues or lease sale acreage involved in *Bernhardt*. 2022 WL 2438963, at *6 ("The Montana leases involve less than 2% of the total proceeds, and less than 11% of the total acreage for the leases involved in the Phase Three claims.") The Court concludes that venue proves proper in Montana as a substantial part of the events giving rise to Plaintiffs' claims occurred in Montana.

### C. Whether Plaintiffs Montana Wildlife Federation Reside in Montana and This Action Involves Real Property.

Plaintiffs contend that venue proves proper on a third ground as they reside in Montana and this action involves no real property. (Doc. 29 at 20.) Wyoming disagrees and asserts that this action involves real property because the "Wyoming RMPA governs rights-of-way, lease sales, where different natural resources can be developed, grazing rights, and other real property interests." (Doc. 19 at 17.) Wyoming concedes that the Court previously has concluded that challenges to land use plans do not implicate real property pursuant to 28 U.S.C. § 1391(e)(1)(C). (*Id*. at 16, citing *WORC II*, 2021 WL 718857, at *3-4; *Bernhardt*, 2022 WL 2438963, at

*6-7.)

Wyoming now asks the Court to revisit its previous decisions and instead adopt the reasoning of the court in *W. Watersheds Project v. Burgum*, No. 1:18-CV-00187-REP, 2025 WL 3853055 (D. Idaho Dec. 29, 2025). *Burgum* concluded that the action involved real property, contrary to the decision in *Bernhardt*. *Burgum*, 2025 WL 3853055, at *11. *Burgum* reasoned that the plain meaning of the term "involved" "means that real property 'is part of, included in, or associated with' an action." *Id*., at *16. *Burgum* rejected *Bernhardt*'s conclusion that "the touchstone of the venue provision 'cannot sensibly be whether real property is marginally affected by the case at issue. Rather, the action must center directly on the real property, as with actions concerning the right, title or interest in real property.'" *Id*., quoting *Bernhardt*, 2022 WL 2438963, at *7 (quoting *WORC II*, 2021 WL 718857, at *4 (internal citation omitted)).

The Court previously addressed the conflict between *Burgum* and the Court's previous cases in *Bernhardt*, 2026 WL 1707576, at *4 (D. Mont. June 12, 2026). The Court declined to apply the standard adopted by the Idaho court and reasoned that the Idaho decision would remain only persuasive authority until the Ninth Circuit answers the question left open from the Idaho decision. *Id*. The Court again will continue to follow this approach and declines to revisit its previous analysis. The Court also notes that even if it were to apply *Burgum*'s reasoning, it remains

15

unclear whether any real property interests would be involved in this action because it does not concern oil and gas leases which all parties in *Burgum* agreed constituted interests in real property. *Burgum*, 2025 WL 3853055, at *11 n.9.

The court in *Torongo v. United States Dep't of Interior*, No. 25-11263, 2026 WL 597414 (E.D. Mich. Mar. 3, 2026), recently found *Bernhardt* "persuasive" and concluded that a national monument "designation's regulatory impact on [the plaintiff's] mining claims [did] not 'involve' real property for purposes of § 1391(e)(1)(C) because the claims [] [did] not center on the right, title, or interest in his mining claims." *See also Ctr. for Env't L. & Pol'y v. United States Bureau of Reclamation*, No. C08-1730RAJ, 2009 WL 10668581, at *4 (W.D. Wash. May 12, 2009) (concluding the same). The Court emphasizes that venue remains proper based on the two grounds discussed above even if the framework changes for involvement of real property pursuant to § 1391(e)(1)(C). The Court refrains from addressing the arguments for pendent venue based on its earlier conclusions. The Court next addresses Wyoming and Federal Defendants' requests to transfer the case, or specific claims, to the District of Wyoming pursuant to 28 U.S.C. § 1404(a).

## II.    Transfer Pursuant to 28 U.S.C. § 1404(a)

Wyoming asks the Court to sever and transfer Plaintiffs' claims challenging the Wyoming ROD/RMPA to the District of Wyoming pursuant to 28 U.S.C. § 1404(a). (Doc. 19 at 19-20.) Federal Defendants seek to transfer the entire to case to

the District of Wyoming pursuant to 28 U.S.C. § 1404(a). (Doc. 23 at 16.)

### A. Severance & Transfer of Wyoming Related Claims.

District courts possess broad discretion when evaluating whether to sever claims pursuant to Fed. R. Civ. P. 21. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1297 (9th Cir. 2000). Claims against different parties may be severed for trial or other proceedings if the court determines that the interests of justice would be better served by severance. *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 154 F. Supp.2d 10, 13 (D.D.C. 2001). Severance should be denied where plaintiffs' allegations address a common series of transactions and occurrences that raise common questions of law and fact applicable to all defendants. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 724 (1966).

Plaintiffs argue that severance proves inappropriate as they allege a common series of transactions and occurrences that raise common questions of law and fact applicable to all. (Doc. 29 at 23-24, citing *United Mine Workers*, 383 U.S. at 724.) Plaintiffs correctly assert that "[a] plaintiff is entitled to join "as many claims as it has against an opposing party." (Doc. 29 at 23-24, quoting Fed. R. Civ. P. 18(a).) The Court previously has employed a balancing test in similar cases to decide whether to keep claims together as pleaded or separate them by location. *WORC II*, 2021 WL 718857, at *6; *see also WORC I*, 2917 WL 374705, at *7. Under that test, a court should weigh "a plaintiff's choice of forum against the competing interest in

'having localized controversies decided at home.'" *Ctr. for Biological Diversity & Pac. Env't v. Kempthorne*, No. C–07–0894, 2007 WL 2023515, at *5 (N.D. Cal. July 12, 2007) (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)). "The Court again finds this balancing test helpful to determine whether to sever and transfer the [Wyoming] claims." *WORC II*, 2021 WL 718857, at *6.

A court typically affords great deference to a plaintiff's choice of forum. *See e.g.*, *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987); *Anderson v. Thompson*, 634 F. Supp. 1201, 1204 (D. Mont. 1986). "The Court previously determined in *WORC I* that the plaintiffs' forum choice deserved deference because BLM had approved the [two] RMPs through a single ROD, the Court maintained an interest in judicial economy to rule on identical claims relying on a similar record, and plaintiffs' held an interest in preventing the risk of inconsistent judgments." *WORC II*, 2021 WL 718857, at * 6 (citing *WORC I*, 2017 WL 374705, at *9).

By contrast, the BLM had approved two separate RODs in *WORC II*, yet the Court concluded that severance again proved inappropriate. *WORC II*, 2021 WL 718857, at * 6. The Court reasoned that "BLM's argument focuse[d] on formalistic administrative distinctions, but fail[ed] to address the broader context in which the claims arose." *Id*. The Court determined that the risk of inconsistent judgments and judicial economy counseled against severance because the plaintiffs "allege[d] identical NEPA flaws regarding the two RMPAs and their respective 'mirror'

18

SEISs." *Id*. The Court concluded that "[t]he claims involve[d] common questions of law because each SEIS allegedly suffers from identical flaws rooted in the same NEPA obligations and this Court's previous orders" in related cases. *Id*. The Court also expressed concern that severance could lead to "inconsistent judgments [that] could create disparate outcomes on either side of the state border in an ecologically and geographically contiguous region." *Id*., at *7.

The Court recognizes that this case has many similarities to the *WORC* cases. BLM issued separate RMPAs and RODs for each region. BLM used the same FEIS and employed a range-wide management approach that demonstrates regional planning. The sage-grouse habitat in Montana and Wyoming is also largely ecologically and geographically continuous despite the state borders. The Court acknowledges that other courts have reached different conclusions with slightly different factual presentations. *WildEarth Guardians v. Jewell (WildEarth Guardians I)*, No. 1:15-CV-2026-WJM, 2016 WL 8577508, at *5 (D. Colo. June 17, 2016), concluded that severance proved appropriate even though the plaintiffs challenged a "pattern and practice" of NEPA violations, because the plaintiffs challenged separate Mining Plan approvals that each had separate administrative records and significant factual differences. *See also WildEarth Guardians v. United States Off. of Surface Mining Reclamation & Enf't (WildEarth Guardians II)*, No. 1:13-CV-00518, 2014 WL 503635 (D. Colo. Feb. 7, 2014) (similar conclusion).

The Court concludes that this case proves more similar to *WORC I* and *WORC II* than to *WildEarth Guardians I* and *WildEarth Guardians II* as it pertains to Plaintiffs' choice of forum. The administrative record would be identical for each of the claims in this case. The factual differences appear minimal compared to the approval of entirely different mines in different locations addressed in *WildEarth Guardians I* and *WildEarth Guardians II*. Plaintiffs also challenge a pattern and practice of NEPA violations, yet this pattern and practice remains rooted in factual similarities, the same FEIS, and shared analysis.

The Cout next considers the interest in having localized controversies decided at home. *WORC II*, 2021 WL 718857, at * 7; *see also Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986). The Court recognizes that Wyoming has a strong interest in having its localized controversies decided at home. Wyoming contains a significant amount of sage-grouse habitat and for years actively has engaged in sage-grouse conservation efforts. The Wyoming ROD/RMPA represents a collaborative effort between BLM and Wyoming to protect sage-grouse, in addition to recognizing other priorities. Wyoming relies heavily on the oil and gas industry and greatly prioritizes mineral extraction across the state. The 2015 and 2025 Plans include specific distinctions among all states and particularly in Wyoming.

A court typically affords great deference to a plaintiff's choice of forum. *See*

20

*e.g.*, *Lou*, 834 F.2d at 739; *Anderson*, 634 F. Supp. at 1204. Those interests may be outweighed by the interest in having localized controversies decided at home. The Court sees great benefit in local controversies being decided in the communities that experience those controversies. This factor may be dispositive in many scenarios.

The Court determined in *WORC I* that the single ROD at issue, judicial economy, and the plaintiffs' interest in consistent judgments tilted "slightly in favor of keeping the claims together." *WORC I*, 2017 WL 374705, at *10. The Court decided similarly in *WORC II* reasoning that the "[p]laintiffs' elevated interest in prevention of inconsistent judgments and judicial economy rooted in the unique background of th[e] case outweigh[ed] the interest in having localized controversies decided at home." *WORC II*, 2021 WL 718857, at * 7. The Court finds it challenging to assess the proper balance in this case.

The Court recognizes Wyoming's strong interests in this matter, including high levels of oil and gas extraction. The Court also recognizes efforts in Wyoming to limit the effects on sage-grouse and sage-grouse habitat during oil and gas extraction with the implementation of Wyoming's core area strategy. (*See* Doc. 19 at 11-12, 24-26, 32-25.) The Court applauds these efforts. Wyoming provides no authority, however, to support the contention that its interests in oil and gas extraction, or its concentrated efforts on sage-grouse management, should outweigh Plaintiffs' choice of forum.

The Court recognizes the many distinctions between the plans based on state-specific conditions. Wyoming provides no evidence that such distinctions were not present in other RODs/RMPAs that courts declined to sever. The Court also remains concerned about the risk of inconsistent judgments based on the shared procedural history, shared FEIS, and the many shared analyses and decisions throughout the Montana and Wyoming RODs/RMPAs. The Court will exercise its broad discretion to deny the motion to sever and transfer claims relating to the Wyoming ROD/RMPA.

### B. Transfer of Case.

Federal Defendants alternatively seek to transfer the entire case to the District of Wyoming. (Doc. 23 at 18.) Section 28 U.S.C. § 1404(a) governs discretionary changes of venue: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).

A district court's consideration of a transfer pursuant to § 1404(a) involves two steps. *Montana Wildlife Fed'n v. Zinke*, No. CV-18-69-GF-BMM, 2018 WL 5810502, at *4 (D. Mont. Nov. 6, 2018). A district court first must decide whether the action originally could have been brought in the proposed transferee districts. *Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 414 (9th Cir. 1985). If the answer is yes, then the district court must make an individualized, case-specific analysis of

22

convenience and fairness to the parties and witnesses, and an assessment of the interests of justice. *See Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498-99 (9th Cir. 2000).

This assessment incorporates multiple factors, including the following: (1) the convenience of the parties and witnesses; (2) familiarity of each forum with the applicable law; (3) the plaintiffs' choice of forum; (4) contacts of the different parties with the forum; (5) local interest in the controversy; (6) the ease of access to sources of proof and evidence; and (7) relative congestion in each forum. *Id*. The Court recognizes that the District of Wyoming likely would have served as a proper venue as well. The Court declines to conclude affirmatively such a result but will address the remaining balancing factors.

The moving party bears the burden to establish why the forum should be changed. *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979). "The defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum." *Decker Coal Co.*, 805 F.2d at 843. When a transfer "would only shift the inconvenience from defendant to plaintiff, the motion to transfer should be denied." *Anderson v. Thompson*, 634 F.Supp. 1201, 1204 (D. Mont. 1986). "[A] transfer is not available to a forum which is equally convenient or inconvenient to the original forum." *Id*.

Where venue is proper, "a plaintiff's choice of forum should rarely be

disturbed." *Anderson*, 634 F. Supp. at 1204. A plaintiff need not choose the "best" forum. *WORC II*, 2021 WL 718857, at *3. The Court disagrees with Federal Defendants that this "forum lacks a significant connection to the activities alleged in the complaint" just because more acreage of sage-grouse habitat exists in Wyoming compared to Montana. (Doc. 31 at 3, quoting *Williams v. Bowman*, 157 F. Supp. 2d 1103, 1106 (N.D. Cal. 2001).) BLM manages millions of acres of sage-grouse habitat in Montana. (Doc. 31 at 3, citing Doc. 23 Ex. 3.) Such a connection proves far from "attenuated." (Doc. 31 at 4.) Federal Defendants provide no evidence of inconvenience to them if the case remains in Montana.

Courts routinely decline to credit defendants' arguments that the comparable percentage of a species in respective districts matters to a § 1404(a) analysis in discounting a plaintiff's choice of forum in ESA cases. *See Sierra Forest Legacy v. U.S. Fish & Wildlife Serv.*, No. 20-CV-05800-BLF, 2021 WL 2354852, at *5 (N.D. Cal. June 9, 2021). *Sierra Forest Legacy* explicitly rejected the defendant's contention that courts consider the percentage of species found in the competing districts to discount a plaintiff's choice of forum. *Id*. (discussing analysis in *Bay.org v. Zinke*, No. 17-CV-03739-YGR, 2017 WL 3727467, at *4 (N.D. Cal. Aug. 30, 2017).) Federal Defendants fail to meet their burden as to this factor.

Federal Defendants additionally argue that Wyoming and other local entities have an interest in having local issues resolved in a home forum. (Doc. 31 at 5.)

24

Federal Defendants asserts that Wyoming's interests "far outweigh the similar interests State of Montana and its citizenry." (*Id.*) Federal Defendants cite the increased acreage of sage-grouse habitat in Wyoming and Wyoming's oil and gas interests as reasons for that imbalance. (*Id.*) The Court finds unpersuasive Federal Defendants' arguments.

The Court understands that the relative percentage of the species in the competing districts represents a factor that may be considered when weighing local interests in ESA cases. *Sierra Forest Legacy*, 2021 WL 2354852, at \*6. The Court recognizes that Wyoming has strong interests. Wyoming's strong interests cannot easily be valued over those of Montana. No authority suggests that oil and gas interests should be weighed more heavily than other interests, including but not limited to, conservation interests. The Court determines that Federal Defendants fail to demonstrate Wyoming's local interests exponentially outweigh those of Montana's, particularly when considering the great deference granted to a plaintiff's choice of forum.

Many courts have granted transfer where all the land, or relevant matter of dispute, lies in the other district. *See e.g., Ctr. for Env't L. & Pol'y*, 2009 WL 10668581, at \*4 (granting transfer when dam was located entirely in Eastern District of Washington and the plaintiff's only purported reason to be in the Western District of Washington was for convenience of counsel); *Native Vill. of Point Hope v. U.S.*

*E.P.A.*, No. C11-667 MJP, 2011 WL 4395717, at *1 (W.D. Wash. Sept. 21, 2011) (granting transfer when the plaintiffs challenged water quality standards of creek located exclusively in Alaska); *W. Watersheds Project v. Nat'l Park Serv.*, No. 1:21-CV-00219-DCN, 2021 WL 5828028, at *3 (D. Idaho Dec. 8, 2021) (granting transfer where challenges involved livestock grazing and associated infrastructure in four units of the National Park System exclusively located in Utah and Colorado); *but see Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*, No. CIV. 10-1129-AC, 2011 WL 1527598, at *8 (D. Or. Apr. 20, 2011) (denying transfer when issue involved mining plan located in other district but the complaint challenged meetings held in violation of federal law in District of Oregon). This case substantially differs from these examples as a significant portion of the sage-grouse and sage-grouse habitat lies in Montana, rather than being located exclusively in Wyoming.

Federal Defendants further argue that judicial economy favors hearing this case jointly with *WEA* in the District of Wyoming. (Doc. 31 at 8.) The Court will discuss this case when it addresses the first-to-file analysis. Federal Defendants suggest that convenience of the parties and witnesses does not represent a significant factor in an APA case such as this one. (Doc. 31 at 10.) The Court generally agrees. Federal Defendants lastly argue that transfer would relieve court congestion as the District of Wyoming is less congested than the District of Montana. (Doc. 31 at 11-12.) The Court agrees with Plaintiffs that the relative court congestion is not so stark

as to prove significant. Federal Defendants focus only on the number of cases filed in each district without acknowledging that Montana also has one more Article III judge to handle the larger case load.

The Court notes that no significant case history exists in the District of Wyoming that would counsel transfer, and rather, the most relevant case history occurred in the District of Montana. The court in *Pit River Tribe v. Bureau of Land Mgmt.*, No. 19-CV-02002-PJH, 2019 WL 6341566, at \*6 (N.D. Cal. Nov. 27, 2019), determined that transfer proved appropriate based largely on the fact that the previous iterations of the *Pit River* cases—which challenged lease sales—had occurred in the other district. Courts have considered the relative experience of a judge or district in specific case histories when analyzing judicial efficiency. *See Bay.org*, 2017 WL 3727467, at \*5 (concluding that the other judge had "gained not only factual and technical knowledge" of the issues, but familiarity as well, as the judge already had presided over related matters for several years which weighed in favor of judicial efficiency). "In the usual case, unless the balance of the § 1404(a) factors weighs heavily in favor of the defendants, 'the plaintiff's choice of forum should rarely be disturbed.'" *Kempthorne*, 2007 WL 2023515, at \*3 (quoting *Securities Investor Prot. Corp. v. Vigman*, 764 F.2d 1309, 1317 (9th Cir.1985)). For the reasons discussed above, the Court declines to transfer the case, or segments of the case, to the District of Wyoming pursuant to § 1404(a).

27

## C. First-to-File Rule.

The first-to-file doctrine permits a district court to transfer, stay, or dismiss an action when a similar complaint already has been filed in another district. *Pacesetter Systems Inc. v. Medtronic, Inc.*, 678 F.2d 93, 94-95 (9th Cir. 1982); *Kohn Law Group, Inc. v. Auto Parts Mfg. Miss., Inc.*, 787 F.3d 1237, 1239 (9th Cir. 2015). The first-to-file rule "is designed to avoid placing an unnecessary burden on the federal judiciary, and avoid the embarrassment of conflicting judgments." *Church of Scientology of Cal. v. U.S. Dep't of Army,* 611 F.2d 738, 750 (9th Cir. 1979), *overruled on other grounds by Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987 (9th Cir. 2016). Although discretionary, the first-to-file rule "is intended to 'serve[ ] the purpose of promoting judicial efficiency well and should not be disregarded lightly." *Kohn*, 787 F.3d at 1239 (quoting *Church of Scientology*, 611 F.2d at 750).

Courts consider three factors in determining whether the first-to-file rule applies: (1) the chronology of the lawsuits; (2) the similarity of the parties; and (3) the similarity of the issues. *Kohn*, 787 F.3d at 1240. The first-to-file rule is not "a rigid or inflexible rule to be mechanically applied." *Pacesetter*, 678 F.2d at 95. The Ninth Circuit has recognized the following three exceptions to the rule: bad faith, anticipatory lawsuit, and forum shopping. *Alltrade, Inc. v. Uniweld Products, Inc.*, 946 F.2d 622, 628 (9th Cir. 1991). Where the earlier filed action has not advanced,

28

the equities may weigh in favor of an exception to the first-to-file rule. *See Adoma v. Univ. of Phoenix*, 711 F.Supp.2d 1142, 1150 (E.D. Cal. 2010); *see also Church of Scientology*, 611 F.2d at 750.

*WEA* filed its action on December 23, 2025, only one day after BLM published the final 2025 Plans. *See Complaint*, *WEA*, No. 1:25-cv-299-KHR (D. Wyo. Dec. 23, 2025), ECF 1. Plaintiffs filed the complaint in this case on March 26, 2026. (Doc. 1.) Nothing happened in *WEA* until March 10, 2026, when the plaintiffs amended the complaint to add Wyoming as a plaintiff. *See Amended Complaint*, *WEA*, No. 1:25-cv-299-KHR (D. Wyo. Dec. 23, 2025), ECF 6. Nothing else has happened in the *WEA* docket beyond issuance of summonses, pro hac vice orders, and the filing of the administrative record on July 13, 2026. *See NOTICE*, *WEA*, No. 1:25-cv-299-KHR (D. Wyo. July 13, 2026), ECF 23.

"[E]xact identity of parties is not required," however, "this action involves substantially different parties than the [WEA] action." *Montana Env't Info. Ctr. v. Bernhardt*, No. CV-19-130-SPW, 2020 WL 4346604, at *3 (D. Mont. July 29, 2020); *see also Kohn*, 787 F.3d at 1240. No Plaintiffs in this case are parties in the *WEA* action. "The issues in both cases also need not be identical, only substantially similar." *Kohn*, 787 F.3d at 1240. To determine whether the issues are substantially similar, courts "look at whether there is 'substantial overlap' between the two suits." *Id.* at 1241.

29

Courts have determined that the first-to-file rule may not apply where the second-filed action proves broader than the first action. *See e.g., Montana Merchandising, Inc. v. Dave's Killer Bread, Inc.*, 2017 WL 2536530, *5 (D. Mont. June 9, 2017) (declining to apply the first-to-file rule where second-filed action included "additional plaintiffs, defendants, and claims" and the claims extended "beyond the scope of the claims of the [first-filed] case"); *Roller Bearing Co. of Am., Inc. v. American Software, Inc.*, 570 F.Supp.2d 376, 388 (D. Conn. 2008) (finding judicial economy was best served by allowing the much broader second-filed action to proceed). The Court recognizes that both suits relate to the same federal agency decisions. The Court also acknowledges that the suits include different challenges, under varying statutes, that seek the opposite relief. The Court remains skeptical about whether the two cases prove substantially similar for the purposes of the first-to-file rule.

The Court is further troubled by application to this case of the Ninth Circuit's recognized exceptions to the first-to-file rule, including bad faith, anticipatory lawsuit, and forum shopping. *Alltrade, Inc.*, 946 F.2d at 628.  A lack of "adverse legal interests" between the first-filed friendly party and the agency represents one of the issues that fall into those buckets. *Shell Gulf of Mexico Inc. v. Ctr. for Biological Diversity, Inc.*, 771 F.3d 632, 636 (9th Cir. 2014). The Ninth Circuit in *Shell Gulf of Mexico* concluded that the plaintiff and the Bureau of Safety and

30

Environmental Enforcement (the "Bureau") lacked "adverse legal interests" because the plaintiff was not "aggrieved" by the Bureau. *Id*. at 636. The Ninth Circuit reasoned that declaratory judgment actions address adverse legal interests which require that a person have been aggrieved by agency action. *Id*.

The plaintiff had filed suit under the Administrative Procedure Act ("APA") seeking a declaration that the Bureau's approval of its oil spill response plans did not violate the APA. *Id*. at 634. "[The plaintiff] claimed that it needed a swift determination of the legality of the approval so it could conduct exploratory drilling without worrying that the environmental groups would seek to overturn the Bureau's approval of the spill response plans." *Id*. The Ninth Circuit characterized the plaintiff's] lawsuit as "a novel litigation strategy, whereby the beneficiary of agency action seeks to confirm its lawfulness by suing those who it believes are likely to challenge it." *Id*. The Ninth Circuit concluded this strategy "[ran] afoul of Article III's case or controversy requirement." *Id*.

Wyoming similarly argues that it is aggrieved by BLM's action because it believes that BLM potentially could fail to implement the 2025 Plan in a way that would be "consistent with State and local plans to the maximum extent[.]" (Doc. 32 at 11, citing 43 U.S.C. § 1712(c)(9).) The *WEA* plaintiffs' suit explicitly notes that it "seeks a declaratory judgment from this court under 28 U.S.C. § 2201 holding that BLM complied with its statutory and regulatory obligations under the Federal Land

Policy and Management Act (FLPMA) to ensure that the 2025 Record of Decision (ROD) and Approved Resource Management Plan Amendment (ARMPA) for Wyoming was 'consistent with State and local plans to the maximum extent [the Secretary] finds consistent with Federal law and the purposes of [FLPMA].'" *See Complaint*, *WEA*, No. 1:25-cv-299-KHR (D. Wyo. Dec. 23, 2025), ECF 1, ¶ 2. (citing 43 U.S.C. § 1712(c)(9).)

The Amended Complaint states that "[t]he State of Wyoming seeks a declaratory judgment to clarify its rights and obligations concerning two provisions that may conflict with the State's sage-grouse executive order, depending on how they are interpreted. The State seeks a declaration that the State's Density Disturbance Calculation Tool (DDCT) represents the only appropriate tool for measuring disturbance in Wyoming. Furthermore, if a contradiction exists "between the Bureau's project-level analysis for HAF-fine scale and project-level DDCT, the project-level DDCT will control." *See Amended Complaint*, *WEA*, No. 1:25-cv-299-KHR (D. Wyo. Dec. 23, 2025), ECF 6, ¶ 3. The Court recognizes that Wyoming's claim is not as straightforwardly friendly as the claim in *Shell Gulf of Mexico*. The Court also agrees with Plaintiffs that Wyoming's complaint fails to allege a definite adverse interest as its challenge remains qualified by the concession that conflict may exist only "depending on how [the provisions] are interpreted." *Id*.

The Ninth Circuit in *Shell Gulf of Mexico* stated that "[l]awsuits affect a vast

32

range of persons, and an Article III case or controversy does not exist wherever an individual possibly, probably, or even certainly affected by litigation asks a federal court to resolve a legal question. Thus, it is not enough for a declaratory judgment plaintiff to assert, as [the plaintiff] does here, a practical interest in the outcome of a lawsuit between other parties. Instead, Article III requires the existence of adverse legal interests arising from a legal claim, and that is absent from this case." 771 F.3d. at 637. The Court finds compelling this guidance.

Courts are similarly wary of anticipatory filing. *See Z-Line Designs, Inc. v. Bell'O Int'l, LLC*, 218 F.R.D. 663, 665 (N.D. Cal. 2003). The fact that the *WEA* plaintiff filed this suit only one day after BLM had published the final rule, and within the context of an extensive history of litigation over agency decisions on sage-grouse, suggests that the plaintiff filed the action in the District of Wyoming in anticipation of future suits in other Districts. The Amended Complaint clearly states the suit seeks to "resolve longstanding and ongoing legal and regulatory uncertainty" which appears to be a concession that the suit was anticipatorily filed. *See Amended Complaint, WEA*, No. 1:25-cv-299-KHR (D. Wyo. Dec. 23, 2025), ECF 6, ¶ 16. "Such anticipatory suits are disfavored because they are examples of forum shopping." *Z-Line Designs*, 218 F.R.D. at 665 (quoting *Alaris Med. Sys. v. Filtertek, Inc.,* 64 U.S.P.Q.2d 1955 (S.D. Cal. 2001) (citing *Mission Ins. Co. v. Puritan Fashions Corp.,* 706 F.2d 599, 602 n. 3 (5th Cir. 1983))).

33

The Court remains skeptical of this seeming attempt to deprive future plaintiffs of their conventional choice of forum and timing. *Z-Line Designs*, 218 F.R.D. at 665 (internal citation omitted). The Court determines that transfer based on the first-to-file rule would be inappropriate in this case.

**IT IS ORDERED** that the State of Wyoming's Motion to Dismiss or, in the Alternative, to Sever and Transfer (Doc. 18) is **DENIED**.

**IT IS FURTHER ORDERED** that Federal Defendants' Motion to Transfer (Doc. 22) is **DENIED**.

DATED this 24th day of July, 2026.

Brian Morris, Chief District Judge
United States District Court